---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

No. 23-1604

---

ROBERT M. MILLER,

*Plaintiff-Appellant,*

v.

MERRICK V. GARLAND, et al.

*Defendants-Appellees.*

---

## APPELLANT'S INFORMAL OPENING BRIEF

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA

---

Robert M. Miller, Ph.D.
*Pro se*
4094 Majestic Ln, #278
Fairfax, VA  22033
(415) 596-2444

Civ. A. No. 1:23-CV-00195-RDA-JFA

## **CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES**

### A. **Parties**

Robert M. Miller is the Appellant-Plaintiff and moving party for the district court decision under review by the court.

Merrick B. Garland is the Attorney General of the United States.

Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

### B. **Ruling Under Review**

The ruling under review is the Order of the U.S. District Court for the Eastern District of Virginia, in *Miller v. Garland, et al.,* 1:23-cv-00195-RFA-JFA, filed on May 26, 2023. ECF 31.[1] The District Court denied Miller's *Application for a Nationwide Temporary Restraining Order and a Preliminary and Permanent Injunction*, filed on August 12, 2022. ECF 7-2.

### C. **Related Cases**

There are no related cases.

---

[1] References to docket entries in the district court are denoted as ECF ##.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES........................i

    A. Parties.............................................................................................i

    B. Ruling Under Review.....................................................................i

    C. Related Cases ................................................................................i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTION........................................................................................1

AGENCY RULE AT ISSUE IN THE APPEAL ......................................1

ISSUES PRESENTED ..............................................................................2

STATEMENT OF THE CASE ..................................................................3

    A. Facts Relevant to the Issues ..........................................................3

    B. Procedural History .......................................................................10

SUMMARY OF THE ARGUMENT ........................................................13

ARGUMENT ...........................................................................................15

    I.    STANDARDS OF REVIEW ....................................................15

    II.   INTRODUCTION ....................................................................16

    III. MILLER'S CONTENTIONS AND REASONS FOR THEM ....................21

    A. The Rule's Definitional Factors Are Unconstitutionally Vague..................21

    B. ATF's Regulatory Analysis Was Fatally Deficient ......................................24

        1. Agency Did Not Articulate A Significant Problem Requiring Regulation ................................................25

        2. Agency's Analysis of Rule Benefits Was Non-Existent............................27

3.  Defendants Were Required to Obey Executive Orders 12866 and 13563 31

C.  The Rule's Effective Date Violated the CRA and APA ...............................38

a.  The Rule is a Legislative Rule .................................................... 38

b.  The Rule's Immediate Effective Date Was Unlawful ............. 43

D.  The District Court Failed to Apply the Rule of Lenity .................................47

E.  The Rule, NFA, and GCA Violate the Second Amendment ........................50

CONCLUSION ...........................................................................................54

RELIEF SOUGHT ......................................................................................54

ORAL HEARING REQUESTED..........................................................................55

CERTIFICATE OF COMPLIANCE

CORPORATE DISCLOSURE STATEMENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*American Farm Lines v. Black Ball Freight Service, et al.*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) ............................................................................33

*Andrews v. U.S.,* No. 04-7269, at *1 (4th Cir. Jan. 25, 2006) ................................44

*Angiotech Pharm. Inc. v. Lee*, 191 F. Supp. 3d 509, 515 n.11 (E.D. Va. 2016) .....33

*Blackhawk Industries Products Group Unlimited LLC v. United States General Services Administration*, 348 F. Supp. 2d 662 (E.D. Va. 2004) ...........................1

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) .......................................................................29

*Bristol Univ. v. Accrediting Council for Indep. Colls.*, No. 16-1637, at *9 (4th Cir. June 9, 2017) ........................................................................................................33

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962).............................29

*Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).............38

*Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133 (D.C. Cir. 2005) 25, 33

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council. Inc.*, 467 U.S. 837 (1984) ...........40

*Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979) ........................................40

*Chula Vista City School District v. Bennett*, 824 F.2d 1573, 1582 (Fed. Cir. 1987) ................................................................................................................................38

*City of Fredericksburg, Va. v. F.E.R.C*, 876 F.2d 1109, 1112 (4th Cir. 1989).......37

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987)......................................................1

*Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012)

...................................................................................................................25, 33

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ..............................49, 50

*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ......................................50

*Encino Motorcars, LLC v. Navarro*, ⸻ U.S. ⸻, 136 S.Ct. 2117, 2125, 195

L.Ed.2d 382 (2016) ...........................................................................................29

*F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537, 129 S.Ct. 1800, 173 L.Ed.2d

738 (2009) .........................................................................................................25

*General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1562 (D.C. 1984).............39

*Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952) ..........................39

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)........................................25

*Guedes v. ATF*, 920 F.3d at 19, judgement entered, 762 F.App'x 7 (D.C. Cir 2019)

...................................................................................................................41

*Hope Natural Gas Company v. The West Virginia Turnpike Commission*, 143 W.

Va. 913, 105 S.E.2d 630........................................................................................51

*Int'l Refugee Assistance Project, Inc. v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017)

.....................................................................................................................1

*Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Commission*, 874 F.2d 205, 207 (4th Cir. 1989) .............................................................................38

*Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297 (4th Cir. 2018) ...........................29

*Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1375 (Fed. Cir. 2002) .........45

*Miller v. McWilliams*, 1:22-cv-03035-CJN (D.D.C.)...................................................i

*Mock v. Garland*, No. 23-10319 (5th Cir, Aug. 1, 2023)........................................39

*Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29 (1983) ..29

*Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008).................................................33

*Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) .................45

*Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761, 762 (9th Cir. 1937) .............................................................................................51

*National Latino Media Coalition v. Federal Communications Commission*, 816 F.2d 785, 788 (D.C. Cir. 1987)...........................................................................39

*National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 184 (D.D.C. 1948) ...........................................................................................................51

*National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 185 (D.D.C. 1948) ...........................................................................................................51

*Natural Resources Defense Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020).....39

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (June 23, 2022)...49

*Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360 (D.D.C. 2017) ........................................................................................34

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) ....................................39

*Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209 (D.C. Cir. 2004).25, 33

*QinetiQ US Holdings, Inc. v. Comm'r of Internal Revenue*, 845 F.3d 555, 559 (4th Cir. 2017) ........................................................................38

*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)....................................40

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018) .........42

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)...33

*Skidmore v. Swift Co.*, 323 U.S. 134 (1944)............................................................37

*Southern California Edison Co. v. Federal Energy Regulatory Commission*, 770 F.2d 779, 783 (9th Cir. 1985)...............................................................39

*Southern California Edison*, 770 F.2d at 783; *General Motors Corp.*, 742 F.2d at 1565 ..........................................................................................39

*Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1482 (4th Cir. 1996) ....................44

*Strickland v. United States*, 32 F.4th 311, 368 (4th Cir. 2022) ..............................25

United States v. Brewer, 533 F. App'x 234, 238 (4th Cir. 2013)............................25

*United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ..................................................................................42

## STATUTES

18 U.S.C. § 921 ...............................................................................47, 48

18 U.S.C. § 926 .......................................................................................41

26 U.S.C. § 7801 .....................................................................................41

26 U.S.C. § 7805 .....................................................................................41

28 U.S.C. § 599A .....................................................................................41

28 U.S.C. §1291 ........................................................................................1

28 U.S.C. §1292 ........................................................................................1

5 U.S.C. § 702 ...........................................................................................1

Administrative Procedure Act ............................................................2, 43

Congressional Review Act ..................................................................2, 43

Gun Control Act of 1968 ...........................................................................2

Gun Control Act of 1968, Pub. L. 90-618 ..........................................5, 47

Gun Control Act of 1968, Pub. L. 90-618 ..............................................48

National Firearms Act of 1934, Pub. L. 73-474 ..................2, 3, 4, 28, 34

Small Business Regulatory Enforcement Fairness Act ...........................11

Unfunded Mandates Reform Act .............................................................11

Volstead Act ..............................................................................................3

## OTHER AUTHORITIES

Executive Order 12866 .............................................................................31

Executive Order 13563................................................................................31

Office of Management and Budget Circular A-4.............................................31, 32

## REGULATIONS

27 C.F.R. § 478 ........................................................................................2

27 C.F.R. § 479 ........................................................................................2

27 C.F.R. 478.11 .....................................................................................48

27 C.F.R. 479.11 .....................................................................................48

*Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514 ...................................35

*Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 ....................................................................................35

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478 .............................................................................1

## APPELLANT'S INFORMAL OPENING BRIEF

## JURISDICTION

The district court has jurisdiction to review, hold unlawful, and set aside final agency rules under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 5 U.S.C. § 702 ; *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)." *Int'l Refugee Assistance Project, Inc. v. Trump*, 241 F. Supp. 3d 539, 551 (D. Md. 2017); *Blackhawk Industries Products Group Unlimited LLC v. United States General Services Administration*, 348 F. Supp. 2d 662, 670 (E.D. Va. 2004).

This Court has appellate authority under 28 U.S.C. § 1291. The district court denied Miller's motion for a preliminary and permanent injunction on May 26, 2023. Miller timely filed his notice of appeal on June 1, 2023. ECF 32. This appeal is from a denial of a preliminary injunction that is immediately reviewable. 28 U.S.C. §§ 1292(a)(1).

## AGENCY RULE AT ISSUE IN THE APPEAL

Appellant's *Verified Complaint* ("*Complaint*"), ECF 1, challenges Defendants' final rule ("Rule") *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478, amending the Code of Federal

Regulations, Title 27, Parts 478 and 479, published in the federal register and immediately effective on January 31, 2023.

The Rule classified stabilizing arm braces attached to pistols as short-barreled rifles ("SBR") subject to regulation under the National Firearms Act of 1934 ("NFA" or "Title II"). Pistols are normally regulated under the Gun Control Act of 1968 ("GCA" or "Title I"). Stabilizing arm braces are designed to facilitate the firing of a pistol with one hand, particularly for but not limited to disabled persons.

## ISSUES PRESENTED

1. Whether the district court abused its discretion in finding that Appellant was not likely to succeed on the merits.

2. Whether the Rule is a legislative rule subject to requirements of the Congressional Review Act ("CRA") and Administrative Procedure Act ("APA").

3. Whether Defendants' Rule demonstrated a need for rulemaking at the federal level.

4. Whether Defendants proved the Rule was appropriate through a sufficient cost-benefit analysis.

5. Whether the Rule violates the Second Amendment of the United States Constitution.

6. Whether the Rule is arbitrary, capricious, void for vagueness, and subject to the Rule of Lenity.

## STATEMENT OF THE CASE

### A. Facts Relevant to the Issues

From 1917 to 1919, Congress proposed and a sufficient number of states ratified the Eighteenth Amendment to the United States Constitution, which permitted Congress and the several states to prohibit the sale of certain alcoholic beverages. Congress passed the enabling Volstead Act, effective in January 1920.

During this period known as "Prohibition," organized criminal syndicates unlawfully met the nation's demand for alcoholic beverages. As the thousands of criminal gangs at the time vied for control of territory, a wave of violence swept over the nation. America's homicide rate rose from 6.8 per 100,000 population to 9.7 in 1933. For perspective, this was twice the homicide rate of 4.9 in 2015.

On December 5, 1933, a sufficient number of states ratified the Twenty-First Amendment, ending Prohibition, and Congress repealed the Volstead Act. Crime immediately began to subside as the profits from illegal liquor dried up.

In 1934, Congress enacted the National Firearms Act of 1934, largely adopting a draft written by the Department of Justice. The draft initially proposed taxation and regulation of handguns, machineguns, and short-barreled shotguns. The proposed regulation of handguns was dropped because Congress found such a provision would be highly unpopular. Congress added short-barreled rifles to its NFA regulation based on Congressman Knutson's mistaken belief that doing so

would protect rifle hunters in his state from the law. In fact, adding the SBR provision put his constituents at greater risk of legal liability. NFA hearings provided no evidence or argument that short-barreled rifles were any more dangerous than longer barreled rifles. The AG made conclusory claims that short-barreled shotguns ("SBS") were among the most dangerous weapons.

The NFA did not ban regulated firearms, but rather imposed a prohibitive tax of $200 explicitly designed to price those guns out of the market. For example, the NFA tax was a 100% tax on machineguns and a 40,000% tax on silencers. The NFA also added requirements for fingerprints, criminal background checks, and approval.

The NFA and GCA also restricted the transportation of NFA regulated firearms across state lines based on the gangster tactic of fleeing the jurisdiction of pursuing law enforcement.

At hearings for the NFA, the Attorney General argued that he did not expect criminals to pay the NFA tax and register their regulated firearms, and they would "get" the criminals not for violent crimes, but for failure to pay the tax. AG testified that he never intended to enforce the NFA against law-abiding citizens.

From 1931 to 1958, the U.S. homicide rate fell below pre-Prohibition levels to about 4.3 per 100,000 in 1958. Homicides rose again from 1958 to 1968, largely caused by the trafficking of illegal drugs.

On October 22, 1968, the president signed the Gun Control Act of 1968, which was largely motivated by the assassinations of John F. Kennedy, Robert Kennedy, and Martin Luther King, Jr., none of which were committed with NFA-regulated firearms. Despite the GCA, homicide rates continued to rise to a peak of 10.2 per 100,000 in 1980, but fell to about 7.9 in 1984. The homicide rate rose again to 9.4 by 1990 before falling at or near 5.0 from 2009 to 2019.

The semiautomatic AR-15 rifle ("Armalite Rifle") was introduced by Colt in 1963, distinguishing itself from the fully-automatic machineguns used by the U.S. military (the M-16). The AR-15 harnesses the recoil from firing a round with a buffer spring inside a buffer tube (a.k.a. receiver extension). The spring returns the gun into battery after stripping a new round from the top of the magazine and loading it into the chamber. Thus, the buffer tube and spring is an integral part of the operating mechanism of an AR-15. At some point, manufacturers of AR-15s sold "pistols" with barrels shorter than 16 inches and no stock; adding a stock would indisputably make the pistol into an SBR. Defendants still regulate AR-15 pistols as pistols, not rifles, because the statutory definitions of a "rifle" includes being designed to fire from the shoulder.

Other popular rifles do not require a buffer tube and spring since the recoil mechanism is housed within the receivers. These guns include the AK-47 rifle and

its variants and many Sig Sauer rifle variants. Like AR-15s, these rifles also have pistol variants regulated under Title I by Defendants.

In 2012, a manufacturer developed a stabilizing arm brace ("brace") that attached to the buffer tube of an AR-15 pistol. The brace could be strapped around the arm of a shooter to facilitate firing the pistol with one hand – the statutory definition of a pistol. Defendants repeatedly issued determinations that braces did not convert pistols into short-barreled rifles.

Defendants vacillated over the ensuing years, reversing their prior determination by concluding that if a shooter places a braced pistol against his shoulder, this constitutes redesigning the pistol to be fired from the shoulder. Defendants reversed that determination again, stating that incidental contact with the shoulder would not be making an SBR. Defendants determined that a brace was only an unlawful SBR if (1) the brace could not be used as a brace; (2) the brace could only be used as a stock; and (3) the brace was actually used as a stock. Therefore, users could avoid all legal liability as long as the brace could be strapped around their arms to facilitate one-handed firing.

The legal status of braced pistols not being SBRs remained intact until 2021 when a change in presidential administrations caused a reevaluation. Defendants reversed their determinations again, issuing warnings and directives to various manufacturers that their pistols were actually Title II SBRs. One such manufacturer

was Q, L.L.C. for its Honey Badger pistol – an AR-15 style firearm in 300 Blackout caliber with a barrel length of seven inches. Defendants concluded that the brace on this firearm had sufficient surface area to be considered a stock, even though the brace could still be used as a brace with one hand.

Defendants issued a short-lived guidance proposal to regulate braced pistols as SBRs that was withdrawn on December 31, 2020. 85 FR 82516 (December 18, 2020). On June 10, 2021, Defendants issued a Notice of Proposed Rulemaking ("NPR") under notice and comment procedures to reclassify braced pistols as SBRs. The Rule proposed an elaborate points system for determining whether a braced pistol was, in fact, designed as an SBR. Commenters argued that the system was arbitrary, capricious, vague, and several categories of points were duplicative.

Defendants published the final rule in the Federal Register on January 31, 2023. Most of the Defendants' arguments remained intact, but the Rule abandoned the point system in favor of a seven component test. The first purported "objective" factor was the existence of some degree of surface area behind the receiver of a gun that would enable shouldering the weapon. The Rule did not state the amount of surface area that would surpass this threshold, but only argued that an implement such as a spike would certainly not be a stock.

The second factor was the weight of the firearm. The Rule opined that if a firearm was too light to make a brace necessary or too heavy to use the weapon with

one hand, then the brace would "objectively" be useful only as a stock. The Rule presented a table of common rifle weights for comparison, but it did not state how it would determine from a particular gun's weight whether it fell under the category of a rifle weight.

The third factor is length of pull ("LOP"), which is measured by the distance between a shooter's shoulder and the trigger. The Rule opines that if the LOP is too long, then the brace cannot be used as a brace but only as a stock. The Rule designated 13.5 inches as a threshold of LOP based on an *average* of many common rifles, but it provided no evidence of testing or evaluation of whether a shooter could still use a brace with a LOP longer than 13.5 inches. The Rule did not take into account and categorically rejected comments about the length of a person's arm or finger making braces usable beyond 13.5 inch LOP.

The fourth factor involves the use of sights or scopes with limited eye relief that would make a firearm unusable with a brace around the forearm and only usable as a stock. That is, the ocular lens of the scope is too far away from the eye to see the reticle on the target. The Rule presented no testing or evaluation to determine whether a scope could be effectively used outside of its optimal eye relief range. The Rule did not consider that a shooter could use alternative aiming devices, such as lasers, with the brace attached to his arm. The Rule did not consider that scopes can be used at optimal eye placement without shouldering the brace.

The fifth factor was the necessity of any rearward attachment for the cycle of operations of the gun. The Rule opined that if the gun had its recoil mechanism inside the receiver, such as an AK-47 or Sig Sauer 550 series, no protrusion was needed and thus attaching a buffer tube with brace is evidence of the intent to use it as a stock. The Rule did not consider that even if a buffer tube was not necessary, a shooter might need such an extension to use a brace as a brace.

The sixth factor the Rule considers is marketing and promotion materials. The Rule concludes that if manufacturers market a braced pistol as being able to be fired from the shoulder, that indicates the gun is an SBR. As evidence, the Rule presents marketing materials that were instigated by the Agency's own determinations that shouldering a brace did not convert the braced pistol to an SBR.

The seventh factor was "likely use by the community." As evidence, the Rule provided links to YouTube videos of a handful of people using braced pistols as stocks. In the final rule, however, Defendants categorically rejected arguments that particular individual's uses of braces as braces did not affect their classification.

Defendant's Rule relied on only a handful of criminal incidents involving braced pistols from 2012 to 2020, including shootings in Boulder, CO and Dayton, OH that killed a total of nineteen people. For perspective, that is an average of only 2.4 deaths per year and 0.01% of the 148,972 homicides during those years. Even if

homicides using braced pistols were underestimated by a factor of 100, they would represent a miniscule proportion of U.S. homicides.

Nothing in the NPR provided any evidence that the shooters put the braces against their shoulders, much less that the braces were the but-for cause of those deaths. In total, Defendants identified only 104 federal criminal classifications of braced pistols used in crimes, and 63 braced pistols having been *traced* in criminal investigations – a total of only 169 incidents of *potentially* using a braced pistol in crimes. Rule at 6499. Assuming that each of these incidents involved a unique braced pistol, this means that less than 0.0056% of brace pistols have been identified as being used in crimes. *Application* at 14. As a percentage of the *billions* of lawful uses of braced pistols, the incidence of criminal uses vanishes to nearly zero. *Id.*

The Rule made conclusory claims to benefits for public safety without any monetization or quantification of those benefits, it failed to explain *why* benefits could not be monetized or quantified, and it provided no explanation about how purported Rule benefits would flow from the Rule's provisions.

**B. <u>Procedural History</u>**

On June 10, 2021, Defendants promulgated a Notice of Proposed Rulemaking ("NPRM") regulating stabilizing arm braces on firearms. The Rule was open for public comment for 90 days until September 8, 2021.

On January 31, 2023, Defendants issued a final rule *Factoring Criteria for Firearms With Attached 'Stabilizing Braces,'* RIN 1140-AA55, 88 FR 6478, amending the Code of Federal Regulations, Title 27, Parts 478 and 479 ("Rule").

Appellant filed his *Verified Complaint for Declaratory and Injunctive Relief* ("*Complaint*") on February 13, 2023, laying out facts as if by affidavit. ECF 1. The *Complaint* contained seven claims. Claim One sought to hold unlawful and set aside the Rule as violating the Administrative Procedure Act, the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), the Congressional Review Act ("CRA"), and the Unfunded Mandates Reform Act ("UMRA") in that the Rule failed to conduct a sufficient regulatory analysis including cost-benefit analysis, and because the Rule's immediate effective date was unlawful. Claim Two alleged the Rule violates the Second Amendment to the United States Constitution. Claim Three alleged that the Gun Control Act's restrictions on transporting certain regulated firearms across state lines violates the Second Amendment. Claim Four alleged that the NFA's, GCA's and Rules requirement to register his lawfully owned firearms violates his Fourth Amendment rights. Claim Five challenged Defendants' interpretation that making an SBR from a foreign-made pistol violates federal law. Claim Six alleges that the Rule, NFA, and GCA deprive Appellant of liberty and property without due process of law. Claim Seven alleges that the Rule imposes *ex*

*post facto* liability on Appellant from the purchase or making of braced firearms and SBRs.

Appellant filed his *Application for a Nationwide Temporary Restraining Order and a Preliminary and Permanent Injunction* ("*Application*") on March 13, 2023. The *Application* did not seek immediate redress on all Appellant's claims, nor did it assert all manners of attack alleged in the *Complaint*.

On March 16, 2023, Defendants opposed the motion for a restraining order and requested more time to respond to the *Application*.

On March 17, 2023, the district court denied the *pro se* Appellant's motion for a CM/ECF password to file electronically in the case.

On March 20, 2023, Appellant replied to Defendants' opposition to the TRO.

The District Court did not rule on Appellant's motion for a temporary restraining order.

On April 4, 2023, Defendants' opposed Appellant's *Application*. On April 10, 2023, Appellant replied to the opposition.

The district court held an oral hearing on April 12, 2023. At the conclusion of the hearing, the presiding judge stated he expected to have a decision within ten days.

On May 2, 2023, Appellant apprised the court of a decision in the Southern District of Illinois striking down that state's regulation of braced pistols. ECF 28. Defendants responded to that notice on May 4, 2023. ECF 29.

On May 26, 2023, Appellant notified the district court of a decision by the Fifth Circuit to preliminarily enjoin the Agency's Rule pending appeal.

On May 26, 2023 – forty-four days after the hearing – the district court issued a Memorandum Opinion and Order ("*Order*") denying the preliminary and permanent injunction in their entirety. Appellant did not receive notice of the *Order* by CM/ECF until Monday, May 29, 2023 – a federal holiday. The Rule's enforcement began two days later on June 1, 2023.

The district court granted Appellant's motion to stay all proceedings in district court pending the outcome of his appeal. ECF 40.

Appellant timely noticed this appeal on June 1, 2023. This Court granted Appellant an extension of time until August 29, 2023 for Appellant to file his informal opening brief. This brief is timely filed on that date.

## **SUMMARY OF THE ARGUMENT**

The district court abused its discretion numerous times in denying Appellant's *Application* for a temporary restraining order, preliminary injunction, and permanent injunction.

Appellant proved that the Agency failed in its burden under the APA to demonstrate that the Rule was necessary to solve a significant problem requiring action at the federal level.

Appellant proved the Rule made mere conclusory claims of benefits without any monetization, quantification, and without explaining the causal chain of benefits from the Rule's provisions. Far from being "imperfect," as the district court claims, the Rule's analysis of benefits was non-existent.

The district court erred in finding that the Rule is an interpretative rule when, in fact, it is a legislative rule. As a legislative rule, Defendants violated the Congressional Review Act and the Administrative Procedure Act by having the Rule become effective upon its publication date in the Federal Register. The district court accepted the Agency's frivolous argument that it complied with those statutes because of the deferred enforcement date.

The district court failed to properly apply the Rule of Lenity because braced pistols arguably fall within the statutory definitions of both a "pistol" and a "rifle," and thus the court was obliged to interpret the NFA and GCA such that millions of people do not become instant felons as a consequence of the Rule.

The district court failed to discern that the Rule's determinative factors are so vague, arbitrary, and measureless that no one could possibly determine whether weapons they possess violate the NFA and GCA.

14

Appellant proved that weapons he owns that Defendants explicitly consider SBRs do not satisfy most of the factors cited in the Rule.

The district court erred by not concluding that the Rule, the NFA, and the GCA violate the Second Amendment to the United States Constitution. Appellant showed that braced pistols and SBRs are bearable arms presumptively protected by the Second Amendment, that they are not dangerous and unusual, and that there exists no history of regulating such weapons to the Founding era when the Second Amendment was written.

## ARGUMENT

## I.  STANDARDS OF REVIEW

"The dictates of the Administrative Procedure Act ("APA") govern our standard of review on appeal. Pursuant to the APA, a reviewing court must "set aside agency action, findings, and conclusions" when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review de novo a district court's evaluation of agency action, as to questions of both law and fact. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009)." *West Virginia Dept. of Health v. Sebelius*, 649 F.3d 217, 222 (4th Cir. 2011).

This court reviews the denial of preliminary and permanent injunctions for abuse of discretion. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016).

In evaluating the district court's decision, this Court reviews factual findings for clear error and assess legal conclusions de novo. *Fusaro v. Cogen*, 930 F.3d 241, 248 (4th Cir. 2019); *Cecil v. Large*, No. 19-7211, at *2 (4th Cir. Apr. 27, 2020).

## II. <u>INTRODUCTION</u>

Congress is empowered by the U.S. Constitution "To make all laws that are necessary and proper for carrying into Execution the foregoing powers." U.S. Const. Art. I, Sec. 8, Cl. 18. Courts have regularly held that, subject only to constitutional infirmities, all acts of Congress are assumed to be necessary and proper. In other words, Congress may freely enact laws where costs outweigh the benefits.

Not so for federal agency rulemaking. Under the limited delegation of Congressional powers, agencies are required under the Administrative Procedure Act and well-established law to ensure that all regulations are "necessary and appropriate." An agency rule is necessary when the agency demonstrates *with evidence* that regulation at the federal level is the best way to resolve a problem it has identified. This implies that agencies must actually identify an existing or imminent problem, not merely create irrational fears with political rhetoric or for ulterior purposes. The problem identified must also be *significant*, not merely an

isolated nuisance or part of ordinary travails of human interaction, even if those involve loss of life. Try as it might, government has never eradicated death or murder, and attempting to do so is a fool's errand.

An agency rule is "appropriate" only when an agency proves that the provisions of the rule: (1) solve the problem identified; (2) that the benefits of the rule outweigh its costs; and (3) there are no lesser burdensome but nonetheless effective alternatives. Agencies are required to determine whether regulation is better left to Congress. They must also consider whether the problems can best be solved by state, local, or tribal regulation.

Every federal agency at least tries to meet these requirements. The Environmental Protection Agency, the Occupational Health and Safety Administration, and the Department of Transportation regularly promulgate rules with elaborate cost-benefit analyses carefully estimating the marginal number of lives that would be saved by their rules and monetizing those benefits using the Value of a Statistical Life ("VSL"). Such transparent analyses give the public and any reviewing court assurances that the rules create or save more social welfare than they destroy.

Defendants think they are exempt from such diligence. For at least the third major rule in a row, Defendants simply waved their hands in the air and claimed benefits to "public safety" without demonstrating the existence of a significant

problem, how "public safety" flows from rule provisions, and whether the massive costs it imposes on the regulated industry and citizens are justified by lives saved and injuries averted.

While a president can order agencies to engage in rulemaking, a president may not command agencies to ignore their duties and obligations under the APA. Presidents are often impulsive, irrational, politically motivated, and driven by public fear or concern over shocking one-off or periodic events. Federal agencies, on the other hand, must engage in deliberate, evidence-based, objective, rational decisionmaking. Agencies cannot exceed their statutory authority, nor may they violate the U.S. Constitution. Sometimes, agencies must break the bad news to the president that the regulations he desires are not lawful or cost effective. When agencies fail to do so, courts must say in a loud voice what the agencies lacked the courage to say.

The Rule at issue attempts to solve a virtually non-existent problem – the use of pistols bearing stabilizing arm braces in crimes. The rule has nearly zero benefits because using braced pistols in crimes is exceedingly rare, and mere *use* of the brace does not establish that the brace was the but-for cause of the total damages. That is, the rule may only claim credit for the *marginal* damages caused by the brace, holding all other deadly features and uses constant. To the extent there are any benefits, they are greatly exceeded by Rule costs. Yet even in claiming dubious qualitative

benefits, the public and the courts are left guessing *how* the rule produces the purported benefits. The Agency merely expects the courts to take their word for it in a speculative, chasmic leap of causation. The decision of the district court effectively eliminates the Agency's entire analytical burden – a very dangerous precedent giving agencies free reign to impose massive regulatory costs for effusive, conclusory claims the world will become a better place.

The Rule also violates the Second Amendment to the United States Constitution. Recent Supreme Court precedent has made clear that the Second Amendment presumptively protects the rights of law-abiding citizens to carry all bearable arms unless there exists a historical record to the Founding of regulating such weapons. Regulated weapons must be *extraordinarily* dangerous and unusual, not merely capable of causing the damage that are common to all weapons. Appellant demonstrated that braced pistols and short barreled rifles are in common use for lawful purposes, that they are *less* dangerous than longer-barreled counterparts, and that there is no history of regulating such weapons until the National Firearms Act of 1934. Recent Supreme Court precedent imposes a duty on all courts to reevaluate all prior laws regulating firearms and all legal precedent upholding them, which Appellant asked the district court to do in this case.

The Rule's so-called "objective" factors are anything but objective. The Rule does not provide any objective measurements by which an ordinary citizen could

determine whether his braced pistol is actually an SBR. The Rule's factors are arbitrary; Agency relies on factors that Congress did not intend for it to consider. The agency's conclusions from these factors are *non sequitur* because they are not dispositive of whether the braced pistol can be used with one hand or must be used from the shoulder. Appellant ably showed with evidence from his own firearms that he can and does use the brace on his braced pistols with one hand exactly as they were intended. Appellant even demonstrated that a firearm he owns that Defendants expressly consider an SBR does not meet any of the Rule's factors. The Agency all but admits in the Rule that determining whether a particular firearm is an SBR is idiosyncratic and can only be determined by first-hand observation of individual weapons by the Agency itself. This is unconstitutionally vague and overbroad.

The district court also failed to properly consider the Rule of Lenity. Because a braced pistol could arguably fit into the statutory definitions of both a pistol and a rifle, the court was required to interpret the statute in a manner that does not make millions of people into instant felons. Applying this to *Chevron Deference*, the Agency's interpretation is not a permissible construction of the statute.

The district court erroneously concluded that the Rule is an interpretative, not a legislative rule, notwithstanding decades of well-established law cited by Appellant. As a legislative rule, Defendants indisputably violated the Congressional Review Act and Administrative Procedure Act with an effective date immediately

upon its publication date. Agency's reliance on the deferred enforcement date is inconsistent with the plain language of both statutes, and it defeats Congressional intent. Nonetheless, Appellant demonstrated the Rule had many adverse effects on its publication date and before.

Because Appellant demonstrated the Rule is unlawful and violates the Second Amendment, this Court should reverse the decision of the district court, permanently enjoin the Rule nationally, and remand the case to the district court with instructions so that other issues in the complaint may proceed to trial.

## III.  <u>MILLER'S CONTENTIONS AND REASONS FOR THEM</u>

The district court's order addressed only the first element of a preliminary injunction: likelihood of success on the merits. Appellant's *Application* carried all four elements for preliminary injunctive and declaratory relief.

But Appellant also sought a permanent injunction, adjudicated under the summary judgment standards. Because there are no genuine disputes of material fact and Appellant is entitled to judgment as a matter of law, this Court may reach a final disposition on the agency Rule without remand.

## A. <u>The Rule's Definitional Factors Are Unconstitutionally Vague</u>

Appellant's *Application* went into great detail in each of the factors the Agency used to "objectively" determine that a braced pistol is an SBR. *Application* at 21—23. None of these factors are included in the statutory definitions of a pistol,

21

rifle, or SBR. Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

Plaintiff proved that all of these factors are completely arbitrary because none of them indicate to the exclusion of all other uses that a braced pistol will, or is likely to, be used against the shoulder as a stock. Furthermore, the Agency's failure to provide any measurements for the factors deprives law abiding citizens of the means to determine whether their particular braced pistol violates the law.

The Rule does not explain how much surface area there must be to past the first gateway factor.

The Rule does not provide a minimum weight to determine whether the gun is too light to need a brace, and it does not provide a maximum weight to determine whether a gun is too heavy to use a brace.

While the Agency provides a rough threshold of 13.5 inches for length of pull beyond which the weapon is a rifle, the Agency's one-size-fits-all standard fails to account for people with longer and shorter arms and fingers. The Rule also does not

specify how length of pull will be measures (from where to where, straight or diagonal).

The Rule does not define eye relief, how it will be measured, or how much loss of scope function would be necessary to conclude the scope is unusable unless it is place against the shoulder.

The Rule does not explain why the lack of necessity for a rearward protrusion has any bearing on whether a braced pistol is designed to be fired from the shoulder.

The Rule relies on "marketing materials" which an ordinary person could not possibly discern nor read the Agency's mind about these purely subjective judgments. To add insult to injury, manufacturers started marketing braced pistols as being able to be fired from the shoulder *because* of the Agency's classifications.

The Rule relies on "likely use by the community" which has no bearing on how any particular person can or use his own firearm, and is an entirely subjective Agency judgment.

Worst of all, the Agency relies on all these factors in *combination*, making it impossible for anyone to discern whether their particular firearm offends the statute. The determination of whether any particular weapon is an SBR is entirely idiosyncratic, and entirely subjective.

Using his own Q Honey Badger pistol with a brace, which Defendants expressly declare in the Rule is an SBR, Appellant demonstrated that none of

Defendants' criteria implies the firearm was "designed to be fired from the shoulder." *Application* at 24. Appellant can hold and fire his fully loaded 9.14-pound Honey Badger using only one hand and the stabilizing brace. Appellant could fire his Honey Badger using the attached bipod without placing the brace against his shoulder. Appellant could still see a crystal-clear reticle on his scope – with an eye relief of only 3.5 inches – with his eye more than 20 inches from the ocular lens.

The district court abused its discretion in holding that "While Plaintiff's argument that ATF could have used clearer and more precise language has some merit, the law does not require perfect clarity and precise guidance." *Order* at 20. It would be impossible for anyone reading the Rule to conform their conduct to the factors given by the Agency without any definitions, measurements, or methods of measurement. A law is unconstitutionally vague if it does not "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); United States v. Brewer, 533 F. App'x 234, 238 (4th Cir. 2013).

**B. ATF's Regulatory Analysis Was Fatally Deficient**

It has been well-settled for decades that agencies are required to consider the policy effects of their rules, including the benefits, costs, and the expected impact of the rule on competitiveness, innovation, prices, costs, international trade, and other factors laid out in statute, regulation, and executive orders. That costs or benefits are

difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers," and "[o]ne of those constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); *Strickland v. United States*, 32 F.4th 311, 368 (4th Cir. 2022).

For purposes of this appeal, but without waiving such arguments on remand, Appellant will forego discussion of the Rule's analysis of costs and alternative regulatory approaches raised in his *Application* and focus on the Agency's analysis of Rule benefits.

1. Agency Did Not Articulate A Significant Problem Requiring Regulation

The Agency's identification of need and the benefits of the Rule was not data driven, but motivated by an executive order in the aftermath of a shooting. While

Presidents may order agencies to commence rulemaking, no president may order agencies to ignore the requirements of the APA.

Defendants relied on a mere handful of anecdotes of instances where braced pistols were somehow associated with crimes. Two shootings *involving* braced pistols over a ten year period does not indicate braced pistols are ravaging the nation with death and destruction worthy of federal regulation. Nothing in the Rule provides any evidence those shooters concealed the braced pistols or placed them against their shoulders. Even if they did, the Rule does not discern how doing so incrementally impacted the outcome of the shootings. At best, the connection between braced pistols and those tragic 19 deaths is speculative.

Meanwhile, the Rule burdens the rights of *millions* of law-abiding gun owners with *billions* of lawful uses of braced pistols. It burdens every manufacturer, wholesaler, and retailer of pistols and braces.

Nor did the Agency demonstrate a need for regulation from the 169 total incidents involving braced pistols over those ten years, constituting less than 0.006% of the low estimate of 3 million braced pistols.

The district court accepted the Agency's argument that "the requirement of empirical data to enforce the statue would render the statute itself a 'nullity.' *Order* at 9. This is a ridiculous argument. As stated in the Introduction, Congress may enact statutes in which costs heavily outweigh benefits, but Agencies are not permitted to

make such rules. The entire point of the APA is that agencies must make rules based on the best available evidence.

2. Agency's Analysis of Rule Benefits Was Non-Existent.

Appellant, a Senior Financial Economist who conducts regulatory analysis for rulemaking for a federal bank regulator, presented detailed evidence of how Defendants utterly failed to demonstrate rule benefits, which consisted of mere conclusory statements. *Application* at 13—15.

The district court's *Order* made the understatement of the year, "While Defendants' regulatory analysis may have room for improvement, the law does not require perfection." *Order* at 9. Defendants' analysis of benefits was not merely imperfect, but completely non-existent and a mockery of their statutory duties.

The Rule's sole claims to benefits are: "— to prevent manufacturers and individuals from circumventing the requirements of the NFA; — to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders." Rule at 6572.

"Preventing the circumvention of a statute" is not any kind of "benefit" Appellant has ever seen in any rule in all his years of regulatory analysis. Benefits are defined in economics as the increase in satisfaction received from undertaking a certain action. Benefits are objectively measured in manners such as revenue generated, well-being enhanced, options expanded, costs saved, damages reduced,

27

risks reduced, or liberty expanded. Agency's ephemeral desire to enforce a statute is not an economic benefit of the kind contemplated in the APA. This Court will not find any other rule from any agency in any circumstance where enforcing a statute is a non-quantified benefit of the rule. But if this Court allows such nonsense, they will become commonplace, reducing agency burdens to mere empty platitudes.

Nor is "enhancing public safety" a well-stated benefit for regulatory purposes. *How* is public safety being enhanced by the Rule? Agencies typically measure such benefits in terms of lives saved, injuries averted, and damages reduced. See, e.g.,

The Rule does not explain how any of the Rule provisions will lead to enhanced public safety. While Congress can make illustrious proclamations of benefits in a statute, often unproven and undelivered, Agencies do not have such luxury. Agencies are required to *prove* the existence of benefits, or at least the likelihood of them, to survive a court challenge. The district court has turned the Agency's duties under the APA into a circus act, undermining controlling precedent.

Courts invalidate rules failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection' between the facts found and the choice made." *Motor Veh. Manu.  Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, ––– U.S. ––––, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). An agency can satisfy that requirement by providing an explanation with enough clarity that its "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297 (4th Cir. 2018).

The Rule did not even attempt to monetize or quantify these benefits, and the Rule did not state why Defendants could not do so. Only after Miller challenged the non-existent benefit analysis in court did Defendants – through counsel – argue that "it is sufficient for the agency to 'exercise [its] professional judgment' to determine the importance of 'non-quantified benefits . . . in the context of the overall analysis.'" Dkt. 22 at 18 (citing OMB, Circular A-4 at 2)." *Order* at 10. Arguments of counsel are never evidence, and not even Agency counsel's wing and a prayer explains why benefits could not be quantified. If the Agency had an argument to be made that benefits could not be monetized or quantified, the place to do so was in the rule itself so the public would have the opportunity to respond.

The Agency's argument and the district court's accession to it are a mockery of the Agency's burden to demonstrate rule benefits, with a rare exception of

analytical impossibility not present in the instant case swallowing the rule of a requisite diligent analysis.

Appellant's *Application* demonstrated that monetizing and quantifying rule benefits was possible, and the Agency simply refused to do so because it would show **the rule has no benefits at all**. Criminal incidents with braced pistols are virtually non-existent – a mere 169 known or suspected criminal incidents out of **billions** of lawful uses of brace pistols. Even in the **two** known instances where braced pistols were used in homicides, the Agency failed to present any evidence that the perpetrators concealed their braced pistols or placed them against their shoulders.[2]

Nor can the Agency relinquish its duties or the district court absolve them merely because Congress has empowered the Agency to enforce the NFA. Literally every agency in every rule enforces some statutory mandate, yet none of them are relieved from the responsibility to show that its specific actions in a particular rule have benefits exceeding the costs. The *Order*'s reference to authorities holding as such related to circumstances where Congress expressly directed a particular action. In the instant case, Congress never told the Agency to treat braced pistols as SBRs.

---

[2] Defendants misrepresented factual evidence in the Rule, citing newspaper articles to prove the proposition shooters used braces against their shoulders, which could not be found in the cited articles.

3.  <u>Defendants Were Required to Obey Executive Orders 12866 and 13563</u>

In demonstrating that the Agency's cost-benefit analysis was severely deficient, Appellant made use of Office of Management and Budget ("OMB") Circular A-4 and Executive Order 12866.[3] *Application* at 10—11, 13—14; Exh. 8. Defendants misrepresented and the district court misapprehended the role these documents played in Appellant's arguments.

Defendants cited inapposite authorities stating that violating OMB Circular A-4 and Executive Orders 12866 and 13563 do not provide standing or state a claim upon which relief may be granted. *Opposition* at 22; *Order* at 8—9. But Appellant's standing to sue and his right to relief did not rely on violations of those documents. Appellant's standing and right to relief were based on injury in fact directly attributable to the Rule, and a favorable ruling from the court would redress all harm. *Application* at 5—7. Appellant also proved prudential standing because his interest in his firearms and their uses falls within the zone of interest of the NFA and GCA.

The utility of OMB Circular A-4 is that it provides the strongest guidance to regulatory agencies of what constitutes an adequate analysis of policy effects. Appellant never argued that any violations of Circular A-4 would dispose of the Rule. Instead, he made the much more modest argument that the Circular provided

---

[3] Executive Order 13563 is also applicable.

31

the district court – presumably without an advanced economic background – the benchmarks necessary to assess the substance of the Agency's analysis. Certainly, other courts that have found agency regulatory analyses wanting did more than simply check to see if the agency mentioned costs, benefits and alternatives. Those courts applied some standard for determining whether the agencies diligently met their burdens under the APA to prove a rule is necessary and appropriate.

> This Circular provides the Office of Management and Budget's (OMB's) guidance to Federal agencies on the development of regulatory analysis as required under Section 6(a)(3)(c) of Executive Order 12866, "Regulatory Planning and Review," the Regulatory Right-to-Know Act, and a variety of related authorities. The Circular also provides guidance to agencies on the regulatory accounting statements that are required under the Regulatory Right-to-Know Act.

OMB Circular A-4 at 1.

At the very least when examining Agency rules, courts may look to OMB Circular A-4 with deferential respect. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ("[T]he rulings, interpretations and opinions of an agency may constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). *Angiotech Pharm. Inc. v. Lee*, 191 F. Supp. 3d 509, 515 n.11 (E.D. Va. 2016).

It is well-settled that agencies are required to follow their own rules, regulations, and internal policies. *American Farm Lines v. Black Ball Freight Service, et al.*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970); *Nader v. Blair*,

549 F.3d 953, 962 (4th Cir. 2008). *Bristol Univ. v. Accrediting Council for Indep. Colls.*, No. 16-1637, at *9 (4th Cir. June 9, 2017). It is eminently reasonable for courts to demand that agencies also obey executive orders concerning rulemaking.

Without the guidance provided by OMB Circular A-4 and Executive Order 12866 and others, agencies and courts would be rudderless in determining what is expected in regulatory analyses. It certainly is not the case that

That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

The Rule's sole claims to benefits are: "(1) to prevent manufacturers and individuals from circumventing the requirements of the NFA; (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders." The first purported benefit begs the question, i.e., asserting what Defendants have a duty to prove – that braced pistols are SBRs, and that making braced pistols is designing an SBR. The mere desire to enforce a statute, without more, does not satisfy the Agency's burden to prove substantial

benefits. The Rule did not articulate 'at least a general grasp of the rule's benefits."
*Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). How many lives lost, or injuries would the Rule prevent by stopping people from circumventing the NFA? Defendants do not even attempt to estimate this. The second purported benefit is merely a restatement of the first benefit, and it does not attempt to explain how the Rule will reduce criminal use of NFA firearms.

Defendants provided only a handful of anecdotes about crimes involving braced pistols including shootings in Dayton and Boulder, 104 Federal criminal classifications of braced pistols used in crimes, and 63 firearms with braces having been traced in criminal investigations – a total of only 169 incidents *potentially* using a braced pistol in crimes. Rule at 6499. With ***billions*** of lawful uses of braced pistols from 2012 to the present, and only a few hundred known incidents of crimes with braced pistols, the incidence of crime with braced pistols as a share of braced pistol ownership and uses is close to zero. One-hundred sixty-nine criminal uses of braced pistols divided by 3 million braced pistols means only 0.006% of braced pistols have ever been used in crimes. Even if such crimes were underestimated by a factor of 100, only 0.6% of brace pistol owners will have committed crimes with them.

For the third consecutive rulemaking involving gun rights, Defendants claim substantial benefits for public safety without any monetization or quantification. See also *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-

AA54, 87 FR 24652 and *Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514. Defendants could have, but did not, monetize the benefits of the Rule. To do so, Defendants would estimate the current number of criminal uses of braced pistols, explain in detail how the Rule would cause the reduction in crime, and estimate the post-regulatory number of criminal uses, fatalities, or injuries. Then, the Agency would estimate the *value of a statistical life* ("VSL") and the expected value of firearm injuries with SBRs.

In all three rules, Defendants claimed there were *negative externalities* from the criminal use of firearms or devices the Agency sought to regulate. See, e.g., NPRM at 30845, 86 FR 27738, 87 FR 24715, 83 FR 66544. A negative externality is the adverse economic effect that the production or consumption of a good has on third parties who are neither the buyer nor seller of the good. The third parties receive no payment for the damages caused to them. An example of a production externality is the pollution from a factory that damages local residents. An example of a consumption externality is the adverse effects of second-hand cigarette smoke. For the *Bump-Stock* rule and the *Receiver* rule, Plaintiff submitted public comments demonstrating that there are no negative externalities from the criminal use of bump stocks or unmarked firearm receivers and, if there were they would be extremely small; the regulatory ban on bump stocks and unmarked receivers destroyed more social welfare than they saved (i.e., negative net benefits). Based on Plaintiff's

comments, Defendants withdrew their reliance on negative externalities in both the *Receiver* rule and the *Brace* rule. See Rule at 6559. ("The Department agrees that there may be confusion about ATF's statement regarding the externality of the rule; therefore, the final regulatory analysis does not discuss externalities.") There was no confusion on the part of the public. Defendants deceived the public with highfalutin language to posit a market failure in their rules, and they got caught red-handed by professional economists. By withdrawing their reliance on the presence of negative externalities, Defendants literally withdrew the entire economic basis for their rule. Thus, the Rule fails to completely analyze the economic effects and fails the cost-benefit analysis.

In support of Appellant's argument that the agency analysis was deficient, Appellant turned to OMB Circular A-4, which provides detailed guidance to federal agencies on how to conduct a proper regulatory analysis. Appellant also pointed to Executive Orders 12866 and 13563, which command federal agencies to promulgate regulations within certain principles and the guidance of OMB Circular A-4.

Defendants dragged a red herring before the district court, which the court chased, by citing inapposite precedent relating to plaintiffs who tried to use departures from A-4 and executive orders to establish standing and to state a claim. *Order* at 8-9. Miller did no such thing in the instant case, establishing his right to relief as a person adversely affected by the Rule. What Miller did was use A-4 and

36

executive orders to demonstrate how far Defendants strayed from a reasonably diligent analysis.

To the extent that any of those authorities have any applicability, they must be overturned or modified. It is well-settled in law that agencies are required to follow their own regulations. *City of Fredericksburg, Va. v. F.E.R.C*, 876 F.2d 1109, 1112 (4th Cir. 1989). Certainly an executive order to an agency regarding regulatory analysis constitutes a binding agency policy for compliance with the APA. To hold otherwise would be to reduce OMB's guidance and presidential orders to a nullity.

Courts generally review an agency rule based on the record and without additional expert testimony to inform the court of such deficiencies. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); *QinetiQ US Holdings, Inc. v. Comm'r of Internal Revenue*, 845 F.3d 555, 559 (4th Cir. 2017).[4]

Yet courts have not hesitated to strike down agency rules with defective cost-benefit analyses far more expansive than the Rule at issue here.

---

[4] Miller intends to move in the district court to allow his expert testimony at trial as reasonably necessary to a decision, based upon the complex economic issues involved in the analysis.

C. **The Rule's Effective Date Violated the CRA and APA**

a. The Rule is a Legislative Rule

Defendants proffered a sanctionably frivolous argument, and the district court blindly accepted, that the Rule is interpretative, not legislative. The law of what constitutes interpretative and legislative rules has long been settled, Appellant ably cited sufficient authorities in his arguments, and the district court abused its discretion with its erroneous conclusion.

Interpretative rules merely "state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Commission*, 874 F.2d 205, 207 (4th Cir. 1989), citing *Chula Vista City School District v. Bennett*, 824 F.2d 1573, 1582 (Fed. Cir. 1987); *Southern California Edison Co. v. Federal Energy Regulatory Commission*, 770 F.2d 779, 783 (9th Cir. 1985); *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1562 (D.C. 1984); *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952).

"In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties." *Id.*, citing *National Latino Media Coalition v. Federal Communications Commission*, 816 F.2d 785, 788 (D.C. Cir. 1987); *Southern California Edison*, 770 F.2d at 783; *General Motors Corp.*, 742 F.2d at 1565.

"A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up).

Considering a challenge to the same Rule, the Fifth Circuit had no difficulty discerning the obvious: that the Rule is legislative. "Legislative rules are ones with the force and effect of law, while interpretive rules advise the public of the agency's construction of the statutes and rules which it administers. As a result, a court is not required to give effect to an interpretive regulation. Only legislative rules must go through notice and comment rulemaking." *Mock v. Garland*, No. 23-10319 (5th Cir, Aug. 1, 2023) at 23; citing *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)); *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

The Fifth Circuit laid out a five-part test based on longstanding precedent to determine whether the agency intended to speak with the force of law: (1) the language actually used by the agency; (2) whether the agency published its rule in the Code of Federal Regulations; (3) whether the agency explicitly invoked its

general legislative authority; (4) whether the agency claimed *Chevron Deference*;[5] and (5) whether the rule will produce significant effects on private interests. *Mock* at 26.

For factor 1, the Rule issued unambiguous directives to regulated parties, set deadlines for compliance, and threatened criminal liability for noncompliance. The Fifth Circuit flatly rejected Defendants' sophistic contention that the *statutes* impose criminal liability, not the Rule. *Mock* at 25, n. 41. But for the Rule, Defendants would not enforce the provisions of the NFA and GCA against owners or manufacturers of braced pistols. The proof of the pudding is also in the tasting: because of the Rule, hundreds of thousands of braced pistol owners registered their firearms as SBRs under the Rule's tax-exempt provisions prior to the enforcement date.

Considering factor 2, the Rule explicitly modified 27 C.F.R. §§ 478.11, 479.11, weighing in favor of a finding it is a legislative rule. See Rule at 6480. "Publication in the C.F.R. is limited to rules having general applicability and legal effect." *Mock* (cleaned up) citing 44 U.S.C. § 1510. "[A]mendments to [C.F.R. provisions] would be highly unusual for a mere interpretative rule." *Guedes v. ATF*, 920 F.3d at 19, judgement entered, 762 F.App'x 7 (D.C. Cir 2019)(per curiam).

---

[5] Referring to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council. Inc.*, 467 U.S. 837 (1984).

The Rule obviously satisfies factor 3 in that it explicitly invoked its general rulemaking authority:

> The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended,[10] and Congress has included provisions in these statutes that authorize the Attorney General to promulgate regulations as are necessary to enforce the provisions of the GCA and NFA. See 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).[11] Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. See 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)– (2); T.D. Order No. 221(2)(a), (d), Establishment, Organization, and Functions, 37 FR 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations to implement the GCA and NFA. See 27 CFR parts 478, 479.

88 FR 6481.

For factor 4, the agency did not claim *Chevron Deference*, but as this Court and others have observed, an agency cannot waive *Chevron Deference* merely to avoid thorny issues of whether the statute was silent or ambiguous, or whether the agency's interpretations are permissible. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018). The court must independently decide whether *Chevron* is applicable, and whether deference is afforded by *Chevron* or a lesser form of deference. *Id*. "Only an agency interpretation that carries the force of law is *Chevron*-eligible." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th

Cir. 2018), citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

Finally, factor 5 is met because the Rule imposes enormous burdens on private interests. The Rule imposes, by its own estimates, The Rule at issue changed the agency's longstanding interpretation of the NFA and GCA that braced pistols are not SBRs at the whim of a presidential administration hostile to any and all gun rights. Immediately on the effective date of the Rule, Appellant and millions of other persons became instant felons, possessing unregistered SBRs. The Rule laid out elaborate options for compliance with timelines including registering the braced pistols, removing the braces, installing a barrel sixteen inches or longer, and destroying or surrendering the whole firearms. On the effective date, Appellant could no longer carry his braced pistols across state lines without requesting permission from Defendants on an ATF Form 20. Appellant could not sell his braced pistols without paying the $200 NFA tax, and the buyer could not take possession of the braced pistol without undergoing an approximate 9-month wait for an FBI background check and for the transfer application to be approved. Manufacturers and retailers largely immediately ceased commerce in braced pistols, which now required NFA compliance beginning immediately on the effective date of the Rule.

While not dispositive, Defendants could identify only one instance in which an interpretative agency rule went through notice and comment rulemaking. *Mock* at 27, n. 44.

Every factor courts have applied in determining whether a rule is legislative or interpretative point in the direction that the Rule at issue is legislative. Agency attorneys advanced a wholly frivolous contention that the Rule was interpretative merely because it interprets the NFA and GCA and without considering longstanding precedent going back to at least 1979. The district court plainly abused its discretion by dismissing Appellant's contention so casually.

b.  The Rule's Immediate Effective Date Was Unlawful

Agency's Rule became effective on the date it was published in the Federal Register. Rule at 6487. The district court relied on Agency's specious argument that because the Rule had an enforcement date after its published effective date, the immediate effective date did not offend either the CRA or APA. *Order* at 14. This holding cannot be reconciled with the plain language of the statutes, even after considering another circuit's precedent proffered by the Agency.

Title 5, United States Code, Pub. L. 89-554 (1966), 80 Stat. 383—384, requires that "The required publication or service of a substantive rule shall be made not later than 30 days before its *effective date…*" [emphasis added] with exceptions not present in the instant case. Here, the term "effective date" is unambiguous. The

43

Rule was published in the Federal Register on January 31, 2023, and the Rule states that "This rule is effective January 31, 2023." Because the plain language of the statute is clear, that is the end of the matter. *Andrews v. U.S.,* No. 04-7269, at *1 (4th Cir. Jan. 25, 2006) ("As we have consistently recognized, when statutory language is plain and unambiguous, our inquiry is at its end, and we then simply apply the statute according to its terms. See *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir. 1996) (en banc) ("If the [statutory] language is plain and unambiguous, we look no further.").")

The Congressional Review Act ("CRA"), codified in 5 U.S.C. § 801 et seq., mandates that before a rule can take effect, the Agency must submit to each House of the Congress and to the Comptroller General containing a copy of the rule, a concise general statement relating to the rule including whether it is a major rule; and the proposed effective date of the rule. 5 U.S.C. § 801(a)(1). A "major rule" is defined as any rule that the Office of Information and Regulatory Affairs ("OIRA") of the Office of Management and Budget ("OMB") finds has resulted in or is likely to result in an annual effect on the economy of $100 million or more; a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic or

export markets. 5 U.S.C. § 804(2). The Rule concedes that it is a major rule for CRA purposes. 88 FR 6574.

The Agency's argument, bordering on the frivolous, is that because it chose to *enforce* many of its provisions 120 days after the date of publication, it was not required to comply with the CRA. The Agency's argument, and the district court's holding, fails on multiple accounts.

Agency cited a case, and the district court relied upon, a case from a sister circuit where petitioners were entitled to statutory benefits on the date of publication of an agency rule that was *prior* to its published effective date. *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1375 (Fed. Cir. 2002), amended in part on reh'g, 65 F. App'x 717 (Fed. Cir. 2003); accord *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004). The decision in that case turned entirely on the agency's compliance *with the controlling statute*. *Id.* at 1370. In opposition to the *Application*, the Agency attempts to shoehorn this case into a completely inapposite precedential decision, scurrilously using a decision *against* a federal agency in its own favor.

In the instant case, Congress was well aware in enacting the Congressional Review Act that every agency rule has a published "effective date," putting the public and Congress on notice of when the rule's provisions are expected to take effect. Notably, nothing in the CRA refers to an "enforcement date" as Defendants

and the district court would have this Court believe. The statute does not merely stop at the phrase "Before a rule can take effect." In subsection (a)(1)(A)(iii), the statute explicitly says "effective date." Congress could not have meant something different with the words "take effect" in paragraph (a)(1)(A) and "effective date" in (A)(iii) or (a)(3).

Appellant does not argue that the Federal Circuit's interpretation of the CRA, as applied to the circumstances of *Liesegang* was erroneous. Courts have authority to equitably interpret statutes to effect Congressional intent, and when an agency deprives parties of benefits Congress intended them to have, courts are empowered to more expansively interpret their meanings.

Even if Agency's arguments are correct, Appellant nonetheless demonstrated that several provisions of the Rule had *immediate* effects on him as of the publication date and before. Appellant demonstrated that after January 31, 2023, he was not allowed to transport his braced pistols across state lines because the Agency *immediately* considered them to be SBRs. Similarly, Appellant could not sell his braced pistols as Title I firearms. Instead, he would have to pay the $200 NFA transfer tax, and any buyer of his braced pistols would have to wait approximately nine months, undergo an FBI background check, and submit fingerprints and photographs. Gun dealers had immediate adverse effects in adjusting their records of all braced pistols into SBRs, making them less marketable.

Appellant provided evidence and argument that the Rule had adverse effects on him *before* the publication date. In order to transfer his braced pistols into an NFA trust, the Rule required Appellant to take action *before* January 31, 2023 to put the braced pistols into the ownership of the trust, which Agency did not notify him of until *after* the Rule became effective.

Agency's arguments that the Rule was interpretative and that it was not required to obey the CRA and APA are sanctionably frivolous. The district court abused its discretion in accepting these obviously bogus arguments.

### D. <u>The Mystery Logical Outgrowth Argument</u>

Several times in the *Order* the district court beat a straw man claiming that Appellant advanced the argument that the Final Rule was not a logical outgrowth of the NPRM. While Appellant's *Complaint* mentioned the logical outgrowth test as one possible challenge to the Rule, Appellant's *Application* contained no such argument.

The *Order* reads as if Appellant was advancing an argument from *Mock v. Garland*, and the district court agreed with the district court in that case that the Final Rule was a logical outgrown of the NPRM. Subsequently, however, the Fifth Circuit reversed the district court in *Mock*, holding that the Rule was not a logical outgrowth.

The district court in the instant case misapprehended Appellant's argument concerning the existence of a *negative externality* as positive by the Agency in the

NPRM. Appellant argued that in the Rule as well as the prior *Receiver* and *Bump Stock* rules, the Agency asserted the existence of a negative externality as economic support for the rules' benefits.

As Appellant carefully explained, Defendants withdrew their reliance on negative externalities after Appellant and other commenters challenged its existence and the Agency's evidentiary basis for it. Appellant never argued that this violated the logical outgrowth rule. Rather, he argued that withdrawing the Rule's reliance on negative externalities undercut the Agency's analysis of rule benefits.

In their *Opposition*, Agency argued for its own praise in recognizing its error and removing its undue reliance, showing it was responding to comments. But in so doing, the Agency was admitting that the Rule was not remediating any market failures that normally support agency rulemaking.

The district court abused its discretion in misapprehending the arguments and inferences to be drawn from them.

### E. <u>The District Court Failed to Apply the Rule of Lenity</u>

A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be ***held and fired by the use of a single hand***," and "any combination of parts from which" a handgun "can be assembled." [emphasis added] 18 U.S.C. § 921(a)(30). A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels ***when held***

48

*in one hand* that has both a chamber as an integral part of, or permanently aligned with, the bore and a short stock designed to be gripped by one hand at an angle to and extending below the line of the bore." [emphasis added] *See* 27 C.F.R. 478.11 and 479.11. A rifle is defined by the GCA as "a weapon *designed or redesigned, made or remade, and intended to be fired from the shoulder* and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." [emphasis added] 18 U.S.C. § 921(a)(7).

Defendants misrepresented and the district court failed to properly apply the Rule of Lenity as Appellant described it.

For eight years, the Agency classified braced pistols as pistols, not SBRs, based on the original design of braces to facilitate one-handed firing. Agency arbitrarily and capriciously declared, without any new technical evidence, that braces do not facilitate one-handed firing, but are in fact designed to be fired from the shoulder. Appellant argued that if a braced pistol is designed to fire and can be fired with one hand, and it is also designed to fire and can be fired from the shoulder, the court must apply the Rule of Lenity to conclude that braced pistols are pistols under the statutory definition of the GCA. Put another way, because braced pistols could arguably be defined either as a lawful pistol or an unlawful SBR, the court must interpret the law for the more lenient definition. That was precisely the

conclusion the U.S. Supreme Court reached when considering a firearm that could be made into a pistol, a rifle, or an SBR. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 511 (1992). The mere possibility that a braced pistol can be placed against the shoulder does not convert it into an SBR.

The district court abused its discretion by failing to reach this straightforward conclusion. If the innovation of braced pistols eludes the classifications set in statute or cannot be cleanly put into one category or another, it is not for the agency to choose the category imposing greater criminal liability; that is the job of Congress.

## F. <u>The Rule, NFA, and GCA Violate the Second Amendment</u>

The U.S. Supreme Court has held that the Second Amendment to the United States Constitution presumptively protects an individual right to keep and bear arms for self-defense. *New York State Rifle & Pistol Assn., Inc. v. Bruen* ("*Bruen*"), No. 20-843, at *1 (June 23, 2022). "[T]o justify a firearm regulation, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id.* "The Second Amendment is the very product of interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to us arms for self-defense. *Id.*, citing *District of Columbia et al. v. Heller* ("*Heller*"), 554 U.S. 570, 635 (2008) [internal quotes omitted]. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the

founding." *Bruen* at *24. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller* at 625. The need for armed self-defense is perhaps most acute in the home. *Heller* at 628.

First, it is indisputable that short-barreled rifles and shotguns and braced pistols are bearable arms. *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

Appellant's *Application* next demonstrated that short-barreled weapons were in common use for lawful purposes even before the Founding of the Nation. *Application* at 29. Defendants did not and cannot identify any laws regulating such weapons until the NFA. The best Defendants ever did in any cases were to show that certain laws and ordnances required militiamen to muster with long barreled weapons, but this does not imply that shorter barreled weapons were unlawful. *Id.* Longer barreled weapons were desirable because of their higher muzzle velocity and long reach with an attached bayonet. *Id*.

Appellant also demonstrated that short barreled weapons are not dangerous and unusual. Because their barrels are shorter, projectiles will have lower velocity than identical longer barreled weapons. *Application* at 30. By mere assertion, Defendants attempt in their Rule to shoehorn the "dangerous and unusual" language

in *Bruen* and *Heller* into their basis for concluding SBRs can be lawfully regulated. Rule at 6481.

If Defendants or Congress could declare weapons "dangerous and unusual," they could simply declare that handguns are "dangerous and unusual" and ban the very instruments that *Heller* and *Bruen* said were protected by the Second Amendment. SBRs and SBSs are not dangerous and unusual in the meaning of *Bruen* merely because Congress included them in the NFA. "The Supreme Court has said repeatedly … that the courts must 'determine independently', or some equivalent expression, the facts when constitutional questions of congressional power are presented." *National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 184 (D.D.C. 1948) "Congress has no power, by mere legislative fiat, to create a fact or to change a fact." *Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761, 762 (9th Cir. 1937). "Congress cannot establish its own power by a mere affirmation of fact." *National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 185 (D.D.C. 1948). "It is well settled that a factual reality can not be changed or overcome by mere legislative fiat and that a legislative declaration which is clearly contrary to the actual facts will not be recognized or sanctioned in a judicial proceeding." *Hope Natural Gas Company v. The West Virginia Turnpike Commission*, 143 W. Va. 913, 105 S.E.2d 630.

The district court erred with an inapposite discussion proffered by the Agency about the regulation of firearm silencers. *Order* at 22. The Agency's fallacious argument goes like this:

1. silencers are accessories;

2. silencers can be regulated

3. braces are accessories

4. Therefore, braces can be regulated.

The argument fails first because silencers are *not* accessories but firearms under both the NFA and GCA. Second, the Agency has long admitted that it has no authority to regulate accessories. Third, the issue in this case is not whether braces are accessories, but whether attaching a brace to a pistol converts it to an SBR. Nothing in the case the Agency cited and the court relied upon involved the attachment of a suppressor changing the classification of the host weapon. It is also irrelevant that "the stabilizing brace cannot cause harm on its own" and it "is not useful independent of its attachment to a firearm." *Order* at 22. The only issue before the court was whether a brace added to a pistol designed or redesigned it to be fired from the shoulder. It was with this shoddy argument that the lower court found the Second Amendment inapplicable to braces, yet it is beyond question that adding a brace to a pistol is some sort of firearm, possibly a pistol, possibly an SBR. Thus, the Second Amendment remains in play.

## CONCLUSION

The district court clearly abused its discretion in multiple ways as described above. Only one of Appellant's arguments is necessary to defeat the Rule in question, not merely in a preliminary injunction but for a permanent injunction under Summary Judgment standards.

## RELIEF SOUGHT

This Court should reverse the decision of the district court and remand with instructions to grant the permanent injunction against the Rule because it is arbitrary, capricious, an abuse of discretion; in violation of the APA and CRA; and in violation of the Second Amendment to the United States Constitution.

This Court should declare that Defendants failed to demonstrate regulation of braced pistols at the federal level was necessary, failed to demonstrate the benefits of the Rule exceeded its costs, failed to adequately address alternative regulatory approaches, failed to adequately respond to public comments, and had an unalterably closed mind.

This Court should declare that the Rule, the NFA, and the GCA violate the Second Amendment of the United States Constitution in regulating braced pistols and short barreled rifles because they are bearable arms presumptively protected by that amendment, they are not dangerous and unusual, they are in common use for

lawful purposes, and there exists no historical analogues to the Founding of regulating these weapons.

## **ORAL HEARING REQUESTED**

Appellant, an expert in federal agency analysis for rulemaking, believes oral arguments will aid this Court in fully understanding Defendants' obligations for regulatory analysis under the APA and their failures to meet those obligations. The calculation of Rule benefits involves a nuanced understanding of economics, probability, and statistics that Appellant can explain more clearly in two-way communications with the Court. Appellant, *pro se*, has extensive experience briefing law and facts in administrative and judicial proceedings.

Executed August 29, 2023.                Respectfully submitted,

/S/

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P. 32(g), Appellant certifies that this petition complies with all the requirements set forth in Fed.R.App.P. and Circuit Rules.

Appellant certifies this motion complies with the type-volume limitations in Circuit Rule 27(d) because it consists of 12,456 words, not including words exempted under Fed.R.App.P. 32(f).

This motion complies with Fed.R.App.P. 27(d)(1)(E) and 32(a)(5)—(6) because it uses proportionally-spaced, 14-point, Times New Roman font, double spaced on 8 ½ by 11-inch paper with one-inch margins on all four sides.

Executed August 29, 2023                Respectfully submitted,


/S/ _____

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 35(c), Appellant, *pro se*, is a private individual with no parent corporations, affiliates, or publicly held corporations with interest in this case.

Executed August 29, 2023.                    Respectfully submitted,

/s/ _____

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## **CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on August 29, 2023, a copy of the foregoing **APPELLANT'S INFORMAL OPENING BRIEF** was filed by CM/ECF.

I caused a copy of this filing to be served by CM/ECF to:

Sean R. Janda
U.S. DOJ
950 Pennsylvania Ave NW
Room 7260
Washington, DC 20530
(202) 514-3388
Sean.r.Janda@usdoj.gov

Robert M. Miller, *pro se*