No. 23-1604

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

ROBERT MILLER,

Plaintiff-Appellant,

v.

MERRICK B. GARLAND, U.S. Attorney General, U.S. Department of Justice;
STEVEN MICHAEL DETTELBACH, Director, Bureau of Alcohol, Tobacco,
Firearms, and Explosives; BUREAU OF ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Eastern District of Virginia

————————————

**BRIEF FOR APPELLEES**

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

JESSICA D. ABER
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

STATEMENT OF JURISDICTION ...................................................................... 3

STATEMENT OF THE ISSUE ............................................................................. 3

PERTINENT STATUTES AND REGULATIONS.............................................. 3

STATEMENT OF THE CASE .............................................................................. 3

    A.    Statutory and Regulatory Background ....................................... 3

    B.    Procedural History ....................................................................... 11

SUMMARY OF ARGUMENT ............................................................................. 13

STANDARD OF REVIEW.................................................................................... 17

ARGUMENT ........................................................................................................... 17

I.    Plaintiff Cannot Succeed on the Merits ................................................. 18

    A.    Plaintiff's APA Claims Are Not Cognizable............................. 18

    B.    In Any Event, the Rule Properly Interprets the NFA............. 24

    C.    The Rule Is Procedurally Valid .................................................. 33

        1.    The Rule's effective date was lawful................................ 33

        2.    The Rule's analysis was not arbitrary and capricious.................... 34

    D.    Neither the Rule nor the Statute Violates the Second Amendment....... 41

        1.    The text of the Second Amendment is not implicated ................ 41

        2.    Historical tradition confirms that the Rule is lawful .................... 46

II.    Plaintiff Has Not Demonstrated the Equitable Factors Necessary to Support an Injunction ........................................................... 48

      A.    Plaintiff Has Not Shown Irreparable Harm ............................... 48

      B.    The Balance of Equities and Public Interest Weigh Against Injunctive Relief ........................................................... 51

CONCLUSION ........................................................... 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Avail Vapor, LLC v. U.S. FDA,*
    55 F.4th 409 (4th Cir. 2022) ........................................................ 34

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...................................................................... 20

*British Caledonian Airways, Ltd. v. C.A.B.,*
    584 F.2d 982 (D.C. Cir. 1978) ..................................................... 24

*Catawba County v. EPA,*
    571 F.3d 20 (D.C. Cir. 2009) .................................................. 31-32

*Chamber of Commerce v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ..................................................... 35

*Children's Hosp. of the King's Daughters, Inc. v. Azar,*
    896 F.3d 615 (4th Cir. 2018) ................................................. 19, 22

*Cigar Ass'n of Am. v. U.S. FDA,*
    5 F.4th 68 (D.C. Cir. 2021) ......................................................... 37

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ................................................................. 41

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ....................................................... 17

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................16, 41, 42, 42-43, 43, 45, 46

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ................................................................38, 40

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................... 39

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ................................................................. 35, 39

*FTI v. FAA,*
    58 F.4th 230 (5th Cir. 2023) ............................................................ 18

*Guedes v. ATF,*
    920 F.3d 1 (D.C. Cir. 2019) ............................................................. 21

*Health Ins. Ass'n of Am. v. Shalala,*
    23 F.3d 412 (D.C. Cir. 1994) ........................................................... 23

*Helicopter Ass'n Int'l v. FAA,*
    722 F.3d 430 (D.C. Cir. 2013) ......................................................... 36

*Hoctor v. U.S. Dep't of Agric.,*
    82 F.3d 165 (7th Cir. 1996) ............................................................. 23

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ...................................................................... 31, 32

*Investment Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) ..................................................... 12, 40

*Lewis-Mota v. Secretary of Labor,*
    469 F.2d 478 (2d Cir. 1972) ............................................................. 34

*Liesegang v. Secretary of Veterans Affairs,*
    312 F.3d 1368 (Fed. Cir. 2002) ........................................................ 33

*Louisiana v. Biden,*
    No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022) ............... 36

*Maracich v. Spears,*
    570 U.S. 48 (2013) .......................................................................... 30

*MediNatura, Inc. v. FDA,*
    998 F.3d 931 (D.C. Cir. 2021) ......................................................... 51

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ....................................................... 19

*Michigan v. EPA,*
   576 U.S. 743 (2015) ................................................................. 40

*Miller v. Gruenberg,*
   No. 22-5256, 2023 WL 6206247 (D.C. Cir. Sept. 25, 2023) ....................... 50

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ........................................ 14, 20, 21, 24

*Morehouse Enters., LLC v. ATF,*
   78 F.4th 1011 (8th Cir. 2023) ..................................................... 49

*Mowery v. National Geospatial-Intelligence Agency,*
   42 F.4th 428 (4th Cir. 2022) ..................................................... 46

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ...............................16, 41, 45, 46, 47, 48

*New York State Rifle & Pistol Ass'n v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ..................................................... 44

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................. 18

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ...........................................................19, 23, 36

*Posters 'N' Things v. United States,*
   511 U.S. 513 (1994) ............................................................. 27

*Prows v. Department of Justice,*
   938 F.2d 274 (D.C. Cir. 1991) ..................................................... 34

*Rowell v. Andrus,*
   631 F.2d 699 (10th Cir. 1980) ..................................................... 34

*Scotts Co. v. United Indus. Corp.,*
   315 F.3d 264 (4th Cir. 2002) ..................................................... 50

*Sierra Club v. U.S. Dep't of the Interior,*
   899 F.3d 260 (4th Cir. 2018) ..................................................... 35

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ...............................................15, 25, 26

*Staples v. United States,*
   511 U.S. 600 (1994) ........................................................................ 42

*Stilwell v. Office of Thrift Supervision,*
   569 F.3d 514 (D.C. Cir. 2009) ........................................................ 40

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) .......................................................... 18

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ...................................................... 42

*United States v. Freed,*
   401 U.S. 601 (1971) .......................................................................... 4

*United States v. Gavrilovic,*
   551 F.2d 1099 (8th Cir. 1977) ........................................................ 34

*United States v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ................................................... 42

*United States v. Hasson,*
   26 F.4th 610 (4th Cir. 2022) ........................................................... 32

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) .......................................................... 34

*United States v. Miller,*
   307 U.S. 174 (1939) ........................................................................ 42

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) ...................................................... 29

*United States v. Stepp-Zafft,*
   733 F. App'x 327 (8th Cir. 2018) ................................................... 42

*United States v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) ......................................................26, 27

vi

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) ............................................................. 3, 30, 31, 43

*U.S. Dep't of Health & Human Servs. v. FLRA,*
    844 F.2d 1087 (4th Cir. 1988) ................................................. 36

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,*
    435 U.S. 519 (1978) ............................................................. 36

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ............................................................. 31, 32

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ............................................................. 17, 18, 49

**U.S. Constitution:**

    Amend. II ............................................................. 41

**Statutes:**

Administrative Procedure Act:
    5 U.S.C. § 553(d) ............................................................. 33
    5 U.S.C. § 553(d)(2) ............................................................. 33
    5 U.S.C. § 701 *et seq.* ............................................................. 11
    5 U.S.C. § 706 ............................................................. 34

National Firearms Act of 1934,
    26 U.S.C. § 5801 *et seq.* ............................................................. 3
    26 U.S.C. §§ 5811-5812 ............................................................. 4
    26 U.S.C. §§ 5821-5822 ............................................................. 4
    26 U.S.C. § 5841 ............................................................. 1, 4
    26 U.S.C. § 5845 ............................................................. 1
    26 U.S.C. § 5845(a) ............................................................. 46
    26 U.S.C. § 5845(a)(3) ............................................................. 5
    26 U.S.C. § 5845(b) ............................................................. 29
    26 U.S.C. § 5845(c) ............................................................. 1, 4, 14, 24, 28, 29, 37
    26 U.S.C. § 5845(e) ............................................................. 29

26 U.S.C. § 7422 ................................................................ 50
26 U.S.C. § 7801 .................................................................. 4

5 U.S.C. § 801(a)(3) ........................................................... 33

18 U.S.C. § 922(a)(1)(A) .................................................... 50

18 U.S.C. § 922(a)(4) ........................................................... 5

18 U.S.C. § 922(a)(7)-(8) ..................................................... 5

28 U.S.C. § 1292(a)(1) .......................................................... 3

28 U.S.C. § 1331 .................................................................. 3

Ala. Code § 13A-11-63(a) ................................................. 43

Alaska Stat. Ann. § 11.61.200(c) ..................................... 43

Ariz. Rev. Stat. Ann. § 13-3101(B) ................................. 43

Cal. Penal Code:
§ 16590 .............................................................................. 43
§ 33215 .............................................................................. 43

Colo. Rev. Stat. Ann.:
§ 18-12-102(1) .................................................................. 43
§ 18-12-102(3) .................................................................. 43
§ 18-12-102(5) .................................................................. 43

D.C. Code Ann. § 7-2502.02 ............................................ 43

Fla. Stat. Ann. § 790.221(1)-(3) ...................................... 43

Ga. Code Ann.:
§ 16-11-121(4) .................................................................. 43
§ 16-11-122 ....................................................................... 43

Haw. Rev. Stat. Ann. § 134-8 .......................................... 43

Ill. Comp. Stat. Ann.:
  § 24-1(a)(7)(ii) ........................................................................ 43
  § 24-2(c)(7) ............................................................................. 43

Iowa Code Ann. § 724.1C ..................................................... 43

La. Stat. Ann. § 40:1785 ....................................................... 43

Md. Code Ann., Pub. Safety § 5-203 ..................................... 43

Mich. Comp. Laws Ann. § 750.224b ...................................... 43

Mo. Ann. Stat. § 571.020 ...................................................... 43

Mont. Code Ann. § 45-8-340 ................................................ 43

N.C. Gen. Stat. Ann. § 14-288.8 ........................................... 43

N.D. Cent. Code Ann. § 62.1-02-03 ...................................... 43

Neb. Rev. Stat. Ann. § 28-1203 ............................................ 43

Nev. Rev. Stat. Ann. § 202.275 ............................................ 43

N.J. Stat. Ann.:
  § 2C:39-1(o) .......................................................................... 43
  § 2C:39-3(b) .......................................................................... 43

N.Y. Penal Law
  § 265.00(3)(c) ........................................................................ 43
  § 265.00(3)(d) ....................................................................... 43
  § 265.01-b .............................................................................. 43

Ohio Rev. Code Ann. § 2923.17 ........................................... 43

Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E) ........................... 43

Or. Rev. Stat. Ann. § 166.272(1)-(4) .................................... 43

11 R.I. Gen. Laws Ann. § 11-47-8(b) .................................... 43

S.C. Code Ann.
  § 16-23-230 ................................................................. 43
  § 16-23-250 ................................................................. 43

Tex. Penal Code Ann. § 46.05(a)(1)(C) .................................... 43

Va. Code Ann.
  § 18.2-300 .................................................................. 43
  § 18.2-303.1 ................................................................ 43

Wash. Rev. Code Ann. § 9.41.190(4) ...................................... 43

Wis. Stat. Ann. § 941.28(2)-(4) ............................................ 43

## Regulations:

27 C.F.R § 478.11 ............................................................ 23

Exec. Order No. 12,866,
  58 Fed. Reg. 51,735 (Oct. 4, 1993) ...................................... 36

Exec. Order No. 13,563,
  76 Fed. Reg. 3821 (Jan. 21, 2011) ....................................... 36

## Legislative Materials:

H.R. Rep. No. 73-1780 (1934) ............................................... 3

H.R. Rep. No. 83-1337 (1954) .......................................... 3, 42, 51

H.R. Rep. No. 90-1956 (1968) (Conf. Rep.) .............................. 4

S. Rep. No. 73-1444 (1934) ................................................. 3

## Other Authorities:

ATF:
  *Commercially available firearms equipped with a "stabilizing brace"*
    *that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ ...................... 9

*Common weapon platforms with attached 'stabilizing brace'*
   *designs that are short-barreled rifles*, https://perma.cc/GX8K-A4TW ......................... 9

*Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
   *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis*,
   RIN 1140-AA55 (Jan. 2023), https://perma.cc/96PV-KRB9 ................. 10, 38, 39

*Firearms Commerce in the United States: Annual Statistical Update 2021*,
   https://perma.cc/5BMN-LW3Y ................................................................ 43

*PowerPoint Training on Final Rule 2021R-08F*,
   https://perma.cc/W6ZW-8FUL.............................................................. 9

Rev. Rul. 61-45, 1961-1 C.B. 663 (1961) ...................................... 5

Rev. Rul. 61-203, 1961-2 C.B. 224 (1961) .................................... 5

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
   88 Fed. Reg. 6478 (Jan. 31, 2023) ..................1, 2, 5, 6, 7, 8, 9, 10, 19, 21, 23,
                                                     25, 27, 28, 32, 37, 38, 39, 40, 42, 44, 49, 51

OMB, Circular A-4 (2003),
   https://perma.cc/F3AR-RKYP................................................................ 36

**INTRODUCTION**

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as particularly dangerous and unusual weapons. A short-barreled rifle is a rifle—that is, a firearm "designed," "made," and "intended" to be "fired from the shoulder"—with a barrel shorter than 16 inches. 26 U.S.C. § 5845. A typical short-barreled rifle is shown below:



*See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6525 (Jan. 31, 2023) (Rule). It is designed for the user to press the "stock"—the rearward piece—against her shoulder when firing.

In the past decade, some manufacturers have sold firearms with short barrels and with rearward attachments marketed as "stabilizing braces." These manufacturers claim that their firearms are not rifles because they are not designed and intended to be fired from the shoulder. Instead, these manufacturers claim, the stabilizing brace rests against or wraps around a shooter's forearm to assist with one-handed firing. Many braces, however, are virtually indistinguishable from basic stocks:



*See* 88 Fed. Reg. at 6494 (top item equipped with "brace" and bottom equipped with traditional stock).

In response to this evasion of federal law—and resulting confusion among the public—the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued an interpretive rule. The Rule explains that the agency had previously issued individual determinations evaluating whether particular braced firearms constituted short-barreled rifles—with many, though not all, evaluated firearms classified as short-barreled rifles—but that those classifications did not all reflect the same approach and sometimes gave undue weight to the manufacturer's stated intent. The Rule therefore clarifies that whether a braced firearm is designed and intended to be fired from the shoulder within the meaning of the statute does not turn solely on the manufacturer's claimed intent; instead, the standard also focuses on the weapon's features and other evidence. The Rule then sets forth the evidence that ATF will consider when classifying whether any particular firearm equipped with a brace is designed and intended to be shoulder-fired.

Plaintiff, proceeding *pro se*, challenged the Rule and sought preliminary injunctive relief. The district court properly denied that motion, concluding that plaintiff is unlikely to succeed on the merits of any of his myriad claims.

## STATEMENT OF JURISDICTION

The district court denied plaintiff's motion for a preliminary injunction on May 26, 2023. *See* J.A. 159. Plaintiff filed a timely notice of appeal from that denial on May 30, 2023. *See* J.A. 160. The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court properly denied plaintiff's motion for a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

**A.     Statutory and Regulatory Background**

**1.** The National Firearms Act of 1934 (NFA), 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934); S. Rep. No. 73-1444, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality

opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a registration-and-taxation scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). In addition to requirements on importers, manufacturers, and dealers, the statute requires individuals who are not engaged in a firearms business but who nonetheless wish to make an NFA-regulated firearm, such as a short-barreled rifle, to obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, they must describe the firearm; submit identifying information; and pay a $200 tax per firearm. *See id.* And they must register the short-barreled rifle in the National Firearms Registration and Transfer Record. *See id.* § 5841. Finally, to transfer such a firearm, a transferor must go through the same process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

**2.** ATF is responsible for enforcing the NFA's restrictions on short-barreled rifles. *See* 26 U.S.C. § 7801. To properly enforce those restrictions, ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is, as relevant here, a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a

4

barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).[1]

A short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that this stock is often detachable or sold separately as a rearward attachment. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 (1961); ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 (1961).

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they generally have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g.*, *id.* at 6483. Brace manufacturers have generally claimed that a braced firearm is not designed to be fired from the shoulder and, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

---

[1] The Gun Control Act of 1968 also regulates the interstate transport of short-barreled rifles. *See* 18 U.S.C. § 922(a)(4). The Gun Control Act's definitions of "rifle" and "short-barreled rifle" are materially similar to the NFA's. *See id.* § 922(a)(7)-(8).

In many cases, however, firearms with stabilizing braces are designed nearly identically to those with stocks:



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace). And as demonstrated in marketing materials and trade magazines, many firearms equipped with braces are designed and intended to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both braces; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear during this period that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a shoulder-stock" may yield an NFA-regulated short-barreled rifle,

and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492. But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support singlehanded fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6502. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.*, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and inconsistencies and that there was "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide that clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead,

the agency will also consider whether other relevant evidence, such as the firearm's "objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then conveys to the public evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570. Because not all classification letters had followed this approach, the Rule clarifies that those letters are no longer valid and that firearms must be reexamined. *Id.* at 6480.

8

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. And alongside the Rule, the agency published a list of "commercially available firearms" and other "common weapons platforms" as representative examples of firearms that it expected would eventually be classified as short-barreled rifles. *See* ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, <https://perma.cc/BK6C-BRGQ>; ATF, *Common weapon platforms with attached 'stabilizing brace' designs that are short-barreled rifles*, <https://perma.cc/GX8K-A4TW>; ATF, *PowerPoint Training on Final Rule 2021R-08F*, <https://perma.cc/W6ZW-8FUL>.

But the Rule also makes clear that it is possible to design a braced firearm not to be a short-barreled rifle. For example, a braced firearm would not be a rifle if the brace does not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." 88 Fed. Reg. at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

In this way, the Rule provides guidance for the regulated public to comply with the NFA's "requirements on the making and possession of short-barreled rifles." 88 Fed. Reg. at 6481. Because those statutory requirements regulate short-barreled rifles as weapons that "pos[e] a significant danger to the public," *id.*, the regulation—

9

as explained in the Rule and its accompanying regulatory impact analysis—therefore provides two primary benefits: (1) ameliorating confusion among the regulated public and reducing "circumvent[ion]" of the NFA by clarifying which braced weapons the statute regulates; and (2) "enhanc[ing] public safety" by ensuring the effective implementation of Congress's requirements. ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces," Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis*, RIN 1140-AA55, 6 (Jan. 2023) <https://perma.cc/96PV-KRB9>.

The Rule issued on January 31, 2023. *See* 88 Fed. Reg. at 6478. Because the Rule reflects the agency's "understanding of the best interpretation of the statute," it was effective "immediately." *Id.* at 6480. However, "[f]or purposes of the Congressional Review Act," the agency made clear that it would "wait to actually initiate [any] enforcement actions" regarding newly made or transferred braced short-barreled rifles—"for at least 60 days from the publication of the rule." *Id.* at 6481.

In addition, in a further exercise of "enforcement discretion," ATF determined that any current possessor of an unregistered braced short-barreled rifle who submitted a registration by May 31, 2023, could forgo paying the tax and continue to possess the weapon pending approval. *See* 88 Fed. Reg. at 6554, 6480-81. Otherwise, the possessor was required to "remov[e] and replace[] the offending feature[s]," *e.g.*, the short barrel; remove the stabilizing brace "so that it cannot be reattached to the firearm"; or surrender or destroy the firearm by that deadline. *Id.* at 6544.

10

**B.     Procedural History**

Plaintiff Robert Miller, proceeding *pro se*, filed this challenge to the Rule. *See* J.A. 4. The complaint alleges that the Rule contravenes the NFA because it defines "rifle" to include firearms equipped with stabilizing braces and is otherwise void for vagueness because its factors do not give adequate guidance. *See* J.A. 41-44. The complaint further asserts that the Rule violates the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, because it has an immediate effective date and an improper cost-benefit analysis. *See* J.A. 41-44. Finally, plaintiff argues that the Rule violates the Second Amendment on the grounds that the Rule cannot regulate short-barreled rifles. *See* J.A. 44-45.

Shortly after filing the complaint, plaintiff moved for a preliminary injunction. *See* J.A. 56. The district court denied that motion, concluding that plaintiff was not likely to succeed on the merits of any claim. *See* J.A. 159.

First, with respect to plaintiff's statutory claim, the district court explained that it was permissible for an agency to "interpret relevant provisions to ensure efficient and accurate implementation" of statutes and to "provide[] guidance for enforcers." J.A. 116-17. Applying that understanding of the agency's authority, the court explained that "in order to apply the statutory definition" of "rifle" under the NFA, the agency is "necessarily required" to "evaluate objective weapon characteristics, and perhaps conduct to decide whether a particular firearm is subject to the NFA." J.A. 117 (quotation and alteration omitted). In addition, the court concluded that the

considerations identified in the Rule "provide[d] a cognizable standard by which a person can conform their conduct" to the statute, such that the rule was not vague and did not transgress the rule of lenity. *See* J.A. 129.

Next, the district court concluded that the Rule complied with the APA in all respects. *See* J.A. 117-26. With respect to the Rule's effective date, the court concluded that the Rule is an interpretive rule that may properly be immediately effective, because it does "not impose any new legal obligations," "merely attempts to clarify when a weapon is a short-barreled rifle," and simply "provides the public with guidance as to ATF's interpretation of definitions in the" statute. J.A. 124. Further, the court noted that the Rule deferred enforcement for a 60-day period, so it did not transgress any potentially applicable restrictions on its immediate effectiveness. J.A. 123. The court also rejected plaintiff's argument that the agency failed to adequately quantify the Rule's benefits on the grounds that "benefits to public safety are difficult to quantify, and the 'law does not require agencies to measure the immeasurable.'" J.A. 119-20 (quoting *Investment Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013)).

Finally, the district court concluded that the Rule did not violate the Second Amendment for three reasons. First, the court explained that "laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment," and concluded that a stabilizing brace, like a silencer, is only an accessory because it "cannot cause harm on its own, is not useful independent of its

attachment to a firearm, and a firearm remains an effective weapon without a brace."
J.A. 131. Second, the court emphasized that the Rule only required "individuals and
entities to comply with the NFA's statutory requirements," and those taxation-and-
registration requirements, like "fingerprinting and background checks, do not offend
the right to bear arms." J.A. 131-32 (quotation omitted). Third, the court explained
that, in any event, short-barreled rifles are, like short-barreled shotguns, "dangerous
and unusual weapons" unprotected by the Second Amendment. J.A. 133.

## SUMMARY OF ARGUMENT

The Rule is nothing extraordinary: an agency, charged with enforcing a statute,
provided clarification to the public of how it interprets a statutory term in response to
widespread confusion and evasion of statutory constraints. For years, individuals who
wished to possess a short-barreled rifle without complying with the NFA's
requirements simply bought a device marketed as a "stabilizing brace," attached it to a
firearm, and used the resulting combination as a rifle. Manufacturers claimed that
such devices assisted disabled individuals with one-handed firing. But that claim could
not be squared with reality: many devices were not useful for one-handed firing and
served only to permit the shooter to fire from the shoulder. True braced pistols—
which need not be registered under the NFA—were not a dominant part of the
market.

In the face of these market realities and obvious side-stepping of federal law,
ATF issued the Rule challenged here. Although plaintiff urges that the Rule is invalid

13

and the statute unconstitutional, the district court correctly ruled that plaintiff was unlikely to succeed on the merits of those contentions. This Court should affirm.

**I.** The district court correctly concluded that plaintiff had not demonstrated a likelihood of success on the merits.

**A.** Plaintiff's APA claims are not cognizable. The Rule does not change the scope of the statutory provisions at issue, which are the source of the requirements that attach to short-barreled rifles. Thus, the Rule is not final agency action challengeable under the APA, because ATF's decision to articulate for the public its understanding of the statute does not determine any legal rights or impose any legal obligations. And although plaintiff argues that the Rule is legislative, not interpretive, and suggests this Court should adopt the new five-factor test for distinguishing legislative from interpretive rules developed in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), those five factors neither reflect the governing law nor, even if applied, lead to the conclusion that the Rule is legislative.

**B.** Even assuming plaintiff may bring a facial challenge to the Rule, such a challenge cannot succeed. The Rule properly interprets the statute. A weapon constitutes a "rifle" if, as relevant here, it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). In interpreting that provision, the Rule properly clarifies that ATF need not uncritically accept stated intent but may also consider objective evidence of intent. This approach of using objective evidence to "ferret[] out a party's" true intent is a familiar one in the law and has been approved in

14

the context of the NFA specifically. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016). The Rule also properly identifies evidence that ATF believes will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder.

Plaintiff's substantive challenges to the Rule lack merit. Plaintiff's suggestion that ATF violates the statute by articulating what evidence it believes is relevant to the statutory determination is unpersuasive, and plaintiff fails to engage with the Rule's substantial explanation of each identified category of evidence. Moreover, the NFA employs an intent-based standard common throughout the criminal law, and plaintiff identifies no ambiguity in that standard sufficient to trigger the rule of lenity or give rise to vagueness concerns.

**C.** Plaintiff's procedural claims are equally unpersuasive. Although plaintiff takes issue with the Rule's immediate effective date, the APA permits interpretive rules to take immediate effect and the Congressional Review Act is not to the contrary. Regardless, any error on this score would now be harmless because plaintiff does not contend that ATF attempted to enforce the Rule against him during the period before he asserts it could validly take effect.

Nor are plaintiff's attacks on the agency's cost-benefit analysis persuasive. For one, plaintiff identifies no judicially enforceable statutory or other requirement that ATF articulate a need for regulation or quantify benefits. Regardless, ATF properly explained that it was choosing to issue the Rule to provide notice of its interpretation

15

of the NFA, to ameliorate public confusion about the statute, and to ensure the effective implementation of the statutory requirements that Congress has determined are necessary for public safety. And although those benefits are not readily quantified, ATF provided substantial support for its determination that those qualitative benefits support the Rule.

**D.** Finally, the Rule and the NFA comport with the Second Amendment. To begin, the Rule does not implicate "the Second Amendment's plain text." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). The Second Amendment extends only to bearable arms that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). But short-barreled rifles are quintessential "dangerous and unusual" weapons unprotected by the Amendment. *See id.* at 625, 627 (quotation omitted). Moreover, reasonable regulations and licensing regimes on firearm manufacture, sale, and possession do not infringe the Second Amendment.

In any event, the NFA is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Since colonial times, legislatures have routinely exercised their authority to regulate the possession and manufacture of firearms through laws imposing registration, approval, and taxation requirements like the NFA's. That bevy of colonial and State laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Id.* at 2132.

16

**II.** Even if plaintiff could demonstrate a likelihood of success, he would be unable to justify a preliminary injunction.

**A.** Plaintiff cannot establish irreparable harm. His claims of harm are untethered from the Rule, which does not add requirements to the NFA, and the statutory requirements themselves do not impose irreparable harm. He may continue to make and possess short-barreled rifles so long as he complies with the NFA's relatively modest requirements.

**B.** In addition, the balance of equities and the public interest weigh against relief. ATF's previous case-by-case approach to classifying braced weapons led to confusion, regulatory inconsistency, and circumvention of the controls Congress deemed necessary for public safety. The Rule alleviates those problems by providing a clear explanation of ATF's understanding of the statute's application to braced firearms, and any injunction would thus undermine the substantial public interests that the Rule advances.

## STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed for abuse of discretion. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). This Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *See id.*

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff

17

must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff fails to meet his burden at each step.

## I.     Plaintiff Cannot Succeed on the Merits

At the outset, plaintiff brings a scattershot of APA challenges to the Rule's issuance, including claims that the Rule is contrary to law, that the framework it articulates is impermissibly vague, that its effective date was unlawful, and that its regulatory impact analysis was deficient. All of these challenges fail at the threshold, because the Rule is an interpretive rule and is not final agency action subject to APA review. But in any event, each challenge is unpersuasive.

### A.     Plaintiff's APA Claims Are Not Cognizable

**1.** As the district court recognized, *see* J.A. 117, 120, 123-24, 129, the Rule is an interpretive rule: it "clarifies, rather than creates, law." *FTI v. FAA*, 58 F.4th 230, 240 (5th Cir. 2023) (quotation omitted). In issuing the Rule, ATF did not "claim to be exercising authority to itself make positive law." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). The Rule instead articulates ATF's understanding of the best interpretation of the NFA's design-and-intent standard and identifies evidence that ATF thinks will generally be probative of the statutorily required determination of

18

intent. It is therefore a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). In short, the Rule is "merely a clarification or explanation of an *existing statute*," *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (quotation omitted); it "explain[s] something the" NFA "already required," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The Rule thus makes clear that it does not have the independent force and effect of law and that the statute is the source of legal force for any of the NFA's restrictions relating to "rifles." *See*, *e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 ("The revised definition in this final rule clarifies, consistent with the best interpretation of the statutory provision, that firearms with an attached 'stabilizing brace' can possess objective design features that make them 'rifles,' as that term is defined under the NFA[.]"); *id.* at 6501 ("[T]he rule does not create any new law; instead it simply implements the relevant statutes based on the Department's best interpretation of those statutes."). Thus, in any enforcement

19

proceeding, the government could not rely on the Rule to establish whether a weapon is a short-barreled rifle; instead, the adjudicator would apply the statute.

That proper understanding of the Rule makes clear that the relevant portions of the Rule are not final agency action. ATF's articulation of its view of the best understanding of the statute does not itself determine any legal rights or impose any legal obligations, as would be required to demonstrate finality. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Plaintiff has not attempted to demonstrate that the particular braced firearms he possesses or wishes to possess will be classified as "short-barreled rifles" under the Rule but would not be under the correct interpretation of the statute. If plaintiff disagrees with ATF about whether a particular braced firearm he currently owns (or wishes to own) is a short-barreled rifle, the proper course is to seek relief specific to that firearm under the statute, not mount a broadside attack on the Rule.

**2.** Plaintiff contends instead that the Rule is a legislative rule. But plaintiff nowhere disputes the agency's understanding—made clear throughout the Rule—that it intended the Rule to reflect the best interpretation of the statute. Instead, plaintiff suggests (at 39-43) that this Court should employ the five-factor test developed by the Fifth Circuit in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023)—a case where that court incorrectly held that the stabilizing-brace rule is legislative, not interpretive—for distinguishing legislative from interpretive rules. Those "five factors" are: (1) "whether the agency intended to speak with the force of law"; (2) whether the rule was published in the Code of Federal Regulations; (3) whether the agency invoked its

"general legislative authority"; (4) "whether the agency claimed *Chevron* deference"; and (5) whether the rule will "produce significant effects on private interests." *Id.* at 580 (quotations and alteration omitted). And, plaintiff argues, under that test, the Rule is legislative, not interpretive. But plaintiff's arguments are incorrect on all levels.

As an initial matter, the five factors identified in *Mock* are four too many. The key feature that distinguishes interpretive from legislative rules is that "[l]egislative rules result from an agency's exercise of delegated legislative power" and thus "have the force and effect of law," while interpretive rules "are issued by an agency to advise the public of the agency's construction" of a statute. *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019) (per curiam) (quotations omitted). Thus, "[t]o determine whether a rule is legislative or interpretive," the bottom-line question that a court must answer is "whether the agency intended to speak with the force of law." *Id.* at 18 (quotation omitted). Of course, in circumstances where the agency's intent is difficult to discern, courts may reasonably look to additional evidence—including some of the other factors identified in *Mock*—to determine whether the agency in fact intended to speak with the force of law. *See id.* at 18-20. But here, as explained, it is clear from the face of the Rule—and plaintiff does not meaningfully contest—that ATF intended the Rule not to "create any new law" but instead to simply advise the public of the agency's "best interpretation of [the relevant] statutes." 88 Fed. Reg. at 6501. Thus, this Court need go no further than the face of the Rule to conclude that ATF did not intend to speak with the force of law and the Rule is interpretive.

Even if this Court were to believe that factors beyond the agency's intent, like those identified in *Mock*, are relevant to this question, plaintiff provides no persuasive reason to believe the Rule is legislative.

At the outset, plaintiff suggests (at 40) that the Rule is legislative because it assertedly "issued unambiguous directives to regulated parties, set deadlines for compliance, and threatened criminal liability for noncompliance." But although the Rule makes clear that possession of an unregistered short-barreled rifle may subject an individual to criminal penalties, that does not mean that the Rule creates duties that "supplement[]" the NFA. *Children's Hosp. of the King's Daughters, Inc.*, 896 F.3d at 620 (quotation omitted). To the contrary, the criminal penalties in question derive entirely from the NFA. And the agency's decision to exercise its enforcement discretion to permit previous possessors to come into compliance with the statute during a defined period alleviates, rather than imposes, those burdens. Of course, it is entirely permissible for an interpretive rule to advise regulated parties that an agency believes that a statute, including one with criminal penalties, may apply to certain conduct— indeed, that is often the point.

Plaintiff next argues (at 40-41, 43) that the Rule is legislative because it was issued through notice-and-comment, cites the agency's delegated rulemaking authority, and was published in the Code of Federal Regulations. But none of those procedural matters carries much weight. "[T]here is nothing in the [APA] to forbid an agency to use the notice and comment procedure in cases in which it is not *required to*

do so," *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171-72 (7th Cir. 1996), and agencies

are "free to grant additional procedural rights in the exercise of their discretion." *Perez*,

575 U.S. at 102 (quotation omitted); *see also Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d

412, 423 (D.C. Cir. 1994) (publication in Code of Federal Regulations is just a

"snippet of evidence of agency intent"). Particularly in light of preexisting confusion,

ATF's determination to invite and consider the regulated public's views in articulating

its interpretation of the statute—and its determination to more clearly advise the

regulated public of those views by including them in the Code of Federal

Regulations—does not transform the Rule from interpretive to legislative. That is

particularly true here, where the previous regulatory definition of the term "rifle"

amended by the Rule was contained in the Code of Federal Regulations but was no

doubt interpretive, as it merely parroted the statutory definition, *see* 27 C.F.R § 478.11

(effective Aug. 24, 2022). The new definition—contained in the same definitional

section—has the same interpretive status. Nor does plaintiff explain how it is relevant

that the agency correctly stated in the Rule that ATF has authority to issue regulations

administering the NFA, *see* 88 Fed. Reg. at 6481; nothing about that statement reflects

whether the agency was intending to exercise its authority to articulate its views about

what the NFA requires or instead to speak with the force of law.

Finally, plaintiff's argument (at 42) that the Rule is legislative because it

"imposes enormous burdens on private interests" is no more persuasive. Whether a

rule has a "substantial impact" says "little about whether it is legislative rather than

23

interpretive." *Mock*, 75 F.4th at 592 (Higginson, J., dissenting); *see also British Caledonian Airways, Ltd. v. C.A.B.*, 584 F.2d 982, 989 (D.C. Cir. 1978). Of course, many statutes have large economic effects, particularly when evaluated in aggregate across the entire country. As a result, large economic effects may flow from a decision how best to interpret a statute. But that possibility does not undermine the fundamental nature of an interpretive rule as interpreting, rather than making, law.

In any event, plaintiff's argument, which turns on his contention that the Rule substantially altered the agency's "longstanding interpretation of the NFA," Br. 42—overstates the actual change reflected by the Rule. As explained, *see supra* pp. 6-9, before the Rule, the agency had long made clear that braced firearms might constitute short-barreled rifles and had determined that the majority of samples submitted for classification were short-barreled rifles. The Rule thus does not represent a sea change; it instead simply responds to circumvention of the statute and resulting confusion by clarifying that the proper framework for evaluating the design-and-intent standard considers not only the "stated intent" of the manufacturer but also other evidence such as the weapon's design features and marketing materials.

## B.     In Any Event, the Rule Properly Interprets the NFA

**1.** As the district court correctly concluded, the Rule properly interprets the statutory definition of "rifle." Under the NFA, a firearm is a "rifle" if it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The Rule tracks this language: It states that a firearm with a stabilizing brace is a "rifle" when it

24

"provides surface area that allows the weapon to be fired from the shoulder" and other evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569.

Beyond this, the Rule primarily clarifies two features of the design-and-intent inquiry. First, the Rule makes clear that whether a braced firearm is designed and intended to be fired from the shoulder is not properly determined solely by reference to a manufacturer's claimed intent but instead must be determined by evaluating other objective evidence of intent. *See* 88 Fed. Reg. at 6495. Second, the Rule catalogs the sort of evidence that ATF considers probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. *See id.* at 6569-70. And the Rule additionally explains that in evaluating that evidence, the agency must consider "the overall configuration of the firearm"—that is, the entire firearm—and not only the design of any particular stabilizing brace in a vacuum. *Id.* at 6502. Both features of the Rule are consistent with the statute.

**a.** The NFA does not require ATF to uncritically accept a manufacturer's statements about whether its product is designed and intended to be fired from the shoulder, a proposition plaintiff does not seem to dispute, *cf.* Br. 21-24. To the contrary, it is a "very familiar [approach] in the law" to use "objective" evidence to "ferret[] out a party's" true intent, notwithstanding the party's subjective representations about its intent. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016) (collecting cases); *see also* J.A. 117 (explaining that it is appropriate to evaluate

25

"weapon characteristics" to help determine the maker's intent (quotation omitted)).
That approach makes particular sense in the context of the NFA because "it is hard to
believe that Congress intended to invite manufacturers to evade the NFA's carefully
constructed regulatory regime simply by asserting an intended use for a part that
objective evidence" indicates is not "actually" the intended use. *Sig Sauer*, 826 F.3d at
602.

Multiple courts of appeals have therefore held that a product's intended use
may be determined by reference to objective evidence of intent, including evidence of
design features. For example, in *Sig Sauer*, the First Circuit upheld ATF's
determination that a product was a silencer. Although the manufacturer claimed that
the product was "intended for use as a muzzle brake"—that is, a "device that is added
to a gun to reduce recoil"—ATF examined the product and determined, based
primarily on evidence derived from the design of the product, that it was in fact
intended for use only as a silencer. *See Sig Sauer*, 826 F.3d at 600, 602.

Similarly, in *United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996), the Seventh
Circuit affirmed a conviction for possession of an unregistered and unmarked
silencer, in violation of the NFA, based on objective evidence of intent. Although the
defendant in that case testified that "he had designed and manufactured" the item in
question "to be a muzzle break," not a silencer, the court explained that there was
evidence in the record "casting doubt on his professed intentions." *Id.* at 232. The
court thus concluded, based on that evidence, that a jury could reasonably infer that

26

the defendant's "description of the [item] was not credible" and that he had made it "to be a silencer." *Id.*

**b.** ATF also properly identified evidence that will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. In the Rule, ATF identified both evidence related to the design features of the weapon—such as whether the weapon includes certain features useful for firing from the shoulder but not useful for one-handed firing—and more direct evidence, including the way the weapon is marketed and used in the real world. And the Rule's focus on design features and direct evidence is well-supported. As explained, *see supra* pp. 25-27, it has long been established—including specifically in the NFA context—that a product's design may be probative of the question how the product is intended to be used. Likewise, it is equally appropriate for an agency to consider a manufacturer's "marketing materials" and the "likely use of the weapon in the general community" as direct and indirect evidence to test the manufacturer's "stated intent." 88 Fed. Reg. at 6479. "[T]he actual use of the item in the community" may be relevant to whether a product was "primarily intended" for a particular use. *Posters 'N' Things v. United States*, 511 U.S. 513, 519-20 (1994) (quotation omitted).

**2.** In response, plaintiff briefly suggests (at 21-23, 48-50) that the Rule is contrary to the NFA. And he further advances fallback arguments (at 23-24, 48-50) that the Rule may be invalid even if it reflects the best interpretation of the statute. None of those arguments is persuasive.

**a.** At the outset, plaintiff contends (at 21-22) that the Rule contravenes the statute because none of the categories of evidence that it identifies as probative is "included in the statutory definitions." But the statutory definition requires the agency to assess how any particular firearm is designed and intended to be used. *See* 26 U.S.C. § 5845(c). And nowhere does plaintiff dispute the Rule's basic premise that such a design-and-intent inquiry is necessarily a fact-specific inquiry that requires consideration of all relevant evidence. The Rule properly interprets that standard by identifying such evidence to promote regulatory clarity and consistency.

Although plaintiff complains in passing (at 22-23) that some of the categories identified in the Rule are not sufficiently explained, he nowhere develops those arguments or engages with the lengthy explanations contained in the Rule. The Rule contains a substantial explanation related to each identified category, explaining why ATF believes that evidence is probative, *see* 88 Fed. Reg. at 6509-43, and those explanations are backed by both ATF's expertise and common sense. Thus, for example, although plaintiff complains (at 23) that the Rule considers it probative whether a firearm's rearward attachment that permits shouldering is actually "required for the cycle of operations," it is clear (and ATF explained) that the inclusion of an otherwise unnecessary rearward attachment is more likely to indicate that a firearm is designed to be fired from the shoulder than is the inclusion of a necessary attachment. *Id.* at 6512.

28

Plaintiff also suggests (at 48-49) that the Rule is invalid because it does not account for the possibility that a braced firearm might be designed to be fired both one-handed and from the shoulder. In such a circumstance, plaintiff suggests, the Rule might lead to the conclusion that the firearm is a rifle even though it also fits the definition of a "pistol" in the Gun Control Act. But that argument rests on the incorrect premise—repeatedly rejected by courts—that a weapon may be a rifle only if it is designed "to be fired exclusively from the shoulder." *United States v. Rose*, 695 F.2d 1356, 1357-58 (10th Cir. 1982) (collecting cases). Unlike other NFA definitions, the definition of "rifle" does not include any exclusive-intent requirement. *Compare, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" to include "any part designed and intended *solely and exclusively*" for "use in converting a weapon into a machinegun" (emphasis added)), *with id.* § 5845(c) (defining "rifle" to include a weapon "designed," "made," and "intended to be fired from the shoulder"). Thus, if a braced firearm is designed and intended to be fired from the shoulder, it is a rifle, even if it may also be designed to be fired in other ways. And indeed, although the NFA excludes some pistols from its catch-all definition of "any other weapon," *see id.* § 5845(e), the definition of "rifle" and the provision regarding short-barreled rifles at issue in this case make no mention of pistols.

**b.** Plaintiff next contends that even if the Rule comports with the best interpretation of the NFA, concerns regarding the rule of lenity (at 48-50) and the

void-for-vagueness doctrine (at 21-24) render the Rule invalid. Those concerns are misplaced.

First, plaintiff invokes the rule of lenity (at 49-50) to suggest that if a particular braced firearm could arguably be designed both for one-handed firing and for shoulder-firing, then lenity dictates that the firearm is a pistol and not a "rifle." But plaintiff's suggestion fails on all levels. As an initial matter, plaintiff's argument again rests on the incorrect premise that a "rifle" must be exclusively intended to be fired from the shoulder; as explained above, that understanding of the statute is incorrect.

Regardless, plaintiff fails to identify any ambiguity—much less the "grievous ambiguity or uncertainty" required to trigger the rule of lenity, *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotation omitted)—in the relevant statutory language. The statute states that a weapon is a "rifle" if it is "designed" and "intended" to be fired from the shoulder. At most, plaintiff might demonstrate the challenge of applying that intent-based standard to particular facts. But that is not unique to the NFA. Many statutes, including numerous criminal statutes and other provisions of the NFA, govern conduct based on a party's intent. Courts routinely apply those provisions in criminal and civil cases alike, and plaintiff points to no authority to support the remarkable proposition that an inquiry into intent is per se ambiguous and thus prohibited under the rule of lenity.

Plaintiff's single citation in his lenity argument, *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 511 (1992) (plurality opinion), fails to advance his claim.

30

*See* Br. 50. There, the plurality identified an ambiguity in the NFA word "made"—not at issue in this case—as applied to a "pistol and carbine" kit that contained parts that could be used to make a pistol, a short-barreled rifle, *or* a regular rifle. *See* 504 U.S. at 509, 512-13, 518. Given the multiple possible ultimate configurations of the assembled firearm, the plurality applied the rule of lenity to determine that the kit had "not been 'made' into a short-barreled rifle"—at least until the purchaser actually assembled a short-barreled rifle from the components. *Id.* at 517-18. That analysis is unilluminating in this case, which does not involve any dispute about similar statutory language.

Second, for similar reasons, plaintiff's contention (at 22-24) that the Rule is unconstitutionally vague hits wide of the mark. The Rule proceeds from the statute's "comprehensible normative standard"—whether a weapon is intended to be fired from the shoulder. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quotation omitted). Statutory intent standards, which are common in civil and criminal law, have a generally "settled legal meaning[]," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010); *see also Village of Hoffman Estates*, 455 U.S. at 500-01 (rejecting vagueness challenge to "designed for use" standard), and plaintiff points to no authority to suggest that such a focus on design and intent is itself unconstitutionally vague. And, moreover, the Rule—which does no more than interpret the statute—provides additional clarity by "defin[ing] and explain[ing] the criteria" ATF considers relevant to a party's intent. *Catawba County v. EPA*, 571 F.3d

20, 39 (D.C. Cir. 2009) (per curiam). That is more than enough to give a "person of ordinary intelligence fair notice of what is prohibited." *United States v. Hasson*, 26 F.4th 610, 619 (4th Cir. 2022) (quotation omitted).

Nor does this Court address a vagueness claim in a vacuum: a court must "consider whether a statute is vague as applied to the particular facts at issue," because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18-19 (quotation omitted). Plaintiff has not identified any specific braced firearm for which it is unclear how the statute and Rule might apply. To the contrary, the single firearm plaintiff discusses in his brief (at 23-24) is his "Q Honey Badger pistol with a brace." The Rule uses that braced firearm repeatedly as a representative example of a firearm likely to be classified as a short-barreled rifle. *See, e.g.*, 88 Fed. Reg. at 6527, 6529. Plaintiff is not confused about whether the NFA, as interpreted by the Rule, applies to his particular firearm, and his vagueness challenge fails. *See Hasson*, 26 F.4th at 618-19 (discussing the well-settled "rule prohibiting vagueness challenges by those whose conduct a statute clearly prohibits"). And, finally, to the extent plaintiff remains uncertain about how ATF will classify any particular other braced firearm, he may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552. That ability to receive additional clarity "by resort to an administrative process" ameliorates any harm from claimed vagueness. *Hoffman Estates*, 455 U.S. at 498.

### C.      The Rule Is Procedurally Valid

Unable to show any error in the Rule's interpretation of the NFA, plaintiff

identifies (at 24-48) various asserted procedural defects in the agency's issuance of the

Rule. But none persuades.

### 1.      The Rule's effective date was lawful

Plaintiff argues (at 43-47) that the Rule's immediate effective date was unlawful,

both because the APA requires that a legislative rule be published "not less than 30

days before its effective date," 5 U.S.C. § 553(d), and because the Congressional

Review Act (CRA) provides that a "major rule" generally "shall take effect" 60 days

after it is reported to Congress or published in the Federal Register, *id.* § 801(a)(3). As

the district court recognized, *see* J.A. 122-24, plaintiff is incorrect.

As an initial matter, and as plaintiff does not dispute, the APA provides that

"interpretive rules" may be immediately effective. 5 U.S.C. § 553(d)(2). As explained,

*see supra* pp. 18-24, the Rule is interpretive, and its immediate effective date was thus

permissible. And even assuming that the CRA's provision applies to interpretive rules,

that provision "does not change the date on which the regulation becomes effective."

*Liesegang v. Secretary of Veterans Affairs*, 312 F.3d 1368, 1374 (Fed. Cir. 2002). Instead, it

"only affects the date when the rule becomes operative"—that is, the date when "the

agency may enforce" it. *Id.* Here, as explained, *see supra* p. 10, the Rule expressly

provides that ATF will not enforce it for 60 days after publication. As a result, "it

does not run afoul of CRA requirements." J.A. 123.

Regardless, even if the Rule's effective date had violated the APA or the CRA, any such violation would be harmless. *See* 5 U.S.C. § 706; *Avail Vapor, LLC v. U.S. FDA*, 55 F.4th 409, 419 (4th Cir. 2022). Such a violation is not "fatal to the validity of the challenged rule." *Prows v. Department of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991) (per curiam). Instead, the proper remedy is to "deny[] such a rule effectiveness for the mandated 30 days" (APA) or 60 days (CRA) after issuance, "allowing it to take effect in full thereafter." *Id.* at 275 (per curiam) (addressing APA provision); *see Rowell v. Andrus*, 631 F.2d 699, 704 (10th Cir. 1980) (same); *United States v. Gavrilovic*, 551 F.2d 1099, 1106 (8th Cir. 1977) (same); *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2d Cir. 1972) (same). That remedy "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation." *Prows*, 938 F.2d at 276. Because plaintiff does not contend that the agency took any action against him during the 30 or 60 days after the Rule was issued, any error was harmless. *See, e.g., United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011).

### 2.     The Rule's analysis was not arbitrary and capricious

Plaintiff also argues that ATF's Regulatory Impact Analysis was deficient and, thus, the Rule is arbitrary and capricious, because (at 25-27) ATF assertedly failed to identify a problem sufficient to justify regulation at all and because (at 27-37) ATF assertedly did not identify or quantify the Rule's benefits. Those claims fail for threshold reasons, but even were the Court to consider them, the arbitrary-and-

34

capricious standard is "deferential" to the agency, *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018), and simply requires that the agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The Rule comfortably clears that bar.

**a.** As the district court explained, *see* JA 63-64, plaintiff's attempts to take issue with the agency's decision to issue a regulation at all and its quantification of the benefits of the regulation provide no basis for relief. Plaintiff identifies no statutory or otherwise enforceable requirement that ATF "articulate a significant problem requiring regulation," Br. 25 (formatting and capitalization altered), before it issues an interpretive rule. Nor does plaintiff identify any specific "statutory obligation" for ATF to "determine as best it can the economic implications of the rule it has proposed" in quantitative terms. *Id.* (quoting *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005)); *cf. Chamber of Commerce*, 412 F.3d at 142 (explaining that such an obligation existed in that case because the relevant statute provided that the SEC must consider "whether the action will promote efficiency, competition, and capital formation").

Nor can plaintiff invoke (at 31-33) Executive Orders 12,866 and 13,563, or OMB Circular A-4, to provide the necessary enforceable requirements. Those Executive Orders are expressly "intended only to improve the internal management of the Federal Government and do[] not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States[ or] its

agencies." Exec. Order No. 12,866 § 10, 58 Fed. Reg. 51,735, 51,744 (Oct. 4, 1993); *see* Exec. Order No. 13,563 § 1(b), 76 Fed. Reg. 3821, 3821 (Jan. 21, 2011) (similar). OMB Circular A-4 similarly provides only internal "guidance to Federal agencies on the development of regulatory analysis" under Executive Order 12,866. OMB, Circular A-4, at 1 (2003), https://perma.cc/F3AR-RKYP. Compliance with that guidance "is not required by any statute or regulation and is not binding on any agency." *Louisiana v. Biden*, No. 22-30087, 2022 WL 866282, at *1 (5th Cir. Mar. 16, 2022) (per curiam); *see also U.S. Dep't of Health & Human Servs. v. FLRA*, 844 F.2d 1087, 1095 (4th Cir. 1988) (en banc) ("As an arm of the executive branch, OMB may issue Circulars that create no rights enforceable by third parties."). Consistent with those limitations, it is well established that claims based on the bare alleged failure to comply with those internal directives are not subject to judicial review. *See Helicopter Ass'n Int'l v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013).

In the absence of any enforceable requirement to quantify the costs or benefits of a regulation, plaintiff's claims challenging asserted deficiencies in the agency's cost-benefit analysis cannot succeed. To the contrary, Congress has "establish[ed] the maximum procedural requirements" that agencies must adhere to, and "courts lack authority 'to impose upon [an] agency its own notion of which procedures are "best."'" *Perez*, 575 U.S. at 102 (second alteration in original) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 524, 549 (1978)).

36

That an agency's cost-benefit determinations may be reviewable through the usual APA arbitrary-and-capricious framework "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking," *Cigar Ass'n of Am. v. U.S. FDA*, 5 F.4th 68, 76 (D.C. Cir. 2021) (quotation omitted), does not alter the outcome here. Although ATF complied with the Executive Branch's internal directives by preparing and issuing a cost-benefit analysis, the agency ultimately did not justify its decision to adopt the Rule on the basis of perceived economic benefits. *See* 88 Fed. Reg. at 6572-73. Thus, any asserted errors in the articulation of those benefits did not form the basis of the decision to issue the challenged action.

**b.** Regardless, ATF reasonably explained the need to issue the Rule and articulated the benefits of the Rule. To enforce (or comply with) the NFA, ATF and the regulated public are required to determine which firearms are short-barreled rifles. *See* 26 U.S.C. § 5845(c). As explained, in the last decade, ATF has received an increasing number of requests to determine whether specific braced firearms constitute short-barreled rifles. Although ATF initially responded to those requests by providing individual classification letters, ATF came to understand over time that its letters were not always consistent with each other or with the best meaning of the statute. *See supra* pp. 6-9.

Against that backdrop, ATF concluded that its case-by-case "classification determinations had led to confusion," 88 Fed. Reg. at 6494, and that there had developed "an incorrect public perception" that "a firearm equipped with a

'stabilizing brace' never falls within the purview of the NFA," *id.* at 6502. And ATF further came to understand that, as was made "abundantly evident in publications and consumer and marketing material issued by firearms manufacturers," the firearms industry and consumers were widely circumventing the NFA through the "prevalent use of [braced] firearms as rifles." *Id.* at 6503-06.

Thus, ATF issued the Rule to clarify for the public its understanding of how the NFA's definition of "rifle" applies to braced firearms. As the Rule explains, this clarification had a number of benefits, all of which follow from the agency's attempt to "inform the public of the best interpretation" of the statutory definition of "rifle." 88 Fed. Reg. at 6502; *see* Regulatory Impact Analysis 68-70.

First, the Rule helps ensure that ATF will consistently use "the proper legal and factual analysis" in determining whether a braced firearm is subject to the NFA. 88 Fed. Reg. at 6502. That benefit alone is enough to justify the Rule, because an agency's decision that a new interpretation is "more consistent with statutory language" always "justif[ies] its policy choice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016) (quotation omitted). And that clarity is particularly important here, where (as explained) previous inconsistencies had led to substantial confusion among the regulated public and so the Rule is required to "ensure the public's awareness of the Department's best interpretation of the relevant statutory provisions." 88 Fed. Reg. at 6559.

38

Moreover, the regulatory clarity engendered by the Rule also has follow-on public safety benefits. As explained, Congress has determined that short-barreled rifles "pose[] a greater risk to public safety as 'gangster' type weapons" and that the NFA's controls are required to ameliorate that risk. *See* Regulatory Impact Analysis 69. By properly interpreting the statute, the Rule will help "prevent[] manufacturers and individuals from violating the requirements of the NFA." 88 Fed. Reg. at 6481. And by reinforcing compliance with the NFA's controls, the Rule thus "enhance[s] public safety in a manner determined by Congress." Regulatory Impact Analysis 70.

That account more than suffices to meet any obligation to provide a "reasoned explanation" for the need to issue the Rule and the benefits that the Rule provides. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Nevertheless, plaintiff contends (at 25-27) that ATF did not have a proper "data driven" need for regulatory action and that the agency's identification of two mass shootings and more than 100 other criminal investigations involving braced firearms did not establish sufficient "death and destruction worthy of federal regulation." *See* 88 Fed. Reg. at 6499. And he similarly argues (at 27) that the Rule's benefits are not cognizable because they are not measurable economic benefits. Those contentions fail on all levels.

As an initial matter, the APA "imposes no general obligation on agencies to conduct or commission . . . empirical or statistical studies" when issuing a rule, *Prometheus Radio Project*, 141 S. Ct. at 1160. And in this context, ATF may properly

"justify its policy choice by explaining why that policy is more consistent with statutory language." *Encino Motorcars*, 579 U.S. at 223-24 (quotation omitted).

Regardless, the Rule created a proper record that short-barreled rifles constructed with stabilizing braces pose risks to the community. The Rule explains that such firearms have been used in two mass shootings where 19 combined victims were killed; have been classified 104 times and traced 63 times as a part of criminal investigations; and were subject to 105 cases or investigations at the time of the Rule. 88 Fed. Reg. at 6499. That is more than sufficient empirical data to reasonably support ATF's decision to issue a rule. ATF is entitled to address those identifiable safety concerns, or even to "adopt prophylactic rules to prevent potential problems before they arise." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

Similarly, the district court correctly rejected plaintiff's argument that the Rule is invalid because ATF failed to quantify the articulated benefits in dollars and cents. *See* J.A. 119-120. An agency is not required to conduct an analysis "in which each advantage and disadvantage is assigned a monetary value." *Michigan v. EPA*, 576 U.S. 743, 759 (2015). Instead, it is "up to the [a]gency to decide (as always, within the limits of reasonable interpretation) how to account" for costs and benefits. *Id.* The Rule's benefits—informing the public of the best interpretation of the statute, preventing circumvention, and enhancing public safety—are largely "immeasurable," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013), but they reflect the kind of

40

commonplace "value-laden decisionmaking and the weighing of incommensurables" entrusted to agencies, *Department of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).

### D. Neither the Rule nor the Statute Violates the Second Amendment

Plaintiff has also failed to demonstrate a likelihood of success on his claim that the Rule and the NFA violate the Second Amendment. To establish that violation, plaintiff must first show that the Rule implicates "the Second Amendment's text, as informed by history." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022). If plaintiff meets that threshold requirement, the government must "demonstrate that the [Rule] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Plaintiff's claim founders at both steps.

### 1. The text of the Second Amendment is not implicated

**a.** The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment's protection extends only to "instruments that constitute bearable arms" and that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-82, 625 (2008). Short-barreled rifles do not qualify.

As the district court correctly explained, *see* J.A. 132-33, short-barreled rifles are not protected by the Second Amendment because they are dangerous and unusual weapons. Like other NFA firearms, they have long been regulated due to their "quasi-

suspect character," *Staples v. United States*, 511 U.S. 600, 611-12 (1994), and Congress has found they can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395. This reality arises from "their concealability" compared to long-barreled rifles and "their heightened ability to cause damage" compared to handguns—"a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." 88 Fed. Reg. at 6499.

For this reason, the Supreme Court has twice affirmed that short-barreled shotguns are "dangerous and unusual weapons" not protected by the Second Amendment. Shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *United States v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are "dangerous and unusual" weapons. *Heller*, 554 U.S. at 581, 622-25 (quotation omitted). As the courts of appeals have repeatedly concluded, that principle applies equally to short-barreled rifles, because there is "no constitutional distinction" between the two. *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam); *see United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished).

That suspect status is also reflected in the fact that short-barreled rifles are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at

42

625. To the contrary, they are substantially regulated—or banned—by jurisdictions across the country. At least 30 States and the District of Columbia generally prohibit possession of short-barreled rifles outright or unless the NFA is followed.[2] And their continued regulation under the NFA reflects Congress's finding that they are particularly dangerous and "likely" to be "used for criminal purposes." *Thompson/Ctr. Arms Co.*, 504 U.S. at 517 (plurality opinion).

Nor are short-barreled rifles "in common use." *Heller*, 554 U.S. at 624 (quotation omitted). Out of the hundreds of millions of firearms in the United States, there are only approximately 530,000 registered short-barreled rifles. *See* ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021*, at 15-16.[3] Short-barreled rifles thus constitute a miniscule portion of all firearms and exist in numbers far lower than the benchmark numbers courts have employed to indicate common use. *See, e.g.,*

---

[2] Ala. Code § 13A-11-63(a); Alaska Stat. Ann. § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Cal. Penal Code §§ 16590, 33215; Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); D.C. Code Ann. § 7-2502.02; Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann. §§ 16-11-121(4), 16-11-122; Haw. Rev. Stat. Ann. § 134-8; Ill. Comp. Stat. Ann. §§ 24-1(a)(7)(ii), 24-2(c)(7); Iowa Code Ann. § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b); N.Y. Penal Law §§ 265.00(3)(c), (d), 265.01-b; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); 11 R.I. Gen. Laws Ann. § 11-47-8(b); S.C. Code Ann. §§ 16-23-230, 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. §§ 18.2-300, 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

[3] *Available at* https://perma.cc/5BMN-LW3Y.

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (7 million "assault weapons" and 50 million large-capacity magazines).

In response, plaintiff nowhere engages with the Supreme Court's analysis in *Miller* and *Heller*, attempts to distinguish those cases, or confronts the fact that short-barreled rifles are widely regulated and not commonly owned. Instead, he only baldly asserts (at 51-52) that short-barreled rifles are protected by the Second Amendment because their "projectiles will have lower velocity than identical longer barreled weapons" and thus they are "not dangerous." But plaintiff's speculation about the dangerousness of short-barreled rifles—which would seem to apply equally to the short-barreled shotguns held unprotected in *Miller*—is neither accurate nor relevant. As is reflected in the NFA and in 30 States' laws, Congress and State legislatures have properly determined that short-barreled rifles are particularly dangerous and require additional regulation—even if they may produce "lower velocity" than full-length rifles. As explained, that legislative judgment correctly rests on the particularly dangerous combination of concealability and lethality that short-barreled rifles (like short-barreled shotguns) embody. *See* 88 Fed. Reg. at 6499. Regardless, whatever short-barreled rifles' relative lethality, plaintiff does not meaningfully contest that as a class, these firearms are dangerous, associated with criminality, not commonly used, and thus unprotected.

**b.** As the district court correctly held, *see* J.A. 131-32, even if short-barreled rifles were generally covered by the Second Amendment, the NFA's regulatory

scheme, as interpreted by the Rule, does not infringe the right because its registration, approval, and taxation requirements do not prevent individuals from exercising the Second Amendment "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156.

The Supreme Court has repeatedly explained that its decisions do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27. Similarly, the Court has spoken approvingly of shall-issue licensing regimes that require applicants to (for example) "undergo a background check or pass a firearms safety course" in order "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2138 n.9 (quotation omitted). These regimes, the Court has explained, are permissible because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Id.* (quotation omitted). The NFA, which permits law-abiding individuals to manufacture, purchase, and possess short-barreled rifles, does no more than similarly impose modest regulatory requirements to ensure that such weapons are used only by law-abiding citizens. And, indeed, the Rule alleviated some of those requirements by permitting previous possessors of braced firearms to register for free by May 31.

The restricted sweep of the NFA underscores the correctness of this view. The firearms subject to the NFA's requirements are limited to narrow classes of arms that Congress has determined are particularly dangerous, such as short-barreled rifles and

45

shotguns, machineguns, and destructive devices. *See* 26 U.S.C. § 5845(a). The statute in no way interferes with individuals' ability to possess the most common firearms, including handguns ("the quintessential self-defense weapon," *Heller*, 554 U.S. at 629) and long rifles. Plaintiff has therefore not demonstrated that the NFA's requirements meaningfully limit his exercise of the right to armed self-defense.

Moreover, although the district court correctly accepted this argument, *see* J.A. 131-32, nowhere in plaintiff's brief does he grapple with the limited nature of the regulatory requirements in the NFA or otherwise explain how, in light of the Court's approval of similar regulatory schemes in *Heller* and *Bruen*, the NFA could be understood to impermissibly infringe the Second Amendment right. Any such argument is therefore forfeited. *See Mowery v. National Geospatial-Intelligence Agency*, 42 F.4th 428, 433 n.5 (4th Cir. 2022).

## 2. Historical tradition confirms that the Rule is lawful

The NFA, enacted nearly a century ago, is also "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Since colonial times, States have regulated the possession and manufacture of firearms by imposing registration, approval, and taxation requirements analogous to the NFA's.

The colonies routinely imposed requirements that—like the NFA—authorized the government to keep a record of firearm ownership in the community. Thus, as early as 1631, Virginia required a regular survey of the arms and munition in the colony, *see* Add.12, and Rhode Island (1667), *see* Add.18, South Carolina (1747),

*see* Add.20, and New Jersey (1781), *see* Add.62, similarly authorized door-to-door surveys of firearms. Indeed, these laws swept substantially more broadly than the NFA by applying to all firearms.

In addition, a number of colonies and early States imposed inspection or testing requirements that—like the NFA's scheme—were aimed at ensuring safe firearm possession. Thus, Massachusetts (1775), *see* Add.43, and New York (1778), *see* Add.45, provided for inspections of militia members' firearms, while Massachusetts (1805), *see* Add.72, and Maine (1821), *see* Add.83, required that firearm barrels generally be inspected and marked before sale. Similarly, Massachusetts (1651, 1809), *see* Add.15; Add.81, Connecticut (1775), *see* Add.39, and New Hampshire (1820), *see* Add.85, required licenses or inspection to export or sell gunpowder. And not only did those colonies and States impose incidental costs on firearm ownership through such regulatory requirements, but other States—including Mississippi (1844, 1867), *see* Add.91; Add.106, North Carolina (1857), *see* Add.94, Georgia (1866), *see* Add.99, and Alabama (1867), *see* Add.102—also enacted direct taxes on firearms ownership.

Taken together, these laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Bruen*, 142 S. Ct. at 2132. Like these laws, the NFA taxes and regulates (but does not prohibit) firearm ownership to ameliorate the danger that weapons pose and gather information on firearms. Those restrictions are "comparable" and "comparably justified" to past laws. *Id.* at 2133.

47

In response, plaintiff argues (at 51) that there were no laws regulating short-barreled weapons specifically around the Founding. But that is irrelevant. For one, many of the laws cited above applied to all firearms—including whatever short-barreled firearms might have existed—and so it cannot be impermissible for the NFA to apply analogous requirements to short-barreled (and other dangerous) firearms specifically. Regardless, *Bruen* makes clear that the government need not identify specific "historical twin[s]"—"historical analogue[s]" are sufficient. 142 S. Ct. at 2133 (emphases omitted). And plaintiff fails to explain why the historical laws cited above do not meet that standard. In short, nothing that plaintiff says undercuts the fundamental lesson to be drawn from the historical record: that it is consistent with historical tradition for the government to impose regulatory requirements, such as registration, inspection, and taxation requirements, that burden (not ban) ownership of firearms to ensure that those arms are used in a safe manner.

## II. Plaintiff Has Not Demonstrated the Equitable Factors Necessary to Support an Injunction

Even setting aside the merits of plaintiff's claims, plaintiff has failed to establish—indeed, does not even address in his brief—that the equitable factors weigh in favor of granting him a preliminary injunction.

### A. Plaintiff Has Not Shown Irreparable Harm

At the outset, in claiming harm from the Rule in district court, plaintiff primarily asserted harms stemming from the application of the NFA to short-barreled

48

rifles he owns or intends to make or sell. Those alleged harms, however, are untethered from the Rule and spring instead from the NFA. The NFA has applied to short-barreled rifles for decades, and ATF has long considered many braced weapons to be short-barreled rifles. *See, e.g.*, 88 Fed. Reg. at 6483, 6487, 6493. The Rule clarifies ATF's approach and increases consistency by articulating a framework for evaluating classification requests. Plaintiff has thus not set forth any basis for concluding that the Rule, as divorced from the statute, imposes harm that would justify an injunction against the Rule.

Regardless, the NFA's requirements themselves do not impose any irreparable harm. In arguing otherwise in district court, plaintiff complained generically about the various restrictions imposed on short-barreled rifles, such as "not being able to transport them to other states" without approval and the need to engrave them with information like a serial number. *See* J.A. 105-06. But as the Supreme Court has made clear, preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Consistent with that admonition, the ordinary and insubstantial costs of complying with government regulation cannot constitute irreparable harm. Instead, such harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted). And nowhere does plaintiff explain in more concrete terms how the NFA's requirements impose

that sort of "actual and imminent" harm on him. *Scotts Co. v. United Indus. Corp.*, 315

F.3d 264, 283 (4th Cir. 2002).

Similarly, although plaintiff complains about the financial harm of paying the

NFA's tax and being unable to sell short-barreled rifles without complying with the

NFA's requirements, *see* J.A. 106-07,[4] nowhere does plaintiff explain how those harms

are irreparable. The NFA's tax on firearms does not qualify because an individual who

pays the tax but believes the statute does not cover his weapon may request, or sue

for, a refund. *See* 26 U.S.C. § 7422. And if plaintiff ultimately wins this suit, he may be

able to continue to sell firearms without having to comply with the NFA's

requirements (assuming he does not otherwise need a license under the Gun Control

Act); plaintiff does not demonstrate that the inability to do so while this suit is

pending will cause him irreparable harm, as is necessary to secure a preliminary

injunction.

Finally, although plaintiff complains about the NFA's criminal penalties for

noncompliance, *see* J.A. 107, those penalties are irrelevant. It is undisputed that

plaintiff may continue to make, possess, and transfer short-barreled rifles—with no

---

[4] In district court, plaintiff suggested an immediate need to sell firearms to continue to meet his financial obligations each month" because he has "been suspended from his job without pay" since 2020. J.A. 106. But plaintiff does not appear to be a licensed firearms dealer and is thus not permitted to "engage in the business" of selling firearms (short-barreled rifles or otherwise). *See* 18 U.S.C. § 922(a)(1)(A). Regardless, plaintiff's financial situation may have changed, as plaintiff was provided back pay with interest in August 2023. *See Miller v. Gruenberg*, No. 22-5256, 2023 WL 6206247, at *1 (D.C. Cir. Sept. 25, 2023).

50

threat of criminal or civil liability—so long as he complies with the NFA's requirements. Plaintiff cannot manufacture irreparable harm by choosing not to comply with those minimally burdensome requirements.

## B.    The Balance of Equities and Public Interest Weigh Against Injunctive Relief

The balance of equities and public interest likewise weigh against injunctive relief.

First, the Rule promotes regulatory clarity and consistency, as has been explained. *See supra* pp. 37-41. ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Second, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces those

controls that Congress deemed necessary for public safety by preventing

circumvention of the requirements.

## CONCLUSION

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JESSICA D. ABER
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

*s/ Ben Lewis*
BEN LEWIS
*Attorneys, Appellate Staff
Civil Division, Room 7250
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2494
benjamin.r.lewis@usdoj.gov*

October 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,825 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*
Ben Lewis