No. 23-1604

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

ROBERT MILLER,

Plaintiff-Appellant,

v.

MERRICK B. GARLAND, U.S. Attorney General, U.S. Department of Justice; STEVEN MICHAEL DETTELBACH, Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————

## JOINT APPENDIX

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JESSICA D. ABER
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
*Attorneys, Appellate Staff
Civil Division, Room 7250
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2494*

**JOINT APPENDIX**

# TABLE OF CONTENTS

**Documents:**

<u>District Court Filings</u>:

Docket Sheet ................................................................................................ 1

Complaint, Dkt. No. 1 (Feb. 13, 2023) ...................................................... 4

Motion for Preliminary Injunction, Dkt. No. 17 (Feb. 13, 2023) ...................... 56

Memorandum Opinion and Order, Dkt. No. 31 (March 10, 2023) ................ 110

Notice of Appeal, Dkt. No. 32 (May 31, 2023) ...................................... 135

Query    Reports    Utilities    Help    Log Out

APPEAL,PRO SE,STAYED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
### CIVIL DOCKET FOR CASE #: 1:23-cv-00195-RDA-JFA

| | |
|---|---|
| Miller v. Garland et al | Date Filed: 02/13/2023 |
| Assigned to: District Judge Rossie D. Alston, Jr | Jury Demand: None |
| Referred to: Magistrate Judge John F. Anderson | Nature of Suit: 899 Other Statutes: Administrative |
| Case in other court: 4CCA, case manager Rachel Phillps,, 23-01604 | Procedures Act/Review or Appeal of Agency Decision |
| Cause: 05:551 Administrative Procedure Act | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Robert M. Miller**
                                        represented by **Robert M. Miller**
4094 Majestic Lane
#278
Fairfax, VA 22033
415-596-2444
Email: robmiller44@hotmail.com
PRO SE

**Defendant**

**Merrick B. Garland**
*U.S. Attorney General, U.S. Department of Justice*
                    represented by **Kirstin O'Connor**
DOJ-USAO
2100 Jamieson Ave.
Alexandria, VA 22314
703-299-3799
Email: kirstin.o'connor@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven Dettelbach**
*Director, Bureau of Alcohol Tobacco, Firearms, and Explosives*
                    represented by **Kirstin O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bureau of Alcohol, Tobacco, Firearms and Explosives**
                    represented by **Kirstin O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2023 | 1 | COMPLAINT against Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland (Filing fee $ 402, receipt number 100000917.), filed by Robert M. Miller. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Civil Cover Sheet, # 6 Receipt)(dvanm) (Entered: 02/15/2023) |
| 02/13/2023 | 2 | MOTION for Pro Se E-Noticing by Robert M. Miller. (dvanm) (Entered: 02/15/2023) |
| 02/13/2023 | 3 | MOTION to File Electronically by Robert M. Miller. (dvanm) (Entered: 02/15/2023) |
| 02/15/2023 | 4 | Summons Issued as to Steven Dettelbach, Merrick B. Garland, and the U.S. Attorney. (dvanm) (Entered: 02/15/2023) |
| 03/01/2023 | 5 | ORDER granting 2 Motion for Pro Se E-Noticing. Signed by Magistrate Judge John F. Anderson on 03/01/2023. (dvanm) (Entered: 03/02/2023) |
| 03/06/2023 | 6 | SUMMONS Returned Executed U.S. Attorney served on 2/14/2023, answer due 4/17/2023. (Attachments: # 1 Envelope)(dvanm) (Entered: 03/06/2023) |
| 03/13/2023 | 7 | MOTION to File an Oversized Application for a TRO and Preliminary & Permanent Injunction by Robert M. Miller. (Attachments: # 1 Proposed Order, # 2 Proposed Application for TRO and Preliminary & Permanent |

**J.A. 1**

**J.A. 2**

| | | Injunction, # 3 Exhibit)(dvanm) (Entered: 03/16/2023) |
|---|---|---|
| 03/16/2023 | 8 | NOTICE of Appearance by Kirstin O'Connor on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland (O'Connor, Kirstin) (Entered: 03/16/2023) |
| 03/16/2023 | 9 | RESPONSE in Opposition re 7 MOTION *for Temporary Restraining Order* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (O'Connor, Kirstin) (Entered: 03/16/2023) |
| 03/16/2023 | 10 | MOTION for Extension of Time to File Response/Reply by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) (Entered: 03/16/2023) |
| 03/16/2023 | 11 | Memorandum in Support re 10 MOTION for Extension of Time to File Response/Reply filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (O'Connor, Kirstin) (Entered: 03/16/2023) |
| 03/16/2023 | 12 | Waiver of re 11 Memorandum in Support, 10 MOTION for Extension of Time to File Response/Reply *Waiver of Hearing* by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland (O'Connor, Kirstin) (Entered: 03/16/2023) |
| 03/17/2023 | 13 | ORDER granting 10 Motion for Extension of Time to File Response/Reply. ORDERED that Defendants shall file their opposition to Plaintiff's Application for a Preliminary Injunction (Dkt. No. 7-2) on or before April 3, 2023. No further extensions of this deadline will be allowed. Signed by Magistrate Judge John F. Anderson on 03/17/2023. (wgar, ) (Entered: 03/17/2023) |
| 03/17/2023 | 14 | ORDERED that Plaintiff's motion is GRANTED. It is also ORDERED that Plaintiff's motion will not exceed 45 pages. It is also ORDERED that Defendant's responsive brief will not exceed 45 pages in re 7 MOTION to File an Oversized Application for a TRO and Preliminary & Permanent Injunction. Signed by Magistrate Judge John F. Anderson on 3/17/2023. (swil) (Entered: 03/17/2023) |
| 03/17/2023 | 15 | ORDER denying 3 Motion to File Electronically (see Order for details). Signed by Magistrate Judge John F. Anderson on 3/17/2023. (swil) (Entered: 03/17/2023) |
| 03/17/2023 | 16 | Application for a Nationwide Temporary Restraining Order by Robert M. Miller. (Attachments: # 1 Exhibits)(swil) (Entered: 03/24/2023) |
| 03/17/2023 | 17 | Application for Preliminary and Permanent Injunction by Robert M. Miller. (Attachments: # 1 Exhibits)(swil) (Entered: 03/24/2023) |
| 03/20/2023 | 18 | Reply to 9 Defendant's Opposition to Plaintiff's Request for a Temporary Restraining Order and Request for Enlargement of Time filed by Robert M. Miller. (Attachments: # 1 Exhibit)(dvanm) (Entered: 03/24/2023) |
| 03/20/2023 | 19 | Waiver of Hearing re 16 MOTION for Temporary Restraining Order by Robert M. Miller (dvanm) (Entered: 03/24/2023) |
| 03/20/2023 | 20 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Attorney for the Eastern District of Virginia on 03/20/2023, filed by Robert M. Miller. (dvanm) (Entered: 03/24/2023) |
| 03/24/2023 | 21 | NOTICE of Hearing on Motion 17 MOTION for Preliminary Injunction, 16 MOTION for Temporary Restraining Order : Motion Hearing set for 4/12/2023 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr.. (Attachments: # 1 Envelope)(dvanm) (Entered: 03/28/2023) |
| 03/30/2023 | | Set Deadline as to 17 MOTION for Preliminary Injunction, 16 MOTION for Temporary Restraining Order. Motion Hearing set for 4/12/2023 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. (jlan) (Entered: 03/30/2023) |
| 04/03/2023 | 22 | Memorandum in Opposition re 16 MOTION for Temporary Restraining Order, 17 MOTION for Preliminary Injunction filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (O'Connor, Kirstin) (Entered: 04/03/2023) |
| 04/05/2023 | 23 | Consent MOTION for Extension of *Time to File Response to Plaintiff's Complaint* by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) (Entered: 04/05/2023) |
| 04/05/2023 | 24 | Waiver of re 23 Consent MOTION for Extension of *Time to File Response to Plaintiff's Complaint Waiver of Hearing* by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland (O'Connor, Kirstin) (Entered: 04/05/2023) |
| 04/10/2023 | 25 | ORDER granting 23 Motion for Extension of Time to File. ORDERED that Defendants shall respond to Plaintiff's complaint within 21 days of the Court's entry of a decision regarding Plaintiff's request for preliminary injunction. ECF Nos. 7-2, 17. Signed by Magistrate Judge John F. Anderson on 04/10/2023. (wgar, ) (Entered: 04/10/2023) |
| 04/10/2023 | 26 | Reply to 22 Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction filed by Robert M. Miller. |

**J.A. 2**

USCA4 Appeal: 23-1604    Doc: 17     Filed: 10/30/2023     Pg: 6 of 138

**J.A. 3**

| | | (dvanm) (Entered: 04/12/2023) |
|---|---|---|
| 04/12/2023 | 27 | Minute Entry for proceedings held before District Judge Rossie D. Alston, Jr: Motion Hearing held on 4/12/2023. Appearance of plaintiff, pro se and counsel for the deft. Plaintiff's [16/17] Application for a Nationwide Temporary Restraining Order and Preliminary Permanent Injunction - Argued and taken under advisement. (Court Reporter: T. Harris)(tarm) (Entered: 04/12/2023) |
| 05/02/2023 | 28 | NOTICE Supplemental Authority by Robert M. Miller (Attachments: # 1 Exhibit)(dvanm) (Entered: 05/02/2023) |
| 05/04/2023 | 29 | Response to 28 NOTICE filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (O'Connor, Kirstin) (Entered: 05/04/2023) |
| 05/26/2023 | 30 | NOTICE of Decision by Robert M. Miller (Attachments: # 1 Exhibit, # 2 Proposed Order)(dvanm) (Entered: 05/26/2023) |
| 05/26/2023 | 31 | MEMORANDUM OPINION AND ORDER that Plaintiffs Application for a Nationwide TRO and Injunction (Dkt. Nos. 16 and 17) is DENIED (see order for details). Signed by District Judge Rossie D. Alston, Jr. on 05/26/2023. (jlan) (Entered: 05/29/2023) |
| 06/01/2023 | 32 | NOTICE OF APPEAL as to 31 Memorandum Opinion and Order by Robert M. Miller. Filing fee $ 505. (dvanm) (Entered: 06/02/2023) |
| 06/02/2023 | 33 | Transmission of Notice of Appeal to US Court of Appeals re 32 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 06/02/2023) |
| 06/06/2023 | 34 | USCA Case Number 23-1604 4CCA, case manager Rachel Phillps, for 32 Notice of Appeal filed by Robert M. Miller. (dvanm) (Entered: 06/06/2023) |
| 06/06/2023 | 35 | Letter from the 4CCA requesting transmittal of record.(dvanm) (Entered: 06/06/2023) |
| 06/06/2023 | | Assembled INITIAL Electronic Record Transmitted to 4CCA re 32 Notice of Appeal. (dvanm) (Entered: 06/06/2023) |
| 06/12/2023 | 36 | MOTION for Extension of *Time to Respond to Plaintiff's Complaint* by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) (Entered: 06/12/2023) |
| 06/12/2023 | 37 | MOTION to Stay Proceedings by Robert M. Miller. (Attachments: # 1 Proposed Order, # 2 Envelope)(dvanm) (Entered: 06/13/2023) |
| 06/15/2023 | 38 | ORDER granting 36 Motion for Extension of Time to File. ORDERED that Defendants shall respond to Plaintiff's complaint on or before June 23, 2023. Signed by Magistrate Judge John F. Anderson on 06/15/2023. (wgar, ) (Entered: 06/15/2023) |
| 06/18/2023 | 39 | RESPONSE to Motion re 37 MOTION to Stay filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland. (O'Connor, Kirstin) (Entered: 06/18/2023) |
| 06/21/2023 | 40 | ORDER granting 37 Motion to Stay. Signed by District Judge Rossie D. Alston, Jr on 06/21/2023. (see order for details) (dvanm) (Entered: 06/22/2023) |
| 06/23/2023 | 41 | REPLY to Response to 37 MOTION to Stay filed by Robert M. Miller. (Attachments: # 1 Envelope)(dvanm) (Entered: 06/23/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/28/2023 17:08:17 | | |
| **PACER Login:** | benjaminrlewis | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00195-RDA-JFA |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**J.A. 3**

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 7 of 138
Case 1:23-cv-00195-RDA-JFA   Document 1   Filed 02/13/23   Page 1 of 52 PageID# 1

J.A. 4

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

ROBERT M. MILLER,

                *Plaintiff,*

    v.

MERRICK B. GARLAND, U.S. Attorney General,
U.S. DEPARTMENT OF JUSTICE; STEVEN
DETTELBACH, Director, Bureau of Alcohol
Tobacco, Firearms, and Explosives; BUREAU
OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES,

                *Defendants.*

Civ. Case No:  1:23 CV 195

FILED
2023 FEB 13 AM 11:20

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff Robert M. Miller, *pro se*, pursuant to Federal Rules of Civil
Procedure and for his claims seeking declaratory and injunctive relief as follows:

### INTRODUCTION

1. On June 10, 2021, Defendants promulgated a Notice of Proposed Rulemaking ("NPRM")
   regulating stabilizing arm braces on firearms.

2. On January 31, 2023, Defendants issued a final rule *Factoring Criteria for Firearms With
   Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478, amending the Code of
   Federal Regulations, Title 27, Parts 478 and 479. ("Rule")

3. As described below, Plaintiff suffers irreparable, imminent and ongoing, concrete, and
   particularized harm from the Rule giving him standing to sue to have the Rule held
   unlawful and set aside under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

4. The Rule was promulgated under the authority of the National Firearms Act of 1934,
   Pub. L. 73-474 ("NFA") and the Gun Control Act of 1968, Pub. L. 90-618 ("GCA"); which

are the federal statutes under which Plaintiff's actions and property are regulated. Thus, Plaintiff's interests in his firearms are within the zone of interest regulated by those statutes.

5. Handguns, pistols, rifles, shotguns, and firearms are generally regulated by Title I of the GCA. Title I firearms are generally not required to be registered by the purchaser under federal law.

6. Defendants possess information on commercially manufactured Title I firearms only until the point of sale, and Defendants must upon probable cause seek the first-purchaser's information from FFLs.

7. Defendants generally possess no information on privately-made Title I firearms.

8. Short-barreled rifles, short-barreled shotguns, silencers, destructive devices, machineguns, and "any other weapons" are regulated by the NFA and Title II of the GCA.

9. Title II firearms must be registered into the National Firearms Registration and Transfer Record ("NFRTR" or "NFA Registry").

10. For SBRs and SBSs, the NFA Registry receives and contains information on the owner's name and address, the manufacturer or maker, model, serial number, caliber, barrel length, and overall length.

11. A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand," and "any combination of parts from which" a handgun "can be assembled." 18 U.S.C. § 921(a)(30).

12. A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels when held in one hand that has both a chamber as an integral part of, or permanently aligned with, the bore and a short

stock designed to be gripped by one hand at an angle to and extending below the line of the bore." *See* 27 C.F.R. 478.11 and 479.11.

13.   A rifle is defined by the GCA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7).

14.   A short-barreled rifle ("SBR") is defined by the GCA as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8).

15.   A stabilizing arm brace ("brace") is a device attached to the rear of a firearm that better enables a person to fire with one hand, often someone with a disability. While the shooter holds the pistol grip, the brace attaches to or sits alongside the shooter's arm, typically but not necessarily the forearm.

16.   Braces come in several different styles, including cuff-type, counterbalance-type, and blade-type.

17.   From 2012 to 2020, Defendants issued numerous determinations and classifications saying attaching braces to pistols and firing the weapon from the shoulder did not convert the pistol into an NFA-regulated SBR.

18.   Defendants' contention in the Rule is that almost all pistols fitted with stabilizing arm braces are, and *always have been*, SBRs.

19.   The Rule has therefore declared Plaintiff and millions of other Americans owning braced pistols to be in violation of those statutes. For each firearm in violation of these statutes,

the law provides a maximum penalty of confinement for ten years, a $250,000 fine, forfeiture of the unlawful firearm, and a permanent loss of the right to keep and bear arms.

20. The Rule demands Plaintiff's compliance with those statutes no later than May 31, 2023.

21. The Rule provides for a forbearance of the $200 NFA tax, but Plaintiff will incur additional costs and burdens such as NFA engraving, restrictions on interstate transport, restrictions on sale and transfer, and exposure to existing state-level bans on SBRs (but not pistols).

22. To register his braced pistols into his NFA Firearms NFA Trust ("NFA Trust") without paying the NFA tax, Plaintiff had to transfer those firearms to his NFA Trust with a notarized document prior to the effective date of the Rule. Thus, the Rule requires Plaintiff register the firearm as an "Individual," and Plaintiff would have to pay a $200 transfer tax to move his firearms to possession of his NFA Trust.

23. Defendants' Rule has caused widespread angst, panic, confusion and unjust costs for millions of Americans, including Plaintiff, trying to comply with the Rule's numerous vague provisions and restrictions that arbitrarily and capriciously change Defendants' prior classifications, upon which Plaintiff and others had reliance interests.

24. The Rule exceeds Defendants' statutory authority; it is arbitrary and capricious; it was promulgated without procedures required by law having been followed, and it violates the Second, Fourth, Fifth, and Tenth Amendments.

25. The Rule's cost-benefit analysis ignored millions, if not billions, of dollars of costs to regulated persons and the firearm industry. The Rule's scale and scope are so sweeping that Congress could not have intended to confer such rulemaking authority on the Defendants.

26.     Defendants purportedly promulgated the Rule as an interpretative rule subject to lesser procedural requirements. As an interpretative rule, the Rule would have no binding legal effect on regulated parties, but the Rule clearly imposes such binding effects.

27.     As a legislative rule, Defendants failed to comply with the APA, the Congressional Review Act ("CRA"), the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), the Unfunded Mandates Reform Act ("UMRA"), OMB Circular A-4, and Executive Orders 12866 and 13563.

28.     Whatever level of deference this Court applies, the statutes are not vague or silent, and if they were, Defendants' interpretations are not permissible constructions of the statutes.

29.     What Defendants call a "loophole," is actually called "lawful." That Congress failed to anticipate lawful reactions and product design and development 55 and 89 years ago does not empower the Agency to rewrite the NFA and GCA, which is a power reserved to Congress.

30.     The Rule failed to monetize or quantify the benefits of the Rule; the Agency simply waved its hand in the air claiming substantial benefits without proving the existence of those benefits. In any event, the costs of the Rule far outweigh its benefits.

31.     The Rule failed to consider alternative regulatory approaches and to appropriately respond to commenters.

32.     The Rule was not based upon any newfound understanding or analysis of firearm design, but was motivated purely by partisan politics to unlawfully regulate or ban certain firearms.

33.     The Rule, NFA, and GCA violate the Second Amendment because braced pistols and SBRs are bearable arms in common use for lawful purposes. SBRs and SBSs pre-existed the Second Amendment and were virtually unregulated until the NFA was enacted. SBRs are

neither dangerous nor unusual. They are indisputably less dangerous than longer-barreled rifles shotguns and less concealable than the pistols Defendants admit they cannot regulate. They are commonly used for sporting purposes and self-defense.

34. Consequently, this Court must hold unlawful and set aside the Rule pursuant to 5 U.S.C. § 701 et seq. The Court must hold the Rule, the NFA, the GCA, Defendants' determinations, and 18 U.S.C. §922(r) unconstitutional.

## PARTIES

35. Plaintiff is a natural person and a citizen of the United States and the Commonwealth of Virginia, residing in Loudoun County, Virginia.

36. Defendant Merrick B. Garland is the United States Attorney General and head of the U.S. Department of Justice, a federal government agency.

37. Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, a bureau within the U.S. Department of Justice, ("Agency" or "ATF").

## JURISDICTION AND VENUE

38. This Court has jurisdiction for this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

39. Declaratory judgment and relief are authorized under 28 U.S.C. § 2201-2202.

40. This Court has inherent powers of injunctive relief under U.S. Const. Art. III, Sec. 2.

41. The Rule is a final rule made reviewable by the Administrative Procedure Act for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

42. Venue is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1)(C).

## STATEMENT OF FACTS

### A.   Facts Concerning Plaintiff

43.   Plaintiff has an M.A. and Ph.D. in Economics from the University of Illinois (1995, 2002), and a B.S. in Mathematics and Economics from the University of Colorado at Denver (1992).

44.   Plaintiff is a Senior Financial Economist for a Federal financial regulator, whose regular duties involve conducting cost-benefit analysis for agency rulemaking, and analyzing rules for compliance with, *inter alia*, the Administrative Procedure Act, Congressional Review Act, Regulatory Flexibility Act, Small Business Regulatory Enforcement Fairness Act, Executive Orders 12866 and 13563, and Office of Management and Budget Circular A-4.

45.   Plaintiff is a disabled veteran with a 60% compensatory disability rating from the Veterans Administration, including compensation for herniated disks and spinal stenosis, causing pain, weakness, trembling, and cramps in his chest, back, arms, and legs. Plaintiff receives medication, physical therapy, and massage for these conditions.

46.   Plaintiff has used, needs to use, and intends to use stabilizing arm braces for certain pistols to maintain stability and accuracy for one-handed firing.

47.   Plaintiff is a firearms expert, with almost forty years experience owning, using, buying, selling, making, repairing, and outfitting firearms.

48.   Plaintiff is currently a licensed firearm seller and full-time employee of Sterling Arsenal, L.L.C.; Sterling, Virginia, which is a federal firearms licensed ("FFL") dealer paying a special occupational tax ("SOT") to make and deal in NFA-regulated firearms.

49.   Plaintiff has a collection of more than one-hundred firearms, including twenty-one short-barreled rifles, and two short-barreled shotguns.

7

50. Plaintiff is active in the firearms community, and he regularly engages in discussions with hundreds to thousands of firearm owners, dealers, lawyers, and experts.

51. Thus, Plaintiff has first-hand, expert knowledge of firearms, firearm accessories, firearm laws, firearm innovation, compliance with the NFA and GCA, and costs to and effects on regulated persons and entities.

**B.   Facts Concerning Firearms, Crimes, and Their Regulation**

52. A firearm with a shorter barrel launches projectiles at a slower velocity, and hence less terminal kinetic energy, than an identical firearm with a longer barrel.

53. A Title I pistol without a brace is more concealable than a Title II SBR made from the same pistol with a fixed stock.

54. Rifles of every kind are known to be used in 2.6% of homicides. FBI, Uniform Crime Report, *Crime in the United States,* 2019 (sum of states).

55. Upon information and belief, SBRs are used in far less than 1% of homicides each year.

56. More people are known to be killed each year with hands, fists, and feet (4.3%) than rifles.

57. The majority of homicides (62.1%) are committed with handguns.

58. Handguns are more concealable than pistols or SBRs.

59. The U.S. Supreme Court has held that handguns are bearable arms in common use, presumptively covered by the Second Amendment. Thus, the test the Supreme Court employed was not based on how common it is for certain guns to be used in crimes, but how commonly they are used for lawful purposes. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (June 23, 2022).

60.     The AR-type firearm and its kind are the most popular pistols and rifles in the United States for all lawful purposes, including personal and common defense, hunting, and sport shooting.

61.     Other types of rifles and pistols in common use for lawful purposes include, but are not limited to, AK-type, Heckler and Koch MP5-type and G93-type, Sig Sauer MCX/MPX/556-type, CZ Scorpion, IWI Galil ACE, Ruger 10/22 and PC Charger.

62.     Shotguns in common use for lawful purposes include, but are not limited to, the Mossberg Maverick/500/590/930 series, Remington 870/Versa Max/1100 series, Stoeger Coach Guns, and other break-action, pump action, and semi-automatic shotguns.

63.     Firearms in common use for lawful purposes include the Mossberg Shockwave and Remington Tac 13 and Tac 14. The Mossberg Shockwave was the best-selling pump-action "shotgun" in 2020.[1]

64.     Pistols, carbines and short-barreled rifles are useful in situations where wielding a full-length rifle is cumbersome, such as close quarters, on horseback, or where storage space is limited. Police, military, and civilians commonly use these weapons for these purposes.

65.     Pistols, short-barreled rifles and short-barreled shotguns are suitable for home defense because they can be wielded through tight hallways and doorways, they can be equipped with flashlights and silencers, and they are much more effective in defense than handguns.

---

[1] Sagi, Guy. "Mossberg 590 Shockwave: Top-Selling Pump Shotgun in 2020". American Rifleman;   https://www.americanrifleman.org/articles/2021/2/20/mossberg-590-shockwave-top-selling-pump-shotgun-in-2020

66. Pistols, carbines, short-barreled rifles, and short-barreled shotguns have been in common use for lawful purposes before, during, and long after the ratification of the Second Amendment.

67. The "carbine" rifle with its short barrel, was developed in the 17th century for cavalry forces.

68. Currently, the United States Army fields the M4 Carbine with a barrel length of 14.5 inches. The M4 is the fully automatic equivalent of a semi-automatic AR-15 rifle with a 14.5 inch barrel and a pinned and welded muzzle device.

69. The Giovanni Beretta Folding Stock Snaphaunce Pistol, produced around 1683, could be concealed under a cloak.

70. Colt's New Model Revolving Rifle was produced from 1855 to 1863 with a barrel length as low as fifteen inches. These were notably used by the Pony Express, a private company.

71. The Springfield Model 1855 musket was produced in a pistol-carbine version with barrel lengths of ten and twelve inches.

72. The Smith & Wesson New Model No. 3 Single Action Revolver, produced between 1870 and 1915 with a 6.5-inch barrel, was sometimes made with a detachable shoulder stock.

73. Winchester Model 1892 rifles were customized into a "mare's leg" model with a shortened barrel of about thirteen inches and a shortened stock.

74. Marble's Game Getter, produced from 1908 to the present, is a double-barrel gun with a rifle barrel over a smooth-bore shotgun barrel, with a folding stock. The gun was produced in barrel lengths as low as twelve and fifteen inches.

75. In the 18th and 19th century, fur traders and other persons modified muskets and rifles for personal defense into "blanket guns," so called because they were easy to conceal under blankets or robes.

76. The British Sea Service Blunderbuss, produced around 1750, was a smoothbore shotgun with a fourteen-inch barrel.

77. The Wilson Flintlock Blunderbuss with its eleven-inch barrel first appeared in the 16th century and was famously associated with the Pilgrims who landed on Plymouth Rock.

78. "Coach guns" or "messenger guns" were double-barreled shotguns with shortened barrels used by stagecoach drivers and messengers in the 1860s for personal protection. These guns originated the phrase "riding shotgun" which today means sitting in the passenger seat of an automobile, but in their time, this meant keeping guard while someone else drove the coach.

## C. Facts Concerning Stabilizing Arm Braces, Blades, and Cheek Saddles

79. Braces often, but not always, have straps to more securely fit the brace to a shooter's arm.

80. AR-type pistols and rifles rely on a buffer and buffer spring to return the bolt carrier group (BCG) into battery, i.e., to fire a subsequent round. The buffer and spring are enclosed within a "receiver extension," commonly called a "buffer tube." Buffer tubes come in varying lengths, e.g., carbine length, rifle length, or personal defense weapon ("PDW") length.

81. A buffer tube, depending on its design, can also accommodate a rifle stock, a stabilizing arm brace ("brace"), a cheek rest or saddle, or a stabilizing blade.

82. AR-type pistols are functionally equivalent to, just as concealable as, and equally deadly as SBRs made from the same AR pistols.

83. Other types of pistols, such as the B&T APC series and Sig Sauer MPX/MCX series, have internal recoil springs and thus do not require a receiver extension for their operation. These are also functionally equivalent to, just as concealable as, and equally deadly as SBRs made from these pistols.

84. Manufacturers also make cheek saddles or pads that attach to a receiver extension that shooters can put their cheeks on to obtain a good sight picture, but without putting the receiver extension against their shoulders.

85. For all intents and purposes, Defendants treat stabilizing blades, other arm rests, and cheek saddles or pads the same as braces.

86. Many commercially produced braces are adjustable along the receiver extension to accommodate the different lengths and sizes of shooters' arms and hands.

87. One handgun in very common use is the Glock 17 and other Glock models of different sizes and calibers.

88. Recover Tactical, Micro Roni, Flux Defense, and other companies manufacturer stabilizing arm braces for Glock-style handguns and other brands of commonly used handguns.

89. B&T manufactures a chassis for Glock-style pistols, and it separately sells stocks that can be attached to these chassis to make SBRs. B&T does not manufacture braces for these chassis because Defendants issued a determination that these handguns do not weigh enough for a shooter to "need" a brace.

90. Custom Smith Manufacturing also requested a determination from Defendants to make braces for B&T firearms, and Defendants responded negatively.

### E.   Facts Concerning Defendants' Determinations and Rule

91.   In 2012, an FFL submitted the first stabilizing brace to Defendants for evaluation.

92.   Defendants determined that brace, when added to a pistol, did not constitute the making of a Title II firearm. *Letter from ATF #2013–0172* (Nov. 26, 2012).

93.   Subsequent to the 2012 determination, Defendants issued at least seventeen classifications that different stabilizing brace designs did not convert pistols into short-barreled rifles.

94.   On March 5, 2014, Defendants issued a determination that "firing a pistol [equipped with a brace] from the shoulder would *not* cause the pistol to be reclassified." FTB Letter 301737 at 1.

95.   These classifications properly focused their analysis on whether braces could effectively be used to facilitate single-handed firing.

96.   Based on Defendants' determinations, firearm manufacturers and retailers began saying in marketing materials that ATF authorized the use of stabilizing arm braces against the shoulder.

97.   The Rule claims that in 2014, it noticed braces being used to fire weapons from the shoulder and new brace designs that included characteristics common to shoulder stocks.

98.   The *cause* of Defendants' observation was *precisely* their own 2014 determination, and the Rule scurrilously attempts to use the consequences of its own determination as evidence in favor of an opposite determination.

99.   In 2014, Defendants determined that a "foam padded stabilizer tube" attached to a Glock pistol chassis with no cuffs or straps "would result in the manufacture of a 'short-barreled rifle.'"

100. Agency claims it issued an "Open Letter" stating that it made clear to makers and manufacturers that despite their purported intent with respect to the use or design of an accessory, the requirements of the NFA cannot be circumvented. *ATF Open Letter on the Redesign of Stabilizing Braces,* ATF (Jan. 16, 2015). The letter stated that a stabilizing pistol brace "may be attached to a handgun without making a[n] NFA firearm."

101. On December 22, 2015, Defendants issued a determination that SB Tactical's adjustable stabilizing brace installed on a pistol "would not be a 'short-barreled rifle.'" The Rule now regulates that product as making a short-barreled rifle.

102. On March 21, 2017, Defendants issued a letter making it "clear that stabilizing braces are perfectly legal accessories for large handguns or pistols."

103. Defendants' repeated determinations that braces on pistols did not violate the NFA or GCA caused, in Defendants' own words, "demand and production for 'stabilizing braces'" to "take off" in "2017."

104. On December 18, 2020, Defendants published proposed guidance for notice and comment, *Objective Factors for Classifying Weapons with "Stabilizing Braces."*

105. On December 23, 2020, Agency withdrew its proposed guidance.

106. June 10, 2021, Defendants issued a notice of proposed rulemaking, ("NPRM"), *Factoring Criteria for Firearms with Attached 'Stabilizing Braces*,' RIN 1140-AA55 (86 FR 30826). Exhibit 2.

107. January 31, 2023, Defendants issued the final rule, 88 FR 6478. Exhibit 1.

108. Under the Congressional Review Act ("CRA") analysis, the Rule stated it is "projected to have an effect over $100 million on the economy in at least one year of the final rule."

109. The Rule became effective immediately on January 31, 2023, without providing Congress an additional sixty days to consider a joint resolution under the CRA; 5 U.S.C. § 801 et seq.

110. The Rule declared "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA."

111. The Rule declared the Agency will use its prosecutorial discretion to allow persons with firearms outfitted with braces until May 31, 2023 (120 days) to comply with the Rule.

112. The Rule claims it does not change the law concerning braced pistols, which it claims were *always* short-barreled rifles.

113. The Rule claims to be an interpretative rule issued pursuant to 5 U.S.C. §553(d)(2).

114. Rule claims, without evidence, that "a majority of these firearms with an attached stabilizing brace are configured as rifles and have a barrel or barrels of less than 16 inches in length."

115. Rule claims that it does not ban braces nor prohibit firearms with an attached brace, regardless of the firearm's classification.

116. The Rule changed the Agency's prior position from permissive interpretations of whether a brace on a pistol could be used as a brace to a restrictive interpretation of whether a braced pistol could be fired from the shoulder.

117. The Rule relies on seven factors in determining whether an accessory constitutes the making of a short-barreled rifle, i.e., designed or redesigned to be fired from the shoulder: (1) rear surface area, (2) weight of the firearm, (3) length of pull, (4) sights or scopes with

eye relief that require shouldering of the firearm in order to be used as designed, (5) necessity for the cycle of operations, (6) marketing and promotional materials, (7) likely use by the community.

118. Neither the NFA nor the GCA define rifles based on any of these factors.

119. None of the text or hearing testimony for the NFA or GCA mentions any of the "objective" factors included in the Rule.

120. While the NPRM applied a point system in determining whether the rear surface area of a firearm is sufficient to categorize the firearm as a rifle, the final Rule determined that *any* rear surface area can potentially make a firearm into a rifle.

121. Thus, moving away from an objective measure of surface area, the Rule makes the subjective regulatory threshold even more vague and arbitrary.

122. The Rule concludes that even raised ridges at the rear end of a brace constitute evidence of the intent to design the brace to be fired from the shoulder, because it opines the raised ridges "serve no functional purpose in the design of a pistol brace; however, the ridges [on the back] do provide a non-slip, gripping surface, a feature commonly associated with buttstocks/shoulder stocks as well as firearms designed to be fired from the shoulder." 88 FR 6488.

123. Defendants' convoluted logic is equivalent to claiming a dog named Rover is a cat because, like a cat, he has fur, four legs, whiskers, and a tail.

124. The most obvious alternative explanation for such raised ridges is to stand the weapon upright on a floor. Defendants are now making classifications of SBRs based on speculation about what inconsequential features on a brace might allow a user to do.

125. Rather than following the plain text of the statutes, Defendants create felony liability for accessories that merely resemble a buttstock.

126. Plaintiff and millions of other gun owners value the aesthetics of firearms, and they prefer stabilizing arm braces that resemble stocks as opposed to a contraption for the handicapped.

127. The Rule relies on the "length of pull" and weight of braced firearms relative to averages of commonly used rifles.

128. Length of pull is defined by the distance between a shooter's shoulder and the trigger.

129. Defendants estimated that average length of pull for rifles is 13.5 inches, and thus braced pistols with a length of pull longer than that is an SBR.

130. If the length of pull for rifles is normally distributed with a mean of 13.5 inches, then 50 percent of all rifle lengths of pull will be shorter than 13.5 inches and 50 percent will be longer. Thus, a braced pistol with a length of pull greater than 13.5 inches will be shorter than many rifles, and many braced pistols have a longer length-of-pull than many rifles.

131. In a criminal lawsuit, Defendants sought to convict a person for having an unregistered SBR, measuring the length of pull diagonally from the trigger to the butt pad, which exceeded 13.5 inches. The Court observed that the same measurement made horizontally was less than 13.5 inches. The defendant in that case was thereby acquitted.

132. The Rule relies on the same measurement of length of pull from the trigger to the butt pad, but the Rule does not state whether Defendants will measure length of pull diagonally or horizontally, leaving firearm owners without sufficient notice of how to measure length of pull.

133.  Despite critical public comments, the Rule's reliance on length of pull expressly rejected that different lengths and girths of people's forearms and fingers would require significantly longer or shorter length of pull than the average rifle.

134.  "Eye relief" is a measurement of the usable distance behind the ocular lens of a rifle scope (the near lens). Scopes with low eye relief require shooters to place their eyes very close to the ocular lens for the scope to be effective.

135.  The Rule presumes that a scope with limited eye relief mounted on a braced pistol is an indicator of intent to make a short-barreled rifle, because the scope is not usable while using the brace.

136.  A shooter need not use a sight or scope while firing, even if those are attached to a gun.

137.  A shooter can use a short eye relief scope close to his eye without shouldering a brace.

138.  Two identical firearms – one fitted with rifle scope with limited eye relief, and one fitted with a red dot sight with infinite eye relief – could be classified as an SBR and pistol, respectively, while both are equally dangerous and concealable.

139.  The Rule countered public comments saying, "The Department disagrees that the method in which a 'stabilizing brace' may be used, in isolated circumstances or by a single individual, is relevant to examining whether a firearm is designed, made, and intended to be fired from the shoulder."

140.  Yet the Rule relies on the configuration of scopes or sights that may be used in isolated circumstances by a single individual.

141.  Agency states it will not rely on "the way a particular individual uses a firearm equipped with a 'stabilizing arm brace," yet the way such an individual uses the firearm can militate against the inference of intent the Agency seeks to create with the Rule.

142.    While the Agency lists purported "objective" factors it will apply in the evaluation of various pistols equipped with braces or other receiver extensions, it is impossible for anyone to know in advance of a determination whether their particular pistol configuration violates the law.

143.    The fear of severe punishments for violating the NFA and GCA will keep people from using braced pistols that do not violate those laws.

144.    While Defendants properly abandoned the arbitrary, complicated, subjective, and duplicative point-system in the NPRM for determining whether a braced pistol is a short-barreled rifle, the final Rule makes the evaluation of these factors even more nebulous and arbitrary for firearm owners to understand.

145.    The Rule relies on Defendants' interpretations of the words "designed" and "intended" in the NFA and GCA. Despite design features demonstrating a brace was designed and can be used as a brace, Defendants prefer to define "designed" to mean that a brace can *conceivably* be used as a stock. Defendants prefer to define "intent" by any features it can conceivably (and speculatively) discern as those enabling firing from the shoulder.

146.    Agency has relied on marketing materials in its Bump Stock (RIN 1140-AA52, 83 FR 66514), Definition of a Receiver (RIN 1140-AA54, 86 FR 27720), and Brace rules.

147.    Marketing materials do not determine the classification of a firearm under the NFA or GCA. If marketing materials claimed a firearm was a machinegun, when it is not, those claims do not make the firearm into a machinegun. Similarly, marketing a braced pistol as being capable of firing from the shoulder does not make it an SBR.

148.

149.    The Rule relies on a few videos and articles by individuals stating their own opinions about how a pistol equipped with a brace could be used like a rifle against the shoulder.

150.    The Rule conducted no survey or other research on the propensity of owners of braced pistols to fire the pistol from the shoulder.

151.    The Rule claims to be for the purpose of enhancing public safety, yet it does not even attempt to quantify these benefits.

152.    The GCA's and Rule's mention of "weapons of war" is mere political dicta and does not reflect the actual characteristics of firearms in common use for lawful purposes; the Nation's historical regulation of firearms has *never* differentiated weapons in common use from weapons used in warfare.

153.    The Rule claims short-barreled rifles, and hence braced pistols, are "dangerous and unusual," obviously attempting to shoehorn the Rule into the holding of *Bruen*, which was decided decades after the NFA and GCA were enacted.

154.    The Rule relies on two specific incidents (Boulder and Dayton) of firearms outfitted with braces being used in mass shootings from 2012 to 2022.

155.    The Rule relies on a few hundred firearms fitted with braces recovered from crime scenes from 2012 to 2022.

156.    Nothing at the Rule's cited sources provides any evidence the shooters in Boulder, Dayton, or other recovered weapons involved the shooters putting braced firearms against their shoulders.

157.    The Rule estimates from three to seven million braced pistols are in circulation.

158.    The Congressional Research Service estimated in an April 19, 2021 report that there could be between ten and forty million firearms using stabilizing arm braces.

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 27 of 138
Case 1:23-cv-00195-RDA-JFA    Document 1    Filed 02/13/23    Page 21 of 52 PageID# 21

J.A. 24

159.    Upon information and belief, Defendants' estimates of braces in common use are substantially underestimated.

160.    A braced firearm categorized by the Rule as a rifle that "is designed, made, and intended to be fired from the shoulder," could also be classified as a handgun if it is "designed to be held and fired by the use of a single hand." Agency has adopted the least permissive interpretation of the statutory definitions rather than apply lenity.

161.    The Rule provides no provisions for, and prohibits the unregistered possession of, braces on shotguns or firearms such as Plaintiff's Mossberg Shockwave.

F.    **Facts Concerning the U.S. Homicide Rate, NFA, and GCA.**

162.    From 1904 through 1919, America's homicide rate rose from 1.3 per 100,000 population to about 7.2 per 100,000. Causes included violent labor disputes, range wars, and racial violence.

163.    On January 16, 1919, a sufficient number of states ratified the Eighteenth Amendment which permitted regulation of intoxicating liquors.

164.    On January 17, 2020, the Volstead Act was enacted by Congress, effectively banning the making, sale, and distribution of alcoholic beverages in the United States.

165.    A history provided by the Federal Bureau of Investigation states that from 1924 through 1938, the FBI was at "war" with gangsters profiting from the illegal sale of alcohol. These gangsters literally outgunned an ill-prepared law enforcement community. In Chicago alone, there were more than 1,300 gangs.

166.    As gangsters fought each other for control of the alcohol trade, America's homicide rate rose from about 6.8 per 100,000 population in 1920 to 9.7 in 1933. For perspective, this was nearly double the U.S. homicide rate of 4.9 in 2015.

167. On December 5, 1933, a sufficient number of states ratified the Twenty-First Amendment, ending Prohibition, and Congress repealed the Volstead Act.

168. In 1934, Congress enacted the National Firearms Act, largely adopting a draft written by the Department of Justice. The draft did not include regulation of short-barreled rifles. The proposed regulation of handguns was dropped because Congress found such a provision would be highly unpopular.

169. Congress added short-barreled rifles to its NFA regulation based on one Congressman's mistaken belief that doing so would protect rifle hunters in his state. In fact, adding the SBR provision put his constituents at greater risk of legal liability.

170. Nothing in NFA hearing testimony indicates short-barreled rifles are dangerous or unusual, that they are "weapons of war," that they have been commonly used in crimes, that they are easily concealed, or that they have no lawful uses.

171. In NFA hearings, Defendants and congressmen made false, conclusory claims that short-barreled shotguns were dangerous and that only criminals would want to possess them.

172. Defendants testified in NFA hearings that they did not expect criminals to pay the NFA tax and register their regulated firearms, and they would "get" the criminals not for violent crimes, but for failure to pay the tax.

173. Defendants testified in NFA hearings that they never intended to enforce the NFA against law-abiding citizens.

174. From 1931 to 1945, the homicide rate in the U.S. fell below pre-Prohibition levels to about 4.3 per 100,000 in 1958.

175. From 1958 to 1968, the homicide rate rose to about 6.9 per 100,000, largely caused by the trafficking of illegal drugs.

176. On October 22, 1968, the president signed the Gun Control Act of 1968, which was largely motivated by the assassinations of John F. Kennedy, Robert Kennedy, and Martin Luther King, Jr., none of which were committed with NFA-regulated firearms.

177. Despite the GCA, homicide rates continued to rise to a peak of 10.2 per 100,000 in 1980, but falling to about 7.9 in 1984. The homicide rate rose again to 9.4 by 1990 before falling at or near 5.0 from 2009 to 2019.

178. The U.S. incarceration rate rose from 310 per 100,000 in 1980 to 1,000 in 2008, falling to 810 by 2019.

179. Thus, the lengthy downward trend in homicide rates from 1980 to the present was not caused by gun control laws, but by incarcerating criminals.

180. There are millions of lawfully registered short-barreled rifles and short-barreled shotguns in common use for lawful purposes. Congress did not ban these weapons, but made them "legal for a price," indicating Congress did not really believe these firearms were dangerous.

## G.  **Facts Concerning the Rule's Cost-Benefit Analysis and Other Regulatory Analysis**

181. Defendants' own estimates show that only 1.16% of rifles in circulation (including SBRs) are found in traces.

182. Defendant's estimates of about 51 million firearms in circulation is only 11.7% of the common estimate of about 400 million guns. Adjusting Defendants' gun count, only 0.147% of rifles in circulation are found in traces, and SBRs are a small fraction of that.

183. The Rule did not monetize or quantify the rule benefits, nor did the Rule state why Defendants could not do so.

USCA4 Appeal: 23-1604   Doc: 17   Filed: 10/30/2023   Pg: 30 of 138
Case 1:23-cv-00195-RDA-JFA   Document 1   Filed 02/13/23   Page 24 of 52 PageID# 24

J.A. 27

184.   Based on Plaintiff's expertise in conducting cost-benefit analysis for agency rulemaking, Defendants could have quantified and monetized benefits, but refused to do so.

185.   In Plaintiff's expert opinion, such a quantification would reveal the Rule has almost no benefits because only a miniscule percentage of braced pistols are used in crimes and, in any event, the costs are substantially higher than the benefits.

186.   Based on Plaintiff's public comment for *Definition of a Frame or Receiver* Rule (RIN 1140-AA54, 86 FR 27720), Defendants withdrew their reliance on the existence of a negative externality (a market failure) from the criminal use of unmarked firearms.

187.   Similarly, the NPRM for the Brace Rule relied on the existence of a negative externality, yet the Final Rule withdrew its reliance on such an economic effect. Consequently, the Rule provides no theoretical or empirical support that the benefits of the rule exceed the costs.

188.   The Rule claimed unquantified benefits: (1) To prevent manufacturers and individuals from circumventing the requirements of the NFA, (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders.

189.   The Rule's declaration that braced pistols are short-barreled rifles begs the question that braced pistols circumvent the NFA.

190.   Few, if any, persons intending to commit violent crimes with braced firearms will register their firearms as SBRs, nor will they be deterred by the NFA, GCA, or the Rule from making and using braced pistols or SBRs to commit such crimes.

191. The Rule estimated the affected population to be five manufacturers of braces; 3,881 manufacturers with pistols outfitted with braces; 13,210 dealers with pistols outfitted with braces; and 1.4 million firearm owners.

192. The Rule estimated societal costs of $266.9 million at a 7 percent discount rate.

193. The Rule estimated government costs of $3.3 million.

194. The Rule excluded any additional costs for more law enforcement personnel or prosecutions of millions of braced firearms suddenly becoming unlawful SBRs.

195. The Rule calculated a "high" cost, based on seven million braced firearms, of $581.9 million.

196. Based on estimates of between 13 and 40 million braced firearms in common use, the costs estimated by the Rule would rise to an annualized $1-3 billion dollars, not including other under- and un-estimated costs.

197. The Final Regulatory Impact Analysis ("RIA"), Exhibit 3, rebuts comments claiming a much higher number of braced pistols by reporting there were only 32.4 million pistols manufactured between 2013 and 2020, and those were obviously not all equipped with braces.

198. Yet Defendants ignored that people could make braced pistols from receivers purchased *before* 2013 or privately-made receivers *after* 2013. The Rule does not include in its estimate the number of bare or complete receivers transferred as "Other," which could be made into rifles or pistols.

199. The Rule contradicts itself first by claiming a rapid rise in the number of braced pistols, while simultaneously low-balling the number for its cost estimates.

200. Even if Defendants' estimates were well-founded, Defendants did not vary their assumptions to estimate costs with numbers of braced pistols above seven million.

201. The Rule's estimates rely on conclusory claims by unidentified "subject matter experts" and "ATF field offices," a common hand-waving tactic Defendants used in the *Receiver* and *Bump Stock* rules.

202. The Rule relies on a low-ball estimate that FFLs have an average of three to seven braced pistols in inventory. But the estimate does not identify or produce sources or reports for these estimates.

203. The Rule does not include costs for the labor hours of the paperwork burdens.

204. The Rule relies on the specious assumption that the "disposal of bump-stock devices, which was an option under Final Rule 2018R-22F" provides meaningful estimates of disposal of braced firearms because "the demand for firearms with an attached 'stabilizing brace' would have been similar to the demand for bump-stock-type-devices since the demand for both items stems from the desire to circumvent the NFA."

205. In reality, ownership of braced pistols is orders of magnitude greater than ownership of bump-stock type devices, and the Agency speculates that similar motives result in similar outcomes.

206. Defendants claim that although "some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it require any State to change its laws.

207. Defendants were required by statutes and executive orders to examine the *economic effects* on State, local, and tribal governments, not merely address the narrow issue of preemption.

Because several states ban possession of SBRs, but not pistols, the Rule will certainly increase the economic burdens of states, localities, and tribes.

208. The Rule acknowledges many public commenters taking issue with the Agency's estimate of costs, but Defendants only partially agreed.

209. The Rule acknowledges many public commenters taking issue with the Agency's estimate of benefits, but Defendants made only conclusory statements that the NFA and Defendants' enforcement enhances public safety. Defendants did not and can not provide any evidence the Rule, NFA, or GCA enhances public safety.

210. Plaintiff's analysis determines that the rise in homicides prior to the enactment of the NFA was caused by enactment of the Eighteenth Amendment and subsequent Volstead Act, increasing the profits from illegal production and distribution of alcoholic beverages.

211. Plaintiff's analysis determines that the repeal of the Eighteenth Amendment and the Volstead Act caused the sharp decline in homicides in the U.S., beginning before the enactment of the NFA and not because of the NFA.

212. Plaintiff's analysis determines that the Gun Control Act had little to no marginal effect on homicide rates in the U.S., the homicide rate rose after enactment of the GCA, and it remained above the 1968 level until 1997. The U.S. homicide rate began falling in 1991 mainly because of tougher anti-crime laws and a sharp rise in incarcerations.

213. Plaintiff's analysis of homicides indicates murders are mostly gang-related and heavily concentrated among Blacks and Hispanics, in less than five percent of U.S. counties, and in only a handful of neighborhoods within those counties. The majority of U.S. counties have zero homicides per year.

214.   Based on Plaintiff's expert knowledge of firearms and economics, the costs to firearm dealers would be enormous, effectively ending all commerce in braced pistols and substantially reducing demand for pistols without braces.

215.   Plaintiff has personal knowledge that the profit margin on firearms for FFL dealers is very low.

216.   Thus, the Rule puts all small firearm dealers at substantial risk of shutting down.

217.   Defendants are attempting to obtain a reduction in gun ownership by attacking the profitability of and harassing gun manufacturers, distributors, retailers, and gun owners.

218.   Defendants did not alter their prior determinations based on any new and material information leading it to conclude its prior classifications were incorrect.

219.   Instead, Defendants altered their classifications based on their preferences for Democratic Party political positions on firearms, enabled by the vast preponderance of Democrat employees in the Department of Justice and the BATFE.

220.   Under the Unfunded Mandates Reform Act of 1995 ("UMRA"), the Rule determined it would not have aggregate annual effects of $100 million or more on state, local, or tribal governments, but it would impose a mandate on the private sector in excess of $100 million annually.

221.   The Rule did not consider deferring action on braced pistols to Congress, state, local, or tribal regulation.

222.   The Rule rejected the *status quo ante* and "grandfathering" alternatives based on its pre-determined position that braced pistols are SBRs. Defendants erroneously and repeatedly assign $0 in costs and benefits to the *status quo ante* without examining the advantages and disadvantages of that alternative relative to the Rule.

223. The Rule did not explain whether its "forbearance" of NFA taxes for registration of braced pistols could later be collected by the Agency, and it did not include later collection within its costs.

224. The Rule rejected specific, quantifiable standards "since it does not account for non-quantifiable features," but without considering the ambiguity of non-quantifiable features.

225. The Rule rejected publishing guidance documents because it is "not as clear as amended regulations and non-FFLs may be less aware of guidance and hence continuing selling firearms outside the purview of the NFA." Defendants' response is nonsense because every other federal agency issues guidance documents for which the public and regulated industry are put on notice in the federal register. But as an interpretative rule, Defendant's Rule is little more than guidance.

226. The Rule rejected the NPRM's weighted criteria as "more confusing to individuals and FFLs in terms of compliance," yet it adopted an even more vague, ambiguous, and subjective standard of non-quantifiable factors.

227. The Rule rejected an alternative to buy back braced firearms because it "would be costly and administratively burdensome" for the government, and "the Department has provided other options." Other options include firearm owners destroying or surrendering their valuable property.

228. The Rule rejected exemption from regulation for persons providing proof of disability or other "need" for a stabilizing brace because it "would require medical judgments that are beyond the scope of ATF's expertise." Nothing prevents Defendants from hiring qualified medical professionals to review the findings of a firearm owner's licensed physician.

USCA4 Appeal: 23-1604    Doc: 17       Filed: 10/30/2023    Pg: 36 of 138
Case 1:23-cv-00195-RDA-JFA   Document 1   Filed 02/13/23   Page 30 of 52 PageID# 30

J.A. 33

229.    While the Rule stated the Agency would issue a small business compliance guide, the Agency has not done so within a sufficient period of time to help small businesses understand the Rule and to mitigate damages caused by the Rule to those businesses.

I.   **Facts Concerning Transportation of Title II Firearms Across State Lines**

230.   Plaintiff owns twenty-three Title II SBRs and SBSs.

231.   The Gun Control Act prohibits the transportation of short-barreled rifles, short-barreled shotguns, any other weapons, destructive devices, and machineguns across state lines without approval by Defendants.

232.   To receive approval to carry Title II firearms across state lines, Plaintiff filed ATF Form 5320.20 ("Form 20").

233.   Approval of a Form 20 takes more than six weeks.

234.   The closest outdoor range to Plaintiff's home with target distances beyond 100 yards is in West Virginia, sixty-four miles and a 1.5-hour drive away.

235.   Virginia, all its bordering states, and at least 36 other states allow Title II firearms.

236.   Plaintiff has brought Title II firearms to another state after receiving an approved Form 20.

237.   Plaintiff's Form 20s expire after one year, requiring him to re-submit the form annually.

238.   Form 20 provides space for only three firearms, and Defendants require separate Form 20s for additional firearms.

239.   Plaintiff would have to file eight Form 20s each year to cover all his Title II firearms, and even more if he registers his braced pistols.

240.   Plaintiff would carry Title II firearms to other states for self-defense and sporting purposes but for provisions of the GCA and Defendants' regulations concerning transporting Title II firearms across state lines.

241.   Plaintiff's exposure to the threat of deadly force and his intention to use Title II firearms for lawful purposes do not vanish once he crosses his state's border into another state.

**J.    Injuries to Plaintiff from the Rule, NFA, and GCA.**

242.   Defendants state that, "This rule would affect all individuals who currently own a firearm with an attached 'stabilizing brace' that is subject to regulation under the NFA." RIA at 25.

243.   Plaintiff owns at least five braced pistols affected by the Rule.

244.   Plaintiff owns twenty-one Title I firearms to which he could attach a stabilizing arm brace.

245.   Plaintiff was constructing a privately-made braced AR pistol in caliber 300 Blackout, which he ceased making when Defendants promulgated a short-lived guidance proposal, 85 FR 82516 (December 18, 2020). That proposal was withdrawn on December 31, 2020.

246.   Plaintiff would immediately make more SBRs and short-barreled shotguns ("SBS") but for the NFA and GCA.

247.   Plaintiff would immediately make more braced firearms but for the NFA, GCA, and the Rule.

248.   Because of the Rule, Plaintiff cannot transport any of his braced firearms across state lines without an approved Application to Transport Interstate or to Temporarily Export Certain NFA Firearms (ATF Form 5320.20, a.k.a. "Form 20").

249.   Because of the Rule, it is a felony violation of the NFA and GCA to sell or otherwise transfer his braced pistols without filing an Application for Tax Paid Transfer and Registration of Firearm (ATF Form 5320.4, a.k.a. "Form 4").

250.   Plaintiff made his first three SBRs and his first SBS on August 17, 2016.

251.   Plaintiff uses braced firearms, SBRs, and SBSs for home defense, in particular a B&T APC 45 SBR and a Remington 870 SBS. Plaintiff also uses a Title I Mossberg Shockwave firing 12-gauge shotgun shells.

252.    On or about November 17, 2019, Plaintiff purchased a Q Honey Badger pistol, originally and permanently fitted with a stabilizing arm brace.

253.    Plaintiff never had any intention to make his Honey Badger pistol into an SBR because Agency classifications at the time he purchased it allowed him to keep and use it as a braced pistol, including using the brace against his shoulder.

254.    On or about October 9, 2020, Defendants issued a Cease-and-Desist Order to Q, L.L.C., saying that Defendants determined the Q Honey Badger pistol in its current configuration is an SBR.

255.    Shortly thereafter, Defendants suspended this determination for sixty days.

256.    Q, L.L.C. stated publicly its belief that the suspension was to postpone the issue past the 2020 presidential election.

257.    Because of Defendants' determination, Q, L.L.C. ceased production of its Honey Badger pistol with brace, and it now produces a pistol with a short buffer tube and no brace.

258.    The Rule explicitly considers the Q Honey Badger pistol with its stabilizing arm brace to be an SBR. *See* 88 FR 6493—4.

259.    Neither Q, L.L.C. nor any other company currently manufactures and sells a product to make Plaintiff's firearm into a pistol without a brace. Thus, Plaintiff's only options are to make an SBR, surrender, or destroy his Honey Badger.

260.    Plaintiff cannot sell his Honey Badger without the buyer paying the $200 NFA tax, submitting a Form 4, and waiting approximately 9 to 12 months. This greatly diminishes the market value of Plaintiff's firearm.

261.  If Q, L.L.C. later makes a short buffer tube and recoil assembly, Plaintiff will incur additional costs up to $375 to convert his Honey Badger to a pistol without a brace or to buy a stock.

262.  If Plaintiff makes an SBR from his Honey Badger pistol, he will incur costs of $65 to $85 for NFA engraving, must provide a photograph and fingerprints, and he must register his pistol on the NFA Registry.

263.  The resale value of Plaintiff's Q Honey Badger pistol was approximately $4500 prior to the Rule, which he would lose if he is forced to surrender or destroy his pistol.

264.  All of Plaintiff's Title II firearms are owned by a trust ("NFA Trust") Plaintiff explicitly set up for his NFA-regulated firearms on August 15, 2015.

265.  On the advice of his attorney, Plaintiff placed no non-NFA firearms into his NFA Trust to prevent Defendants from obtaining a list of Plaintiff's Title I firearms if he were required to provide them a schedule of his Title II firearms.

266.  Defendants know it is standard practice for the vast majority of firearm trust attorneys to not refer to a schedule of Title II firearms in the trust, because Defendants will demand any document mentioned or referred to in the trust with each Form 1 or Form 4.

267.  Defendants know the vast majority of firearm trust attorneys advise their clients to not put Title I firearms on the schedule of Title II firearms owned by the trust.

268.  Defendants know the vast majority of makers or transferees of Title II firearms do not include a schedule of trust firearms with their Form 1 or Form 4 applications.

269.  Defendants do not need a schedule of Title II firearms owned by the trust for each new registration because Defendants already have that information in the NFA Registry.

270. On February 6, 2023, Plaintiff attempted to register his Q Honey Badger to his NFA Trust by an electronic Form 1 under the Rule's tax exemption. Defendants demanded evidence the NFA Trust owned the braced firearm before the January 31, 2023 effective date.

271. Defendants consider sufficient evidence to "generally include the signed, dated, and notarized terms of the trust or trust schedules that list or provide a description of the property held in trust."

272. Yet Plaintiff could not have known of this requirement until after the Rule was published in the Federal Register on January 31, 2023. Thus, Plaintiff is now forever barred from a tax-exempt registration of his Honey Badger pistol, obtained years prior to the Rule, as property of his NFA Trust.

273. Even if Plaintiff knew he was required to list his braced pistols on a notarized schedule in his NFA Trust, the Rule unlawfully required Plaintiff to pay costs of notarization and take obligatory actions prior to its effective date.

274. Plaintiff would have to pay a $200 tax to transfer his Honey Badger pistol to his NFA Trust.

275. Agency's Paperwork Reduction Act estimates filing an ATF Form 1 averages 4.0 hours. At Plaintiff's regular rate of pay, the opportunity cost of his time would be about $383.00.

276. Plaintiff owns a Ruger 10/22 pistol fitted with a Sig Sauer PCB cuff-type folding brace.

277. Plaintiff registered his Ruger 10/22 pistol as an SBR on April 26, 2019, but before making the SBR, Plaintiff decided to keep a brace on it for one-handed use. Plaintiff requested and received an NFA tax refund from Defendants.

278. Plaintiff owns a Mossberg Shockwave firearm on which he mounted an adjustable SB Tactical SBA 3 cuff-type stabilizing arm brace, remaining more than 26 inches in length.

279. Plaintiff removed the stabilizing arm brace from the Shockwave when he became aware from public discussion that Agency considered it a short-barreled shotgun with a brace replacing the "bird's head" grip.

280. Plaintiff owns a Gearhead Works Mod 1c Tailhook, which is a counterbalance type brace, which he bought expressly to add to an AR pistol. The Mod 1c has minimal surface area.

281. The Rule would force Plaintiff to either remove braces from his pistols, to register them as SBRs, surrender, or destroy them. Surrender or destruction would cost Plaintiff thousands of dollars of the value of his firearms.

282. Registration of Plaintiff's firearms injures Plaintiff by forcing him to provide information about himself and his firearms to the federal government, with which it could later confiscate or regulate the firearms. This violates Plaintiff's rights under the Fourth Amendment.

## K.   Facts Demonstrating Strong Political Motivations for the Rule

283. President Barack Obama, a Democrat, issued so many gun control executive actions, proposed bills and regulations, and made public statements that Americans rushed to buy firearms in advance of regulation. The gun community mocked him as "Gun Salesman of the Year."

284. President Donald J. Trump, a Republican, and his appointed officers and judges, were generally favorable to gun rights, with the notable exception of the *Bump Stock* rule.

285. President Joseph Biden, a Democrat, took office on January 20, 2021, and thereafter he appointed a Democrat attorney general, U.S. attorneys, and Director of ATF.

286. On April 8, 2021, President Biden made "President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3, "to treat pistols modified with stabilizing

braces" as "subject to the National Firearms Act," This "change," the President said, would require owners of pistols equipped with a stabilizing brace to "pay a $200 fee and submit their name and other identifying information to the Justice Department" or face criminal penalties. *Id.* The President's express aim was to act "without having to go through Congress." *Id.* at 2.

287. President Biden, and Democrats more generally, have a broad and lengthy history of regulating or banning practically every firearm in existence, or otherwise increasing the costs and burdens to firearm owners and dealers to infringe gun rights in violation of the Second Amendment.

288. In a fit of pique response to U.S. Supreme Court decisions favoring gun rights, President Biden, the Democratic controlled Congress, and Democrat governors and legislatures nationwide have instituted hundreds of new, unlawful, gun control laws and regulations seeking to blunt the impact of these legal precedents.

289. From publicly-available information, Plaintiff has learned that the overwhelming preponderance of federal employees of the Department of Justice are Democrats. These proportions are so far above what we would observe from a random selection of employees, that a researcher could easily reject the null hypothesis of "No Political Discrimination," and conclude that Defendants hire, retain, and promote employees based on political affiliation, in violation of 5 U.S.C. § 2301—2302. This means that DOJ and BATFE employees have sought to enact through regulation what the Democratic Party could not obtain through legislation in a divided Congress.

## CLAIM ONE

**Violations of the Administrative Procedure Act; the Small Business Regulatory Enforcement Fairness Act, the Congressional Review Act, and the Unfunded Mandates Reform Act.**

290. Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

291. From 2012 until late 2020, Defendants issued repeated and insistent determinations that stabilizing arm braces do not make pistols into short-barreled rifles.

292. Defendants' determinations created substantial reliance interests for Plaintiff in making and purchasing braces and pistols with braces, costing him thousands of dollars.

293. Under a politically-motivated presidential directive, and without any new or material information, Defendants promulgated a Notice of Proposed Rulemaking on June 10, 2021 to reclassify pistols with braces as SBRs.

294. On January 31, 2023, Defendants promulgated *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, that was effective immediately.

295. As an interpretative rule, Defendants exceeded their statutory authority by imposing legal obligations with criminal penalties.

296. As a legislative rule, Defendants violated numerous statutes described below.

297. The Rule violates the Congressional Review Act (CRA) by not having an effective date 60 days after publication of the final rule.

298. The Rule's provision of not enforcing the Rule for 60 days does not comply with the CRA.

299. The Rule relies on factors that are arbitrary and capricious, and that Congress did not intend for the Agency to consider in determining whether a gun is a short-barreled rifle or shotgun.

300. The Rule fails to consider factors Congress deemed important.

301.  Agency exceeded its statutory authority in regulating stabilizing arm braces, which are firearm accessories.

302.  Guns with stabilizing braces are not designed or intended to be fired from the shoulder, notwithstanding even widespread use of braces against the shoulder.

303.  Despite claiming to rely on "objective" factors, the Agency's potential classifications for millions of devices and uses remains idiosyncratic, subjective, arbitrary, and capricious, and beyond the capacity of ordinary persons to understand what behavior violates the law.

304.  The Rule violates the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. § 601 et seq., by failing to adequately analyze rule costs and benefits and other rule effects on small businesses.

305.  The Rule is void for vagueness because numerous terms in the Rule cannot be understood by reasonably intelligent people to know what the law requires or forbids.

306.  The Rule of Lenity militates against a restrictive definition of braced pistols as a rifle in favor of a permissive definition of a pistol.

307.  The Rule failed to adequately identify a significant problem requiring regulation.

308.  The Rule failed to explain why regulation at the Federal level is necessary.

309.  The Rule failed to monetize or quantify costs and benefits or otherwise explain why those could not be monetized, even though doing so is a straightforward economic exercise.

310.  The Rule's benefits are negligible, and in any event are far outweighed by its costs.

311.  The Rule failed to provide meaningful responses to public comments.

312.  The Rule failed to adequately address alternative regulatory approaches.

313. The Rule failed to completely analyze the *status quo ante* and explain why existing laws, rules, regulations, criminal and tort liability were inadequate for preventing the harm and economic inefficiency the Rule identified.

314. The Rule failed to consider deferring action to Congress, States, Tribes, or localities, and the Rule did not explain why doing so was not feasible.

315. The Rule failed to examine its effects on economic growth, innovation, competition, and job creation.

316. The Rule made unsupported assumptions greatly in its own favor and without seeking more reliable information from the public through an Advance Notice of Proposed Rulemaking.

317. The Rule failed to show the results of sensitivity analyses from changing rule assumptions.

318. The Rule's definitions are not permissible constructions of the relevant statutes.

319. Defendants acted on a policy issue of great economic and political significance providing a reason to hesitate before concluding that Congress meant to confer such authority.

320. The Rule's switch of its approach in the NPRM in determining whether a braced firearm could be used as a brace to the Rule's determination whether a braced firearm could be used as a stock represents a profound change to the proposed rule the public had no opportunity to comment on, and thus the Rule is not a logical outgrowth of the NPRM.

321. For all the reasons stated above, the rule must be set aside under 5 U.S.C. § 706 because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional right, power, privilege, and immunity; in excess of statutory jurisdiction, authority, or limitations, and short of statutory right; without observance of procedure required by law; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

322.    Plaintiff has no other remedies under the law.

323.    Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

324.    Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' classifications.

325.    Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM TWO

### Violations of the Second Amendment

326.    Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

327.    Congress does not possess police powers, and therefore it has limited authority to enact laws to prevent crime in the several states.

328.    Defendants enforce provisions of the National Firearms Act and Gun Control Act regulating, taxing, possessing, making, and transferring short-barreled rifles (SBRs) and short-barreled shotguns (SBSs).

329.    The United States Supreme Court has held that the Second Amendment presumptively protects keeping and bearing all bearable arms in common use for lawful purposes, including those not in existence when the Second Amendment was ratified. *New York State Rifle and Pistol Association v. Bruen*, __ U.S. __, Case No. 20-843, slip op. (June 23, 2022).

330.    Short-barreled rifles and short-barreled shotguns are bearable arms that were in common use for lawful purposes before, during, and long after the Second Amendment was ratified.

331.    The NFA and GCA, enacted long after the Second Amendment, are not part of the Nation's long history of firearm regulation.

332. Neither Congress nor Defendants may declare weapons "dangerous and unusual," when their objective characteristics and widespread ownership demonstrate they are either not dangerous or not unusual.

333. If Congress or Defendants could declare firearms "dangerous and unusual" by legislative or executive fiat, then any firearm could be deprived protection of the Second Amendment with conclusory legislation or rulemaking.

334. Braced pistols, SBRs, and SBSs are neither dangerous nor unusual.

335. By Defendants' own estimates, SBRs (including braced pistols) are almost never used in crimes.

336. Braced pistols, SBRs and SBSs have legitimate, non-dangerous purposes of wielding firearms inside homes and other structures, on horseback, in cars, and in other confined spaces.

337. The NFA, GCA, and Rule are unconstitutionally overbroad, regulating hundreds of millions of firearms owned by a hundred million people based on the criminal acts of a minuscule proportion of the population. Plaintiff hereby seeks to extend, modify, and reverse existing law, or to establish new law, by expanding the overbreadth doctrine beyond the First Amendment context.

338. For these reasons, this Court should declare that the NFA, GCA, and Rule violate the Second Amendment of the United States Constitution with respect to SBRs and SBSs.

339. Plaintiff has no other remedies under the law.

340. Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

341. Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' classifications.

342. Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM THREE

### The Gun Control Act's Transportation Provision Violates the Second Amendment

343.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

344.  A person's right to protect his life and the lives of others does not end at his home state's boundaries.

345.  Absent state law prohibiting short-barreled rifles and shotguns, Federal law may not prevent persons carrying bearable arms across state lines nor require permission to do so.

346.  Guns used for personal defense, sport shooting, or hunting are not traded in commerce merely because they are transported across state lines, thus Congress and Defendants are prohibited by the Tenth Amendment from regulating their transportation.

347.  Consequently, the Gun Control Act's regulation of transportation of short-barreled rifles, short-barreled shotguns, any other weapons, and machineguns across state lines must be held unlawful and set aside.

348.  Plaintiff has no other remedies under the law.

349.  Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

350.  Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' determinations.

351.  Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM FOUR

### Violations of the Fourth Amendment

352.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 50 of 138
Case 1:23-cv-00195-RDA-JFA   Document 1   Filed 02/13/23   Page 44 of 52 PageID# 44

J.A. 47

353. Plaintiff has a right under the Fourth Amendment to be free from unreasonable searches and seizures.

354. The Rule, GCA and NFA require Plaintiff to provide Defendants – without a warrant or probable cause – his  name, address, fingerprints, photograph, and his firearm's manufacturer, model, serial number, caliber, and Trust information.

355. The Second Amendment is not a second-class right.

356. No other fundamental, enumerated right is regulated with such intrusive information requirements.

357. Defendants can use such information to prosecute Plaintiff or to confiscate his lawfully obtained and used property.

358. The U.S. Supreme Court has held that criminals cannot be punished for failure to register their NFA-regulated firearms because that would violate the Fifth Amendment privilege against self-incrimination. *Haynes v. United States*, 390 U.S. 85 (1968).

359. Thus, the Rule, NFA, and GCA searches and seizes information solely from law-abiding citizens using firearms for lawful purposes.

360. Plaintiff has no other remedies under the law.

361. Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

362. Plaintiff's injuries to his Fourth Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

363. Plaintiff's injuries would be fully redressed by granting the requested the relief.

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 51 of 138
Case 1:23-cv-00195-RDA-JFA    Document 1    Filed 02/13/23    Page 45 of 52 PageID# 45

J.A. 48

## CLAIM FIVE

### Violations of the APA and Second Amendment

364.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint.*

365.  With exceptions not present here, Section 922(r) of Title 18, U.S. Code, makes it unlawful for any person to "assemble" from imported parts any semiautomatic rifle or shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) as not being particularly suitable for or readily adaptable to sporting purposes.

366.  With exceptions not present here, Section Part 178.30, Title 27, Code of Federal Regulations states that "No person shall assemble a semiautomatic rifle or any shotgun using more than ten of the imported parts listed in paragraph (c) of this section if the assembled firearm is prohibited from importation under section 925(d)(3) as not being particularly suitable for or readily adaptable to sporting purposes."

367.  The term "imported parts" includes a list of parts under section 478.39(c).

368.  The Rule and Defendants' determinations interpret the provisions of 18 U.S.C. § 922(r) to affect persons who buy imported pistols made with foreign parts who then assemble such pistols into braced pistols and SBRs. This is because Defendants do not consider SBRs to be suitable for or readily adaptable to sporting purposes.

369.  Such an interpretation would require Plaintiff and millions of other owners of such foreign made pistols, such as B&T, CZ, and H&K firearms to replace foreign made parts in their pistols with American-made parts before making an SBR.

370.  According to Defendants, any person making a braced pistol or an SBR from an imported pistol without replacement of foreign-made parts is already in violation of 18 U.S.C. §922(r), and such violation can not be subsequently cured by later part replacement.

45

371.    Thus, Defendants' Rule and interpretations have turned millions of Americans into instant felons.

372.    Because the market for certain foreign-made pistols such as B&T are rather thin, there exists few to no American manufacturers of replacement parts to comply with Defendants' interpretation.

373.    For example, there are no domestic manufacturers of B&T magazines, which comprise three parts among the list in 27 C.F.R. § 478.39(c).

374.    Replacing foreign with American-made parts is extremely costly, in the hundreds or thousands of dollars per firearm.

375.    Some foreign-made pistols can not be made to comply with Defendants' interpretation of 922(r).

376.    Foreign-made SBRs, such as the B&T APC-9 and USW A1, and the H&K MP5 are routinely used for sporting purposes, such as competitions organized by the National Rifle Association (NRA), United States Practical Shooting Association (USPSA), the International Defensive Pistol Association (IDPA), and the National Shooting Sports Foundation (NSSF).

377.    The imported parts regulated by 922(r) are generally described in § 478.39(c), but Defendants provide specific parts lists for a limited number of guns.

378.    Defendants have never published the § 478.39 for Plaintiff's foreign-made pistols, leaving Plaintiff in complete doubt as to whether his firearms could comply with 922(r).

379.    Because Plaintiff owns numerous foreign-made pistols converted to SBRs, Defendants' Rule and interpretation of 18 U.S.C. § 922(r) will force Plaintiff to destroy or surrender

any foreign-made pistols he ever bought or added a brace to or made an SBR, as well as forfeiting his NFA tax payments.

380.  Defendants' interpretation of "assembled" in 18 U.S.C. §922(r) is not a permissible construction of the statute, in that the statute applies *only* to importers of foreign-made parts making rifles, and not to end-users who convert lawfully imported pistols into SBRs.

381.  If Defendants' interpretation is correct, Section 922(r) of Title 18 violates the Second Amendment in that Plaintiff's foreign-made pistols with braces or converted to SBRs are bearable arms in common use for lawful purposes.

382.  Plaintiff has no other remedies under the law.

383.  Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

384.  Plaintiff's injuries to his Second Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

385.  Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM SIX

### Violations of the Fifth Amendment

386.  Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

387.  The Rule, NFA, and GCA cause Plaintiff to register, surrender, or destroy his valuable personal property, costing thousands of dollars.

388.  The Rule, NFA, GCA, and Defendants' determinations have substantially reduced the market value or altogether prohibited the sale of Plaintiff's valuable property.

389.  The Rule, NFA, GCA, and Defendants' determinations violate Plaintiff's right against self-incrimination protected by the Fifth Amendment.

47

390.    Based upon public information and belief, Defendants' agencies (like almost all agencies) are deliberately packed with Democrats in a lengthy campaign of blatant political discrimination stretching back decades.

391.    Defendants' political discrimination in the hiring, retention, and promotion favoring Democrats and disfavoring Republicans deprives Plaintiff and other gun owners of due process and implicates serious separation of powers concerns.

392.    Plaintiff has an implied cause of action under 5 U.S.C. § 2301-2302 to challenge Defendants' political discrimination because Congress intended to ban political discrimination in federal employment; Plaintiff is one of the class for whose especial benefit the Civil Service Reform Act (CSRA) was enacted to provide a professional, apolitical civil service; there are no implicit or explicit indications by Congress to deny such a remedy; a remedy against political discrimination is consistent with the underlying purpose of the CSRA; and the action is not traditionally relegated to state law.

393.    Plaintiff has no other remedies under the law.

394.    Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

395.    Plaintiff's injuries to his Fifth Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

396.    Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM SEVEN

### Violation of United States Constitution, Article I, Sec. 9, Cl. 3 – Ex Post Facto Laws

397.    Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

398. Defendants' retroactive interpretation of the NFA, GCA, and 18 U.S.C. § 922(r) subjects Plaintiff to *ex post facto* criminal liability for purchasing or making braced firearms or SBRs.

399. Defendants provided no assurances of discretionary non-enforcement to remedy any violation of 18 U.S.C. § 922(r).

400. Plaintiff has no other remedies under the law.

401. Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

402. Plaintiff's injuries from *ex post facto* liability are caused by the NFA, GCA, the Rule, and Defendants' determinations.

403. Plaintiff's injuries would be fully redressed by granting the requested the relief.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

404. Declare that the Rule, RIN 1140-AA55, is held unlawful and set aside.

405. Declare that regulation of braced pistols, short-barreled rifles, and short-barreled shotguns under the Rule, NFA, GCA, and Defendants' determinations violates the Second Amendment to the United States Constitution.

406. Declare that Defendants' Rule and determinations create *ex post facto* liability on Plaintiff.

407. Declare that regulating interstate transportation of braced pistols, short-barreled rifles, and short-barreled shotguns violates the Second and Tenth Amendments.

408. Declare that the National Firearms Registration and Transfer Record violates the Fourth and Fifth Amendments of the United States Constitution.

409. Declare that 18 U.S.C. §922(r) does not apply to end-users purchasing foreign-made pistols who then convert those pistols into braced pistols or SBRs.

410. Declare that 18 U.S.C. § 922(r) violates the Second Amendment.

411. Temporarily restrain, and preliminarily and permanently enjoin Defendants from enforcing any provisions of law, rule, or regulation this Court deems violative of law or the U.S. Constitution, in a nationwide injunction.

412. Order Defendants to provide a tax-exempt transfer of all firearms Plaintiff registers as an individual pursuant to the Rule to his Trust.

413. Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

414. Order any other that the court deems just and appropriate.

I hereby certify and verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746.

EXECUTED ON February 13, 2023.

-s-

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 13, 2023, a copy of the foregoing

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** and

**EXHIBITS** was filed in person at the Court.

I caused a copy of this filing to be served by certified U.S. Mail to:

U.S. Attorney for the Eastern District of Virginia
ATTN: Civil Process Clerk
Justin W. Williams U.S Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314

Steven Dettelbach, Director
Bureau of Alcohol, Tobacco, Firearms,
and Explosives
99 New York Ave, NE
Washington, DC 20226


Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530-0001

Robert M. Miller
*Pro Se*

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 58 of 138
Case 1:23-cv-00195-RDA-JFA    Document 1    Filed 02/13/23    Page 52 of 52 PageID# 52

J.A. 55

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRIGINIA
_ALEXANDRIA_ DIVISION

FILED

2023 FEB 13  A 11: 25

ROBERT MILLER
_____
                Plaintiff(s),

        v.
MERRICK GARLAND, US AG
STEVEN DETTELBACH, DIRECTOR BATFE
_____
                Defendant(s).

Civil Action Number: 1:23-cv-195

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of  VERIFIED COMPLAINT .
                                                        **(Title of Document)**

ROBERT MILLER
_____
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on:  FEB 13, 2023   (Date)

                        **OR**

The following attorney(s) prepared or assisted me in preparation of _____.
                                                            **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)

J.A. 56



### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| ROBERT M. MILLER,<br>        *Plaintiff,*<br>   v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br>        *Defendants.* | Civ. Case No: 1:23-cv-195<br><br>ORAL HEARING REQUESTED |

## APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY AND PERMANENT INJUNCTION

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

March 10, 2023

J.A. 56

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION ...........................................................................................1

JURISDICTION AND STANDING ...................................................................4

    A.   Injury in Fact ....................................................................................5

    B.   Plaintiff's Injuries Are Directly Attributable to the Rule, NFA, and GCA.....................6

    C.   A Favorable Decision Will Redress All Harm. ...............................................7

    D.   Prudential Standing .........................................................................7

LEGAL STANDARDS ...................................................................................8

ARGUMENT .................................................................................................10

I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS...............................10

    A.   The Rule's Regulatory Analysis Was Fatally Deficient.................................10

        1.   The Rule Failed to Identify the Need for Rulemaking. ...............................10

        2.   The Rule Failed Its Cost-Benefit Analysis (CBA). .....................................12

        3.   The Rule Failed to Adequately Consider Regulatory Alternatives ...........................18

    B.   The Rule's Immediate Effective Date Was Unlawful .....................................19

    C.   Agency's Classifications Are Arbitrary and Capricious. ...............................21

    D.   Agency Relied on Factors Congress Did Not Intend for It to Consider.......................23

    E.   Plaintiff's Guns Show the Rule Is Arbitrary and Based on False Conclusions.............25

    F.   The Rule Violates the Second Amendment.................................................26

        1.   Braced Pistols and SBRs are Bearable Arms Presumptively Protected by the 2A. ..26

        2.   SBRs and Braced Pistols Are in Common Use for Lawful Purposes .......................27

3.   There Are No Historical Analogues of Regulating SBRs and SBSs............................29

4.   SBRs Are Neither Dangerous Nor Unusual ..............................................................30

G.   Defendants Cannot Rewrite the NFA or GCA. ............................................................34

H.   The Rule Attempts to Answer a Major Question Reserved to Congress ......................35

I.   Lenity and Vagueness Militate against the Rule's Interpretations. ...............................36

J.   Agency's Interpretations Are Not Deserving of Deference. ...........................................39

K.   The Rule Imposes *Ex Post Facto* Criminal Liability. ...................................................41

II.   THE RULE CAUSES PLAINTIFF IRREPARABLE HARM ...........................................42

III.  BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF...............43

IV.  BONDS, SECURITY, OR SURETIES................................................................................44

V.   CONCLUSION .....................................................................................................................44

VI.  RELIEF REQUESTED .........................................................................................................44

## TABLE OF AUTHORITIES

### CASES

*Amazon.com, Inc. v. WDC Holdings*, Civil Action No. 1:20-cv-484 (E.D. Va. July 28, 2020) .....9

*Ameren Servs. Co. v. Fed. Energy Regulatory Comm'n*, 893 F.3d 786 (D.C. Cir. 2018) ...............5

*American Bankers Association v. Connell*, 686 F.2d 953 (D.C. Cir. 1979)..................................34

*American Trucking Ass'n v. United States*,755 F.2d 1292 (7th Cir. 1985) ....................................7

*Automated Merch. Sys., Inc. v. Rea*, 45 F. Supp. 3d 526 (E.D. Va. 2014).....................................17

*Blackhawk Industries Products Group Unlimited LLC v. United States General Services
    Administration*, 348 F. Supp. 2d 662 (E.D. Va. 2004) ..................................................................4

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962).......................................................23

*Burnham Corp. v. Adamkus*, 750 F. Supp. 282 (S.D.Ohio 1990) ....................................................7

*Caminetti v. United States*, 242 U.S. 470 (1917) ...........................................................................37

*Camp v. Pitts*, 411 U.S. 138 (1973)................................................................................................17

*Casa De Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020) ............................................................9

*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ....................................................18

*Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133 (D.C. Cir. 2005)........................12

*Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).............................................39

*City of Mesquite v. Aladdin's Castle. Inc.*, 455 U.S. 283 (1982)....................................................36

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987)............................................................................4

*Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012) ....................13

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) .....................................................................8

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ...........................................................27

*Elrod v. Burns*, 427 U.S. 347 (1976)..............................................................................................42

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)...............................................41

*Faic Securities, Inc. v. United States*, 595 F. Supp. 73 (D.D.C. 1984) ..........................34

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495 (4th Cir. 1981) .................8

*Geiger v. Abarca Family Inc.*, Civil Action 3:21-cv-771 (E.D. Va. July 29, 2022) ......................8

*Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 781 F.3d 710 (4th Cir. 2015)...........9

*Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019).................................8

*Groyned v. City of Rockford*, 408 U.S. 104 (1972) .......................................................36

*Hias, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021)..........................................................9

*Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017)................................................................36

*Industrial Safety Equip. Ass'n, Inc. v. EPA*, 656 F. Supp. 852 (D.D.C. 1987), aff'd, 837 F.2d 1115

(D.C. Cir. 1988).......................................................................................................7

*Int'l Refugee Assistance Project,  Inc. v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) ...................4

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)........................................................................21

*Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494 (D.C. Cir. 1989) .....................................18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................4, 8

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)....8

*McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819).........................................10

*Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332 (1900)..................................36

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022).......................................................42

*Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29 (1983) ........................23

*National Min. Assn. v. McCarthy*, 758 F.3d 243 (CADC 2014) ...................................21

*Natural Resources Defense Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) ...........................21

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (June 23, 2022) ..................26, 27

*Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360 (D.D.C. 2017)....................13

*Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702 (D.C. Cir. 1985) ........................18

*Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F. Supp. 2d
   607 (S.D.W. Va. 2007)....................................................................................................4

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013)...................................................................8

*Patient Servs., Inc. v. United States*, Civil Action No. 3:18-cv-16 (E.D. Va. Jan. 18, 2019) .......17

*Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209 (D.C. Cir. 2004)...........................12

*Robishaw Engineering Inc. v. U.S.*, 891 F. Supp. 1134 (E.D. Va. 1995)......................................7

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020).............................................................9

*Sarsour v. Trump*, 245 F. Supp. 3d 719 (E.D. Va. 2017) ....................................................9

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) ...........................................21

*Trump v. Int'l Refugee Assistance Project*, ⸺ U.S. ⸺, 137 S. Ct. 2080, 198 L.Ed.2d 643 (2017)
   ...........................................................................................................................9

*U.S. v. Comstock*, 560 U.S. 126 (2010).............................................................................10

*U.S. v. Gray*, 883 F.2d 320 (4th Cir. 1989) .......................................................................6

*U.S. v. Jennings*, 323 F.3d 263 (4th Cir. 2003) ................................................................37

*U.S. v. Wright*, 3:18-CR-162 (N.D. Ohio 2018)..................................................................12

*United States v. Beason*, No. 11-4676 (4th Cir. Apr. 19, 2013)..........................................36

*United States v. Brewer*, 533 F. App'x 234 (4th Cir. 2013) ..............................................36

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992) ........................36, 38

*Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024 (9th Cir. 2010) .................18

*Williams v. Johnson*, 1:10-cv-823 (E.D. Va. Sep. 12, 2011)................................................36

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................8, 9

## STATUTES

18 U.S.C. § 921 ................................................................................................37

18 U.S.C. § 926 ................................................................................................10

18 U.S.C. §922 ..................................................................................................1

26 U.S.C. § 7201 ..............................................................................................36

26 U.S.C. § 7203 ..............................................................................................36

26 U.S.C. § 7805 ..............................................................................................10

28 U.S.C. §1746 ...............................................................................................45

5 U.S.C. § 553 ............................................................................................19, 20

5 U.S.C. § 601 et seq ........................................................................................18

5 U.S.C. § 701 et seq. .........................................................................................2

5 U.S.C. § 702 ....................................................................................................4

5 U.S.C. § 801 et seq. ...............................................................................2, 19, 20

Gun Control Act of 1968, Pub. L. 90-618 ................................................passim

National Firearms Act of 1934, Pub. L. 73-474 .......................................passim

## OTHER AUTHORITIES

*Hearings Before the Committee on Ways and Means*, House of Representatives, Seventy-Third

    Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 .........................32

## REGULATIONS

27 C.F.R. 478.11.................................................................................................37

27 C.F.R. 479.11.................................................................................................37

*Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514 ........................14

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 66 of 138
Case 1:23-cv-00195-RDA-JFA   Document 17   Filed 03/17/23   Page 8 of 54 PageID# 604

J.A. 63

*Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 ................................................................................................................ 14

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478 ............................................................................................................. 1

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II ........................................................................................ passim

U.S. Const. amend. IV .............................................................................................. 6

U.S. Const. amend. V ................................................................................................ 6

U.S. Const. Art I .................................................................................................... 10

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| ROBERT M. MILLER,<br>    *Plaintiff,*<br><br> v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br>    *Defendants.* | Civ. Case No: 1:23-cv-195<br><br>ORAL HEARING REQUESTED |

## APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY AND PERMANENT INJUNCTION

Pursuant to Fed.R.Civ.P. 65, Plaintiff moves this Court to temporarily restrain and to preliminarily and permanently enjoin Defendants from enforcing their rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* ("Rule"), RIN 1140-AA55, 88 FR 6478, which became final and effective on January 31, 2023. Plaintiff also seeks injunctive relief against enforcement of 18 U.S.C. §922(a)(4) and (r) as they apply to firearm owners, and portions of the National Firearms Act of 1934, Pub. L. 73-474 and Gun Control Act of 1968, Pub. L. 90-618. The U.S. Attorney did not respond to messages left on March 9—10, 2023 to confer on this motion.

## INTRODUCTION

The Rule at issue redefines the NFA and GCA to encompass pistols outfitted with stabilizing arm braces ("braces") that facilitate the use of pistols with one hand, especially for firearms that are heavy or for people with disabilities. From 2012 through 2020, Defendants issued dozens of classifications that various types of braces *did not* convert braced pistols into short-

barreled rifles (SBRs). At one point during that period, Defendants reversed their classification, saying that if a brace were not usable as a brace, and if it could only be used as a stock, and was actually used as a stock, then it constituted making an SBR. But Defendants reversed course again, stating that incidental shouldering of braces did not redesign the firearm to be fired from the shoulder, i.e., a rifle. The Rule reverses prior determinations for the third time, not based on any newfound evidence or change in the law, but purely to advance a political agenda of gun control.

The Rule must be held unlawful and set aside because it is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law; contrary to constitutional rights, without observance of procedure required by law, unsupported by substantial evidence and unwarranted by facts. 5 U.S.C. § 706. The Rule's regulatory analysis failed to identify a significant problem requiring regulation at the federal level. It's cost-benefit analysis failed to monetize or quantify Rule benefits, and to the extent they described benefits qualitatively, the Rule did not explain the causal chain from the Rule's provisions to the benefits claimed. The Rule vastly underestimated its costs. The Rule failed to adequately address public comments and to reasonably consider alternative regulatory approaches, especially the *status quo ante*.

This *Application* shows that Defendants violated the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and Congressional Review Act, 5 U.S.C. § 801 et seq., by promulgating a legislative rule without delaying the effective date by 30 and 60 days, respectively. The factors upon which Defendants rely in classifying braced pistols as rifles are nowhere to be found in the NFA and GCA, and Defendants' criteria are vague and subjective despite their repeated insistence that the factors are objective.

In prior classifications, Defendants appropriately reached lenient interpretations that if a braced pistol can be used with one hand, then it meets the statutory definition of a pistol. The Rule

2

turns that upside down to a prohibitive interpretation that if a brace can be used against the shoulder, then the firearm is a rifle. This violates the Rule of Lenity.

The Rule, NFA, and the GCA violate the Second Amendment because they regulate bearable arms that have been in common use for lawful purposes long before the ratification of that amendment, and Defendants can show no historical analogues of regulating these guns prior to the NFA and GCA. Short-barreled rifles and shotguns are not "dangerous and unusual" and are, indeed, less dangerous than their longer-barreled counterparts because projectiles from such guns have lower velocity and hence less kinetic energy. The braced pistols are also *less* concealable than otherwise identical Title I pistols and handguns. Exh. 1, Fig. 37 There are no historical analogues to the Founding regulating *concealable* weapons, as opposed to *concealed* weapons.

The Rule imposes instantaneous *ex post facto* criminal liability on Plaintiff that is incurable by complying with the law after notification of the Agency's interpretations of 18 U.S.C. § 922(r). The Rule immediately prevents Plaintiff from selling his braced pistols as Title I firearms or carrying them across state lines and causes him economic harm.

Plaintiff is likely to prevail in his claims because this *Application* shows numerous reasons why the Rule is unlawful, and even one of those is sufficient to set aside the Rule. Because the Rule causes Plaintiff imminent, ongoing, concrete, and particularized irreparable harm directly attributable to the Rule, and granting this *Application* would completely redress such harm, this Court should grant the requested preliminary relief. Because the scope of the Rule affects Plaintiff outside his home state, and because the Rule has sweeping effects across the entire Nation, and in

the face of numerous court challenges throughout the Nation,[1] this Court should grant a nationwide injunction.

## JURISDICTION AND STANDING

Plaintiff incorporates herein by reference and realleges facts contained in his *Verified Complaint*, ECF 1, and exhibits to his complaint. Plaintiff alleges new facts as verified herein.

This Court has jurisdiction to review, hold unlawful, and set aside final agency rules under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 5 U.S.C. § 702 ; *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)." *Int'l Refugee Assistance Project, Inc. v. Trump*, 241 F. Supp. 3d 539, 551 (D. Md. 2017); *Blackhawk Industries Products Group Unlimited LLC v. United States General Services Administration*, 348 F. Supp. 2d 662, 670 (E.D. Va. 2004).

Plaintiff must first demonstrate Article III standing by showing he (1) suffered injury in fact; (a) that is concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F. Supp. 2d 607, 617 (S.D.W. Va. 2007). After establishing Article III standing, Plaintiff must demonstrate prudential standing by showing that his interests merely *arguably* fall within the zone of interests of the challenged statute giving rise to the Agency's regulation. *Int'l Refugee, supra* at 551.

---

[1] *Firearms Regulatory Accountability Coalition, Inc., et al. v. Garland*, 1:23-cv-24 (D. North Dakota); *Mock v. Garland*, 4:23-cv-95 (N.D. Tex.); *Britto, et al., v. BATFE*, 2:23-cv-19 (N.D. Tex.); *SAF, et.al. v. BATFE, et. al.*, 3:21-cv-116 (N.D. Texas); *Watterson v. ATF*, No. 4:23-cv-90-ALM (E.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.).

## A. **Injury in Fact**

"[A] regulated party generally has standing to challenge an agency action regulating its behavior…" *Ameren Servs. Co. v. Fed. Energy Regulatory Comm'n*, 893 F.3d 786, 792 (D.C. Cir. 2018). The Rule directly regulates Plaintiff's actions and firearms and exposes him to felony criminal liability and restrictions. The restrictions the Rule places upon Plaintiff's property and liberty violate his rights under the Second Amendment to keep and bear arms. The deprivation of constitutional rights, even temporarily, always constitutes irreparable harm. *Grimm*, *Ross*, *infra*.

The Rule criminalizes Plaintiff's possession, use, transportation, and sale of a Q Honey Badger (QHB) pistol that was originally and permanently fitted with a stabilizing arm brace. *Compl.* ¶ 252—263. No parts are available to make the QHB into a braceless pistol because of Q's proprietary design. Exh. 1, Fig. 11. When Q later makes one, they will cost more than $300. *Id.* Plaintiff's only options are to destroy, surrender, or disassemble the gun, making it unusable.

Plaintiff also owns a Ruger 10/22 pistol and an AR-15 with braces. *Compl.* ¶ 276—277; Exh. 1, Figs. 18, 41. Plaintiff has used and intends to use the braces on these firearms. *Compl.* ¶ 46. Plaintiff owns a Mossberg Shockwave "shotgun" to which he attached a stabilizing brace, which he removed when Defendants began rulemaking, e.g., Exh. 1, Fig. 3; *Compl.* ¶ 251.

Plaintiff also owns several foreign-made firearms he made into SBRs, including a B&T APC-9 and APC-45, an FN SCAR 17, a CZ Bren 2, Sig P556, and an IWI Galil Ace, e.g., Exh. 1, Figs 19—22. The Rule's interpretation of 18 U.S.C. § 922(r) would make Plaintiff a felon, claiming he "assembled" a firearm "not particularly suited for sporting purposes" with more than ten foreign parts. 18 U.S.C. § 921. Plaintiff uses these SBRs for home defense. *Compl.* ¶ 251.

In the absence of the Rule, Plaintiff would make or buy additional braced pistols. In the absence of the NFA and GCA, Plaintiff would make or buy additional SBRs and SBSs. The Rule

will cause Plaintiff to engrave markings, at a cost of about $65 for each of his braced pistols that will irreparably deface those pistols. *Compl*. ¶ 262. The Rule will prevent Plaintiff from taking his braced pistols across state lines without Defendants' permission, and not at all to at least three to six states that do not allow SBRs. RIA at 93—94. No later favorable judgment can correct this.

Since 2020, Plaintiff has received no paychecks from his employer because of whistleblower retaliation. To meet financial obligations, Plaintiff has been selling firearms. The Rule imposes imminent costs on Plaintiff by requiring him to pay a $200 tax when he sells his newly classified SBRs. 26 U.S.C. § 5811(b). The tax reduces demand for Plaintiff's braced pistols, thus they have lost market value. Plaintiff must also file an ATF Form 4 for each braced pistol sold, and the buyer would have to wait more than nine months for an approved tax stamp.

The Rule further injures Plaintiff by forcing him to put his lawful Title I firearms on the National Firearms Registration and Transfer Record (NFRTR), violating his Fourth and Fifth Amendment rights. Plaintiff is not free to decline the information requested. *U.S. v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989). Defendant has no warrant or probable cause to obtain the information required for an ATF Form 1 or Form 4. The information provided could be used to prosecute Plaintiff for felony crimes under the NFA or GCA.

### B.  Plaintiff's Injuries Are Directly Attributable to the Rule, NFA, and GCA.

On January 30, 2023, Plaintiff was the lawful owner of at least five braced pistols. *Compl.* ¶ 243. On January 31, 2023, Plaintiff woke up a felon. Prior to the effective date, Plaintiff had no obligation to register or mark his Title I braced pistols, nor was he required to file a Form 20 to carry his braced pistols across state lines or file a Form 4 and pay a $200 tax to sell his braced pistols. Prior to the effective date, there were no nationally issued Agency opinions that a gun owner making an SBR from a foreign-made pistol would violate 18 U.S.C. §922(r) if it had more

than ten foreign-made parts; the Rule was widely believed to apply only to importers or manufacturers, not retail customers for their own use.

Defendants argue that braced pistols were *always* SBRs, and the Rule does not impose any new harm on Plaintiff. "This rule does not itself impose any new restrictions; instead, this rule articulates the best interpretation of the relevant statutory terms. Nothing in this rule changes those underlying statutory requirements." Rule at 6554. "Courts have…construed 'agency action' to include statements that announce a rule of law, impose obligations, determine rights or liabilities, or fix legal relationships. See *American Trucking Ass'n v. United States*,755 F.2d 1292, 1296 (7th Cir. 1985); *Industrial Safety Equip. Ass'n, Inc. v. EPA*, 656 F. Supp. 852, 855 (D.D.C. 1987), aff'd, 837 F.2d 1115 (D.C. Cir. 1988). Thus, 'agency action' includes an agency's legal interpretations. See *Burnham Corp. v. Adamkus*, 750 F. Supp. 282, 285 (S.D. Ohio 1990)." *Robishaw Engineering Inc. v. U.S.*, 891 F. Supp. 1134, 1150-51 (E.D. Va. 1995).

### C. **A Favorable Decision Will Redress All Harm.**

If the Court grants this *Application* and sets aside the Rule, the status of Plaintiff's braced pistols would revert to the *status quo ante*. If the Court declares that 18 U.S.C. § 922(r) does not apply to consumers, then Plaintiff's foreign-made pistols converted to SBRs would not be unlawful. If the Court declares that 18 U.S.C. § 922(a)(4) is unconstitutional because it restricts the right to carry arms across state lines for lawful purposes, then the infringement on those rights would be completely vindicated. If the Court declares the NFA and GCA unconstitutional as relating to SBRs, then all burdens and restrictions would be lifted entirely.

### D. **Prudential Standing**

"The scope of the zone of interests is not especially demanding, and the plaintiff receives the benefit of any doubt." [internal quotes omitted] *Geiger v. Abarca Family Inc.*, Civil Action

3:21-cv-77, at *13 (E.D. Va. July 29, 2022); *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012). The zone of interest test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." [internal quotes omitted] *Id.* Plaintiff's interest in and uses of these firearms falls within the zone of interest of the NFA and the GCA – the two federal statutes cited by the Rule as providing Defendants the authority for this rulemaking. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), 112 S.Ct. 2130.

## **LEGAL STANDARDS**

A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). A preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought. *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981). A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), 129 S.Ct. 365. Courts considering whether to impose preliminary injunctions must separately consider each Winter factor. *Pashby* at 321.

The deprivation of constitutional rights unquestionably constitutes irreparable injury for purposes of equitable jurisdiction. *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 461 (E.D. Va. 2019).

USCA4 Appeal: 23-1604    Doc: 17-A    Filed: 10/30/2023    Pg: 75 of 138
Case 1:23-cv-00195-RDA-JFA    Document 17    Filed 03/17/23    Page 17 of 54 PageID# 613

J.A. 72

A plaintiff need not establish a "certainty of success," but must make a clear showing that he is likely to succeed at trial. *Id.* Similarly, a plaintiff must demonstrate more than just a "possibility" of irreparable harm. *Winter* at 22. "When the government is a party … the balance of the equities and the public interest … merge." *Casa De Md., Inc. v. Trump*, 971 F.3d 220, 255 (4th Cir. 2020). This Court can grant a nationwide injunction, appropriately tailored to prevent irreparable injury to the prevailing party. *Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (quoting *Trump v. Int'l Refugee Assistance Project*, —— U.S. ——, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232-33. A district court did not abuse its discretion in issuing a nationwide injunction when, by a policy's nature, adversely affected persons were spread throughout the country and enjoining the policy only as to the plaintiff would cause inequitable treatment the law (or the U.S. Constitution) was designed to protect. *Hias, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021).

"The standard for granting either a TRO or preliminary injunction is the same." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017); *Amazon.com, Inc. v. WDC Holdings*, Civil Action No. 1:20-cv-484, at *7 (E.D. Va. July 28, 2020).

# ARGUMENT

## I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

### A.    The Rule's Regulatory Analysis Was Fatally Deficient.

#### 1.    The Rule Failed to Identify the Need for Rulemaking.

The United States Congress is empowered by the U.S. Constitution "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art I, Section 8. Subject only to Constitutional principles, the law presumes all statutes are necessary and proper. *U.S. v. Comstock*, 560 U.S. 126, 134 (2010); *McCulloch v. Maryland*, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819).

But federal agencies do not inherit these broad powers and judicial deference from Congress. They possess only the powers explicitly granted to them by Congress and under the limitations set by Congress and the Constitution. The APA requires federal agencies to *prove* a rule is necessary and appropriate. See 26 U.S.C. § 7805(a); 18 U.S.C. § 926.

To meet the necessity burden, every rule must identify a "significant" or "compelling" problem requiring federal regulation. Exh. 8, OMB Circular A-4 at 3—4; Exh. 9, Executive Order 12866 at 1. It is insufficient to identify rare and sporadic harms affecting relatively few people.

To show a rule is appropriate, the agency must *prove* the rule will solve the problem identified, that the benefits of the rule outweigh its costs, that there are no other less burdensome but effective alternatives, and that regulation at the federal level is necessary. *Id.*

Supporting its "need" for rulemaking, Agency argues that pistols with stabilizing arm braces were used in mass shootings in Boulder, CO, and Dayton, OH, and that "since 2015, ATF reports that approximately 63 firearms with stabilizing braces have been traced in criminal investigations, and that it has "105 firearms cases or investigations involving stabilizing brace

devices." Rule at 6499. With all due respect to the tragic losses in Boulder and Dayton, two mass shootings using braced pistols fails to identify the need to regulate the *millions* of braced pistols used for lawful purposes. None of the sources the Rule relies upon states the shooters put the braced pistols against their shoulders. No evidence shows those weapons were concealed.

All economic analysis is made *at the margin*. Defendants do not get to assume that if the Rule were in effect prior to the Boulder and Dayton shootings, that those would not have happened. Even if the shooters complied with the Rule, which they likely would not have, they had next-best alternatives of using pistols without braces, rifles, handguns, and shotguns. A rule may only claim benefits for the *difference* between a world with the rule and the counterfactual world without it.

The entire purpose of the APA, OMB Circular A-4, and Executive Order 12866 is to prevent agencies from burdening the public with costly regulations that are not justified by need or benefits. A mere 63 braced pistols "traced" to crime scenes and 105 investigations over an *eleven-year period*, out of *millions* of braces used for lawful purposes, does not constitute a significant problem requiring regulation. Rifles of every kind are known to be used in 2.6% of homicides each year, and obviously SBRs (or braced pistols) are a small fraction of those. *Compl.* ¶ 54—58. The Rule could have, but did not, provide data on the use of SBRs (registered or not) in crimes.

The Rule asserts that "Given the wide variety of configurations of weapons and 'stabilizing braces,' this rule is 'necessary' or 'needful' to clarify the meaning of [the phrase] ["designed or redesigned, made or remade, and intended to be fired from the shoulder."] Rule at 6500. This is the second consecutive rule Defendants have claimed to "clarify" provisions of law when Defendants are changing the law to make themselves right in future prosecutions. After Defendants lost a criminal case in *United States v. Rowold*, 429 F. Supp. 3d 469, 475–76 (N.D. Ohio 2019),

USCA4 Appeal: 23-1604    Doc: 17    Filed: 10/30/2023    Pg: 78 of 138
Case 1:23-cv-00195-RDA-JFA    Document 17    Filed 03/17/23    Page 20 of 54 PageID# 616

J.A. 75

they redefined a "receiver" to prevent similar rulings. *Definition of a Frame or Receiver and Identification of Firearms*, RIN 1140-AA54, 87 FR 24655. In that same regulation, Defendants created regulations to implement the *Crime Gun Tracing Modernization Act*, S.2974 (115th Congress), S.3348 (116th Congress), which failed to pass. After Defendants lost a criminal case in which they attempted to use a diagonally-measured length of pull exceeding 13.5 inches to prosecute someone for possessing a braced pistol as an SBR, *U.S. v. Wright*, 3:18-CR-162, (N.D. Ohio 2018) [sealed], they seek to "regulate themselves right" by issuing a rule that "clarifies" what the court in that case expressly rejected on the merits of their arguments. In that case, Defendants filed a motion *in limine* (denied) to prevent the jury from considering Agency's prior classifications, claiming they are "not precedential," and that "each letter relates to specific firearm design specifications and prototypes that have nothing to do with this case ... and creates a grave risk of confusing the issues and misleading the jury." Thus, Defendants admitted that whether a particular braced pistol is an SBR is idiosyncratic. If Defendants believe a jury would be confused by its prior determinations, then certainly persons affected by this Rule would also be confused. These rulemakings only serve as salve for the Agency's hurt feelings about failing to put people they deem as criminals behind bars. The rulemakings attempt to advance Democratic party policies they cannot pass through legislation in a divided Congress.

## 2. The Rule Failed Its Cost-Benefit Analysis (CBA).

That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). Courts

invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

The Rule's sole claims to benefits are: "(1) to prevent manufacturers and individuals from circumventing the requirements of the NFA; (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders." The first purported benefit begs the question, i.e., asserting what Defendants have a duty to prove – that braced pistols are SBRs, and that making braced pistols is designing an SBR. The mere desire to enforce a statute, without more, does not satisfy the Agency's burden to prove substantial benefits. The Rule did not articulate 'at least a general grasp of the rule's benefits." *Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). How many lives lost, or injuries would the Rule prevent by stopping people from circumventing the NFA? Defendants do not even attempt to estimate this. The second purported benefit is merely a restatement of the first benefit, and it does not attempt to explain how the Rule will reduce criminal use of NFA firearms. Like the *underpants gnomes* in the prime-time cartoon *South Park* explaining why they steal young boys' underpants, Defendants' Rule argues a causal relationship of:

1. Enact the Rule

2. ? ? ?

3. Benefits

This falls well short of the Agency's burden to justify the rule by *explaining* a causal chain from the regulations to the benefits. Agency is attempting to adopt the "necessary and proper" deference afforded to Congress in the NFA instead of meeting its burden to prove their actions are necessary and appropriate. The APA, OMB Circular A-4, and Executive Order 12866 require agencies to *monetize* rule benefits. Only if the agency explains why it cannot monetize benefits

may the agency *quantify* the benefits. Only if the agency explains why it cannot quantify benefits may it describe the benefits qualitatively. This progression of burdens prevents agencies from doing what Defendants do in the Rule: simply wave their hands in the air to claim substantial benefits. OMB Circular A-4, *passim*.

Defendants provided only a handful of anecdotes about crimes involving braced pistols including shootings in Dayton and Boulder, 104 Federal criminal classifications of braced pistols used in crimes, and 63 firearms with braces having been traced in criminal investigations – a total of only 169 incidents *potentially* using a braced pistol in crimes. Rule at 6499.

Defendants did not present *data* or *statistics*, which underly all good analysis in rulemaking. With **billions** of lawful uses of braced pistols from 2012 to the present, and only a few hundred known incidents of crimes with braced pistols, the incidence of crime with braced pistols as a share of braced pistol ownership and uses is close to zero. One-hundred sixty-nine criminal uses of braced pistols divided by 3 million braced pistols means only 0.006% of braced pistols have ever been used in crimes. Even if such crimes were underestimated by a factor of 100, only 0.6% of brace pistol owners will have committed crimes with them. And, of course, there is a likelihood that certain criminals could have committed multiple crimes with the same guns.

For the third consecutive rulemaking involving gun rights, Defendants claim substantial benefits for public safety without any monetization or quantification. See also *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 and *Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514. Defendants could have, but did not, monetize the benefits of the Rule. To do so, Defendants would estimate the current number of criminal uses of braced pistols, explain in detail how the Rule would cause the reduction in crime, and estimate the post-

regulatory number of criminal uses, fatalities, or injuries. Then, the Agency would estimate the *value of a statistical life* ("VSL") and the expected value of firearm injuries with SBRs.

In all three rules, Defendants claimed there were *negative externalities* from the criminal use of firearms or devices the Agency sought to regulate. See, e.g., NPRM at 30845, 86 FR 27738, 87 FR 24715, 83 FR 66544. A negative externality is the adverse economic effect that the production or consumption of a good has on third parties who are neither the buyer nor seller of the good. The third parties receive no payment for the damages caused to them. An example of a production externality is the pollution from a factory that damages local residents. An example of a consumption externality is the adverse effects of second-hand cigarette smoke. For the *Bump-Stock* rule and the *Receiver* rule, Plaintiff submitted public comments demonstrating that there are no negative externalities from the criminal use of bump stocks or unmarked firearm receivers and, if there were they would be extremely small; the regulatory ban on bump stocks and unmarked receivers destroyed more social welfare than they saved (i.e., negative net benefits). Based on Plaintiff's comments, Defendants withdrew their reliance on negative externalities in both the *Receiver* rule and the *Brace* rule. See Rule at 6559. ("The Department agrees that there may be confusion about ATF's statement regarding the externality of the rule; therefore, the final regulatory analysis does not discuss externalities.") There was no confusion on the part of the public. Defendants deceived the public with highfalutin language to posit a market failure in their rules, and they got caught red-handed by professional economists. By withdrawing their reliance on the presence of negative externalities, Defendants literally withdrew the entire economic basis for their rule. Thus, the Rule fails to completely analyze the economic effects and fails the cost-benefit analysis.

Defendants grossly undercounted the number of individuals affected by the Rule and, hence, its costs. The Rule erroneously failed to account for braced pistols made from transferrable receivers or privately made receivers. Agency issued no Advance Notice of Proposed Rulemaking (ANPR) to obtain a more accurate count of ownership of braced pistols. "Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation." EO 12866, Sec. 1(b)(7). A report by the Congressional Research Service found estimations of between 10 and 40 million braced pistols in use by the public. *Compl.* ¶ 158; Exh. 2. While the CRS report was unsourced, second-hand information, and not detailed, it was published two months prior to the proposed rule and clearly indicated that there were other sources of information that Defendants could have, but did not, identify. Commenters directly put Defendants on notice of the CRS report. Rule at 6560. In response, Defendants simply disagreed, saying 3 million braces is the more accurate measurement, without addressing why the other estimates are incorrect. *Id.* The Rule claims it relied on "anecdotal commentary from the manufacturers, information gleaned from ATF field offices throughout the United States, and subject matter experts' conclusions" without substantiating any of those claims. *Id.*

The Rule relied only on unnamed "subject matter experts" regarding the number of braced pistols in retail and distributor inventory without an ANPR to obtain the information from the public. Rule at 6561. While the Rule relies on an *average* of seven braced pistols in inventories, these pistols are clearly not uniformly distributed. Some small business owners could have most of their inventory in braced pistols that constitute most of their sales, while many FFLs have no braces at all.

The reason why this Rule and every other gun control rule fails cost-benefit analysis is obvious: the rules sweep too broadly to adversely affect *tens of millions* of law-abiding gun owners because of the actions of a few criminals. Defendants have never, and certainly cannot in this Rule, prove their measures will save lives, reduce injuries, or benefit "public safety."

The Rule did not reduce from expected benefits the amount of criminal non-compliance. People who intend to commit murder will obviously not heed regulations preventing them from having braces (or stocks) on pistols. The Rule affects only adversely law-abiding citizens. Even if the Rule did reduce the incidence of using braced pistols in crimes, the benefits would be only speculative. Law enforcement would have to miraculously catch a potential murderer with an illegal braced pistol *before* his crimes for the Rule to prevent any deaths or injuries. As add-on charges after a criminal incident, the marginal benefits for deterrence would be minimal.

The Rule gains credit only for the *marginal* reduction in deaths attributable to the Rule. If criminals obeyed the Rule, they would have other options to commit their crimes, such as unbraced pistols, registered SBRs, handguns, shotguns, and rifles. The Rule may claim credit only for the *reduction* in lives lost or injuries, not the total number currently inflicted with braced pistols.

Defendants cannot rescue their cost-benefit analysis in response because this Court relies solely on the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Patient Servs., Inc. v. United States*, Civil Action No. 3:18-cv-16, at *13 (E.D. Va. Jan. 18, 2019); *Automated Merch. Sys., Inc. v. Rea*, 45 F. Supp. 3d 526, 529 (E.D. Va. 2014). In so doing, Defendants also violated the Small Business Regulatory Enforcement Fairness Act

USCA4 Appeal: 23-1604   Doc: 17   Filed: 10/30/2023   Pg: 84 of 138
Case 1:23-cv-00195-RDA-JFA   Document 17   Filed 03/17/23   Page 26 of 54 PageID# 622

J.A. 81

("SBREFA"), codified in 5 U.S.C. § 601 et seq., requiring Defendants to assess the impact of the Rule on small businesses, such as firearm retailers and manufacturers.[2]

Because Defendants utterly failed to present a meaningful cost-benefit analysis, Plaintiff is certain to prevail in this case.

### 3.   The Rule Failed to Adequately Consider Regulatory Alternatives

Courts invalidate rules for failure to consider regulatory alternatives also achieving rule objectives. *Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702, 714 (D.C. Cir. 1985); *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005). Where a party raises facially reasonable alternatives, the agency must either consider those alternatives or give some reason for declining to do so. *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). "It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline." OMB Cir. A-4, p. 16.

The first alternative to a proposed rule is usually the *status quo* or "no change" alternative. A side-effect of not monetizing, quantifying, or explaining the Rule's benefits is that Defendants have provided the public no reason to believe the Rule will be any better than simply maintaining its classifications for the past eleven years. Defendants gave short shrift to the *status quo*, stating that it has no costs or benefits. RIA at 7. A proper analysis would identify the advantages and disadvantages of the status quo alternative. This, Defendants did not do.

---

[2] While Plaintiff has no standing to sue under SBREFA, UMRA, CRA, or the Tenth Amendment, once he establishes standing, he is not limited under 5 U.S.C. § 706 to challenging as unlawful the Rule provisions harming him.

Defendants rejected comments suggesting the Agency grandfather existing braced pistols. Defendants again begged the question saying, "The Department disagrees that it must provide individuals a grandfather clause for currently possessed firearms equipped with 'stabilizing braces' that are short-barreled rifles under the NFA…" Rule at 6568. Agency also said it "cannot have a grandfather clause because providing one would inappropriately exempt individuals from future compliance with provisions of the NFA." *Id.* Defendants failed to consider and explain why they should not let Congress decide whether to amend the NFA and GCA to include braced pistols or otherwise clarify the definition of a rifle. Defendants did not consider allowing states, local, and tribal governments to regulate braced pistols.

Defendants' justifications for the Rule and rejection of feasible alternatives boil down to nothing more than an assertion that "Braced pistols are SBRs." This is not reasoned rulemaking.

### B. The Rule's Immediate Effective Date Was Unlawful

Title 5, United States Code, Pub. L. 89-554 (1966), 80 Stat. 383—384, requires that "The required publication or service of a substantive rule shall be made not later than 30 days before its effective date," with exceptions discussed below. 5 U.S.C. § 553(d).

The Congressional Review Act ("CRA"), codified in 5 U.S.C. § 801 et seq., mandates that before a rule can take effect, the Agency must submit to each House of the Congress and to the Comptroller General containing a copy of the rule, a concise general statement relating to the rule including whether it is a major rule; and the proposed effective date of the rule. 5 U.S.C. § 801(a)(1). A "major rule" is defined as any rule that the Office of Information and Regulatory Affairs ("OIRA") of the Office of Management and Budget ("OMB") finds has resulted in or is likely to result in an annual effect on the economy of $100 million or more; a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies or

geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic or export markets. 5 U.S.C. § 804(2). While not delving into the entire analysis under Section 804(2), as the Agency was required to do by law, the Agency admitted the Rule is a "major rule" for purposes of the CRA. Rule at 6574.

The Rule states, "For purposes of the Congressional Review Act, however, the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register. See 5 U.S.C. 801(a)(3)." 88 FR 6481. The Agency either does not understand or ignores its obligations under the CRA. The CRA states that a major rule cannot "take effect" until the later of (A) 60 days after the date Congress receives the report submitted under Section 804(1), or the rule is published in the Federal Register; or (B) the earlier of the date on which either House of Congress votes and fails to override the veto of the President, or occurring 30 session days after the date on which the Congress received the veto and objections of the President; or (C) the date the rule would have otherwise taken effect. Defendants' effective date on the date of publication in the Federal Register and promise to not initiate enforcement actions fails to provide Congress the opportunity to disapprove of the Rule. The entire purpose of the CRA was to *prevent* all adverse effects of a major rule until after Congress and the President had the opportunity to consider the rule. This, Defendants did not do.

To evade the requirements of the CRA and the general requirement of a 30-day delay of the effective date after publication, Defendants claim the Rule is "interpretative." ("This revised definition reflects the Department's understanding of the best interpretation of the statute, and it is immediately effective. See 5 U.S.C. 553(d)(2).") 88 FR 6480. "Interpretive rules…do not have the force and effect of law and are not accorded that weight in the adjudicatory process. *Shalala v.*

*Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995). In *Mortgage Bankers*, we held that interpretive rules, even when given *Auer* deference, do not have the force of law. See 575 U. S., at ——, and n. 4, 135 S.Ct., at 1208, and n. 4. An interpretive rule itself never forms the basis for an enforcement action—because, as just noted, such a rule does not impose any legally binding requirements on private parties." [internal quotes omitted] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) citing *National Min. Assn. v. McCarthy*, 758 F.3d 243, 251 (CADC 2014).

Yet it is clear the Rule is intended to have the force and effect of law from the sweeping provisions of the Rule and its broad threats of felony prosecutions against millions of people. "A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up). Thus, the Rule is a substantive or legislative rule, and Defendants could not lawfully have the Rule take immediate effect. At the very least, these violations justify an immediate nationwide temporary restraining order and a preliminary injunction. At most, this is cause to permanently enjoin enforcement and hold the Rule unlawful and set it aside.

### C. Agency's Classifications Are Arbitrary and Capricious.

Agency's Rule relies on numerous purportedly "objective" factors to determine whether a braced pistol is a rifle, including (1) rear surface area, (2) weight of the firearm, (3) length of pull, (4) sights or scopes with eye relief that require shouldering of the firearm in order to be used as designed, (5) necessity for the cycle of operations, (6) marketing and promotional materials, and (7) likely use by the community. Rule at 6480. Defendants apparently do not understand the meaning of the word "objective." An objective factor is one based on observable phenomena for

which there is no reasonable disagreement, i.e., uninfluenced by emotions or personal prejudices.[3] Objective means "of, relating to, or being an object, phenomenon, or condition in the realm of sensible experience independent of individual thought and perceptible by all observers; reality independent of the mind."[4]

None of these factors are, as the Rule asserts, "objective." The Rule provides no measure of how much surface area passes the first gateway factor. Defendants do not set upper or lower limits on the weight of the firearm, and those limits in any event would be arbitrary since shooters of varying strength and level of disability could use or need stabilizing braces. The length of pull is arbitrary because the Rule does not account for – and summarily rejected comments saying – that different arm lengths, finger lengths, and forearm sizes would require braces of varying lengths to be useful. The Rule does not state how length of pull will be measured. The Rule does not state how eye relief will be measured or how much loss of scope function would indicate the scope is unusable unless the brace were placed against the shoulder. The Rule does not explain why the lack of necessity of a rearward protrusion for the cycle of operations indicates a firearm will likely be used as a stock rather than a brace. It is obviously arbitrary that marketing materials do not affect the classification as a pistol or rifle, and this is purely subjective Agency judgment.

Finally, how the Agency subjectively perceives the likely use by the community has no bearing on how Plaintiff, or anyone else similarly situated, will use those guns. Indeed, the Rule flatly rejects classifying "weapons based on how a particular individual uses a weapon," Rule at 6484, while holding the contradictory belief that a handful of anecdotes of people using braces as stocks justifies a "likely use in the general community." Rule at 6479, n. 8.

---

[3] American Heritage Dictionary.
[4] Merriam-Webster.

In numerous classification letters from 2012 until 2020, ATF repeatedly affirmed that adding a stabilizing arm brace to a pistol *did not* convert that pistol into an SBR. Exhibits 3—7. Betwixt those classifications, Agency determined that braces were illegal if they could not be used as a brace, could only be used as a stock, and were actually used as a stock. Rule at 6491—92, n. 50. Even that adverse determination gave the public some clarity. Without any new information it did not know in 2012, the Agency reversed that decision too, and now reverses again; this is the very definition of capricious.

### D. Agency Relied on Factors Congress Did Not Intend for It to Consider

Courts invalidate rules failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection' between the facts found and the choice made." *Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

Neither the NFA nor GCA relies on any of the seven factors identified in the Rule. These factors constitute the Agency's subjective determination that a braced pistol is "designed to be fired from the shoulder" because these features either facilitate firing from the shoulder, are not necessary for a pistol, or that they indicate "intent" to fire from the shoulder. This runs afoul of the Supreme Court's holding in *Thompson/Center Arms*, *infra*., that if there exists at least one lawful Title I configuration of a firearm from its components, a court cannot presume the intent to make an unlawful SBR.

Plaintiff's Q Honey Badger demonstrates that none of Defendants' criteria implies the firearm was "designed to be fired from the shoulder." Plaintiff can hold and fire his fully loaded 9.14-pound Honey Badger using only one hand and the stabilizing brace. Exh. 1, Fig. 13. Plaintiff could fire his Honey Badger using the attached bipod without placing the brace against his shoulder. *Id.*, Fig. 12, 46. Plaintiff could still see a crystal-clear reticle on his scope – with an eye relief of only 3.5 inches – with his eye more than 20 inches from the ocular lens. *Id.*, Fig. 6.

For the third rule in a row, Defendants try to rely on a firearm or accessory manufacturer's marketing materials to determine whether a firearm violates the NFA or GCA. If a manufacturer were to claim that a semi-automatic firearms was a machinegun, this would not actually make it a machinegun; the gun is classified as what it is, not what someone purports it to be. In the instant case, Defendants determined that placing a braced pistol against your shoulder *did not* convert the firearm to a short-barreled rifle. As a direct consequence of this determination, firearm and brace manufacturers, and shooters began to say that ATF allowed people to shoulder a brace without violating the NFA or GCA. Yet now, Agency attempts to use these lawful responses *to its own determination* as evidence manufacturers designed braces to be used as stocks and the public uses them as stocks. Bad faith in rulemaking does not get much worse than this.

The Agency's subjective determination that shooters do not "need" a brace for very light weapons, or cannot use a brace for very heavy weapons, is arbitrary and capricious. It is simply impossible for any firearm owner to evaluate whether the weapon he possesses violates the NFA or the GCA under the Rule. Defendants rely on people's *fear* of prosecution to self-regulate away their rights.

E.  **Plaintiff's Guns Show the Rule Is Arbitrary and Based on False Conclusions.**

Plaintiff owns a Q Honey Badger pistol that Defendants *expressly* consider an SBR because of its rear surface area and resemblance to a stock, its barrel length of 7 inches, and its weight of 4.4 pounds. Rule at 6514. Plaintiff's Honey Badger is equipped with a Nikon P-300 scope with a published eye relief of 3.8 inches. Exh. 1, Figures 4, 5, 12. The Honey Badger weighs in at 9.14 pounds with a loaded 30-round magazine, a scope, a visible and infrared laser, a bipod, and a suppressor. *Id.*, Figures 15—16. It has an overall length of more than 32 inches with the suppressor and more than 24 inches without the suppressor. The Court can easily see that Plaintiff is able to hold the nine-pound gun with one hand by using the stabilizing arm brace. *Id.*, Figure 13. Plaintiff's nine-pound gun weighs more than 99 out of the 100 guns Defendants list in their Rule as typical weights for rifles. Rule at 6514—15. Plaintiff's Honey Badger is equal to or longer than 25 of the 74 firearms Defendants list in the Rule. *Id.*

Using the Honey Badger with its bipod and Plaintiff's eye more than 20 inches from the ocular lens of the Nikon scope, he can see the reticle with crystal clarity. *Id.*, Figure 7. Using the brace with his supporting hand and tilting the gun 90 degrees to the left, Plaintiff can easily obtain a full field of view with a crystal-clear reticle on the Nikon scope. *Id.*, Figure 14. Thus, Defendants' vague reliance on "eye relief," presumably from published or measured distances (and not stated in the Rule), fails to demonstrate that magnified optics with low eye relief cannot be used with a braced pistol. Published eye relief is at *maximum magnification* and *full field of view*. Users are not required to maximize these desirable features.

Similarly, Plaintiff can easily use his Ruger 10/22 pistol as a braced pistol. Exh. 1, Figs. 42—45. By slightly canting the gun to the left, Plaintiff can use the brace and still obtain a sight picture with a red dot sight with infinite eye relief. *Id.* Fig. 44.

Even if a braced pistol is equipped with an optic with limited eye relief, shooters are not required to – and cannot be assumed to – use that optic. Plaintiff's QHB and Ruger 10/22 are equipped with aiming lasers in addition to optics. Exh. 1, Figs. 12, 42, 43, 45. The Ruger 10/22 Charger pistol, with no stock or brace, was designed for hunting small game with a bipod and scope, demonstrating a shooter *can* use the gun and scope without shouldering it. *Id.*, Fig. 46.

Depending on how length of pull is measured, which the Rule does not state, Plaintiff's Q Honey Badger has a length of pull of 8.5 inches with the brace fully collapsed, about 13 inches when measured horizontally to the midpoint of the fully extended brace, about 13.5 inches when measured flush with the rearmost part of the brace, and about 13.7 inches when measured diagonally. *Id.*, Figures 8—10. By the Agency setting a bright line of 13.5 inches for length of pull, Plaintiff's firearm is precariously close to being an illegal stock under the Rule, and even small measurement errors, the position of the measurer's eye relative to the gun and measuring tape, and arbitrary choices on whether to use the rearmost, center, or closest point of the brace could result in Plaintiff being a felon or not. If the length of pull were two inches longer (15—15.7"), Plaintiff could still attach the brace to his forearm. *Id.*, Fig. 7.

### F. <u>The Rule Violates the Second Amendment</u>

#### 1. <u>Braced Pistols and SBRs are Bearable Arms Presumptively Protected by the 2A.</u>

The U.S. Supreme Court has held that the Second Amendment to the United States Constitution presumptively protects an individual right to keep and bear arms for self-defense. *New York State Rifle & Pistol Assn., Inc. v. Bruen* ("*Bruen*"), No. 20-843, at *1 (June 23, 2022). "[T]o justify a firearm regulation, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id.* "The Second Amendment is the very product of interest balancing by the people, and it surely elevates above

all other interests the right of law-abiding, responsible citizens to us arms for self-defense. *Id.*, citing *District of Columbia et al. v. Heller* ("*Heller*"), 554 U.S. 570, 635 (2008) [internal quotes omitted]. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen* at *24. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller* at 625. The need for armed self-defense is perhaps most acute in the home. *Heller* at 628.

2.  SBRs and Braced Pistols Are in Common Use for Lawful Purposes

By Defendants' own admission, between three and seven million people own pistols with stabilizing arm braces. Rule at 6560; RIA 18. But while the parties may dispute the number of braced pistols in circulation, the U.S. Supreme Court did not rely on something as banal as counting guns when it determined "that handguns are weapons 'in common use' today for self defense." *Bruen* at 2. "Common use" is not defined in numbers or percentages, as if the public is voting on which weapons are most useful for their purposes. The word "common" has two relevant senses. The first is "of or relating to a community at large."[5,6] That is, the word common means guns that are possessed by "law-abiding citizens with ordinary self-defense needs" *Bruen* at *1. The second sense of "common" means "widespread; prevalent,"[7] and "occurring or appearing

_____

[5] Merriam-Webster.
[6] *Ibid.*
[7] American Heritage Dictionary.

frequently,"[8] "happening often; existing in large numbers or in many places,"[9,10] "occurring, found, or done often; prevalent."[11]

The *millions* of braced pistols in circulation plus hundreds of thousands more SBRs are clearly "common" and "widespread" among American firearm owners. Indeed, the Rule *relies* on these weapons becoming more common each year. ("in light of the proliferation of various 'stabilizing brace' models...") Rule at 6556. ("Since [2012], the variety of available 'stabilizing braces' or similar 'brace' devices and pistols equipped with 'braces' has grown significantly.") Rule at 6479. "The demand and production for ''stabilizing braces'' did not appear to take off until 2017...This relatively recent rise in popularity..." Rule at 6560. From 2012 to 2020, Defendants processed more than 250,000 ATF Form 1 applications to make NFA firearms, the vast majority of which are SBRs.[12]

Defendants will likely argue there are a relatively low number of registered SBRs – about 532,725.[13] Yet this is a circular argument that SBRs can be regulated because they are uncommon, but they are uncommon because they are regulated by the NFA. As inflation eroded the burden of the fixed NFA tax over time, more and more people have found it worthwhile to pay the tax to obtain NFA-regulated items. ATF Form 1 processing has increased nearly eight-fold from 5,169 applications in 2010 to 40,790 in 2020. ATF Form 4 transfers have increased more than seven-fold from 33,059 to 246,806 during the same period.[14]

---

[8] Merriam-Webster.

[9] Oxford Dictionary

[10] Wiktionary

[11] Google Dictionary

[12] *Firearms Commerce in the United States*, Annual Statistical Update 2021, p. 13.

[13] *Ibid.*, pp. 15-16.

[14] *Ibid.*, p. 13

3.   <u>There Are No Historical Analogues of Regulating SBRs and SBSs.</u>

Defendants did not and cannot identify any historical record of regulating short-barreled shotguns, short-barreled rifles, or braced pistols to the Founding era. Plaintiff's *Verified Complaint* demonstrates SBRs and SBSs have been in common use for lawful purposes since before the ratification of the Second Amendment. *Complaint* ¶¶ 67—78. See also Exhibit 1, Figures 24—32.

While persons and militaries in the Founding era preferred long-barreled weapons, there is no evidence that they ever *restricted* short-barreled weapons. The purpose of requiring longer-barreled muskets for militia service had nothing to do with any contemporaneous sentiment that short-barreled rifles were the weapons of criminals with no relation to the military service. The purpose was to ensure uniformity among the weapons used by military units, and to maximize the velocity of the heavy projectile in an ill-fitting barrel that allowed propellant gases to bypass the ball; the requirement was practical, not a matter of law. Long barreled weapons also facilitated the use of bayonets, for which length confers a distinct advantage. And, of course, the requirement to bring a long-barreled musket to a militia muster is not a prohibition on the keeping and bearing of short-barreled muskets for other purposes.

Defendants will likely argue that the eighty-nine year old NFA and the fifty-five year old GCA are firmly rooted in this Nation's historical regulation of firearms. First, as the U.S. Supreme Court explained, the proper inquiry is whether such regulations were firmly rooted at the time the Second Amendment was ratified according to its historically fixed meaning. *Bruen* at 2. Second, *Bruen* now calls both statutes into question in a newfound light that previous courts had not examined when they upheld the NFA under an improper interest-balancing test and without acknowledging an individual right to bear arms. It is obvious that if the NFA contained the

regulation of handguns, as it was originally written, *Bruen* would have struck down at least that portion of the statute.

### 4.  SBRs Are Neither Dangerous Nor Unusual

By technical and statutory definition, firearms use the energy from an explosive charge to push a projectile down the barrel toward its target. As soon as the projectile exits the barrel at the muzzle, it begins to lose velocity because hot gases are no longer pushing it from behind. Generally, the longer the barrel, the higher the velocity of the projectile because the expanding gases inside the barrel will have more time to push the projectile.[15] Kinetic energy is equal to one-half the mass of the projectile times the velocity squared ($KE = 0.5 \ mV^2$). Because velocity is squared, increases in velocity will have a proportionally larger effect on kinetic energy. For example, firing a 55-grain bullet (3.56 grams) from a 5.56mm rifle with a 10.5-inch barrel will have a muzzle velocity of 2,739 feet per second[16] (fps) and 1,240.6 joules of energy.[17] The same bullet fired from a 16-inch barrel would have a muzzle velocity of 3,132 fps and 1,622.2 joules of energy – a 14.3 percent increase in velocity results in 30.8 percent more kinetic energy. Thus, a projectile from a firearm with a shorter barrel has *less* kinetic energy, and less terminal effects on the target. Slower projectiles also have less range because the vertical force of gravity is independent of the horizontal rate of travel.

In *Bruen* and *Heller*, the Supreme Court cautioned that nothing in those decisions should raise doubts about longstanding prohibitions of firearm possession by felons and carrying firearms

---

[15] If a barrel is too long, the gases will reach full expansion before the muzzle, and the projectile will slow down inside the barrel. Modern firearm and ammunition manufacturers design their products to not let this happen.

[16] https://theprepperinsider.com/ar-15/barrels/length-velocity-chart/

[17] https://www.calculatorsoup.com/calculators/physics/kinetic.php

into sensitive places. *Heller* at 571. In gratis dicta unrelated to the facts and issues of those cases, the Supreme Court remarked that it would be a "startling reading" of *U.S. v. Miller*, 307 U.S. 174 (1939) that "restrictions on machineguns might be unconstitutional." *Heller* at 624. Startling as that may be, the Court did not consider the constitutionality of regulating machineguns, and it certainly did not consider or mention the regulation of short-barreled rifles. Similarly, the High Court considered the constitutionality of regulating short-barreled shotguns in *Miller* and found in the government's favor only because the case was undefended by Mr. Miller, who was deceased. The Court refused to take judicial notice that short-barreled shotguns had been used in combat, and the Court held that it could not conclude that SBSs were part of the "ordinary military equipment or that its use could contribute to the common defense." Thus, the decision in *Miller* turned on a factual issue, not an issue of law.

By mere assertion, Defendants attempt in their Rule to shoehorn the "dangerous and unusual" language in *Bruen* and *Heller* into their basis for concluding SBRs can be lawfully regulated. Rule at 6481. That is, Defendants claim that SBRs are "dangerous and unusual" for no reason other than they were included in the NFA, which is now under scrutiny in this suit and others. Yet neither Defendants nor Congress can declare by executive or legislative fiat that particular weapons are "dangerous and unusual" for the purposes of this Court's analysis. It is the physical characteristics of the guns and the history of their regulation, not political dicta, that determines whether they are protected by the Second Amendment. If Defendants or Congress could declare weapons "dangerous and unusual," they could simply declare that handguns are "dangerous and unusual" and ban the very instruments that *Heller* and *Bruen* said were protected by the Second Amendment. Indeed, the initial draft of the NFA written by Defendants sought to regulate handguns among the other regulated firearms. Congress did not drop that provision

because they concluded handguns were not as dangerous as the other weapons, but because such regulation would be highly unpopular. *Hearings Before the Committee on Ways and Means*, House of Representatives, Seventy-Third Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 ("*NFA Hearings*").

Nothing in the text or legislative history of the NFA stated short-barreled rifles were especially dangerous or unusual. Indeed, short-barreled rifles were added to the NFA as an afterthought when a Congressman from Minnesota erroneously believed his hunting constituents would be adversely affected by the NFA; he oddly suggested that adding SBRs would provide them protection when, in fact, the absence of SBRs from the legislation protected them.

> Hon. Knutson: General, would there any objection, on page 1, line 4. After the word 'shotgun' to add the words 'or rifle' having a barrel less than 18 inches? The reason I ask that is I happen to come from a section of the State where deer hunting is a very popular pastime in the fall of the year and, of course, I would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer.

> AG Cummings: Well, as long as it is not mentioned at all, it would not interfere at all.

> Hon. Knutson: It seems to me that an 18-inch barrel would make this provision stronger than 16 inches, knowing what I do about firearms.

*NFA Hearings* at 13.

When reaching its decisions in *Bruen* and *Heller*, the High Court found unpersuasive the data that handguns are used in most firearm homicides. Thus, whether a weapon is "dangerous" in the meaning of *Bruen* and *Heller* is not a matter of counting bodies falling beneath the weapon's wrath or how it could conceivably be used in mass killings. Rather, *Heller* and *Bruen* declared handguns were in common use for lawful purposes, and there were no historical analogues of regulating handguns at the time of the ratification of the Second Amendment or long thereafter.

SBRs (and braced pistols) are indeed bearable arms useful in self-defense. Plaintiff uses an APC-45 SBR, a Glock 17 SBR, a Sig Sauer P320 SBR, a Remington 870 SBS, and a Mossberg Shockwave for home defense. *Compl.* ¶ 251. These shorter weapons are ideal for home defense because they can easily be wielded through narrow doorways and hallways, just as they are used by police and military. *Compl.* ¶ 64—65. Their shorter stature and comparatively lighter weight than longer-barreled firearms allow Plaintiff to attach silencers and flashlights while keeping the length and weight relatively short and light. *Id.* Silencers and lights are especially important on home defense guns when Plaintiff must awaken in the middle of the night without any hearing protection. The silencer reduces the flash, report, muzzle rise, and infrasonic compression waves of using a firearm, which are not features of firearms but undesirable bugs.

Defendants admit that *millions* of people own braced pistols on top of the millions who already own registered SBRs. Such ownership could possibly be up to 40 million guns. Exhibit 2. Yet the anecdotal evidence of criminal uses of braced pistols numbers, at most, reveals fewer than 200 instances of criminal misuse of braced pistols in the eleven years from 2012 until 2022.

The sole remaining argument Defendants have about the "danger" of SBRs is that they are "easily concealable." It is obvious that a pistol without a stock or brace is much shorter, and hence more easily concealed, than an identically functioning SBR or braced pistol. *See* Exh. 1, Fig. 37 comparing the pistol without a brace (top) with the braced pistol (second from top) and the SBR (bottom). The Rule provides no evidence braced pistols have been concealed prior to the few unlawful uses Defendants identified. This highlights a crucial difference between "concealable" and "concealed." While there is arguably some history of government regulation prohibiting concealed weapons, Defendants can cite no historical analogues prohibiting weapons that are

concealable. Indeed, no firearms are more concealable than handguns, which are presumptively protected by the Second Amendment.

### G. Defendants Cannot Rewrite the NFA or GCA.

"When a court is confronted with a clear need for regulatory action under a statute which did not anticipate the condition which created the regulatory problem or provide the means for dealing with it, there is a temptation to approve good-faith agency efforts despite the agency's apparent lack of statutory authority. But this temptation must be avoided, for it is the Congress, not the judiciary, which must act to provide the regulatory agencies with the tools they require. The Court 'is neither empowered to rewrite the language of statutes which may be antiquated in dealing with the most recent technological advances, nor [is it] empowered to make a policy judgment as to whether [the regulations are] in the overall public interest. Therefore, [the Court has] no option but to set aside the regulations . . . as being in violation of the statute." *American Bankers Association v. Connell*, 686 F.2d 953 (D.C. Cir. 1979). Accordingly, an Order granting summary judgment to plaintiffs and setting aside the challenged regulations is filed herewith." *Faic Securities, Inc. v. United States*, 595 F. Supp. 73, 79 (D.D.C. 1984).

That the eighty-nine year old NFA and fifty-five year old GCA failed to anticipate the innovation of braces and modern firearms does not authorize Defendants to unilaterally declare they are encompassed by the NFA and GCA. It is up to *Congress*, not the Agency, to decide whether to regulate braced pistols. Agency did not even consider deferring to Congress to decide the issue, much less explain why they could not. Agency's standard answer in rulemaking to criticism that it failed to consider deferring action to Congress is that the Rule does not preclude Congressional action. This response is not what the APA requires.

This is the third President in a row who sought to enact through regulation what he could not pass through Congress. President Obama responded to the deadlock in a divided government over his preferred policies by saying, "I've got a pen, and I've got a phone."[18] President Trump ordered rulemaking to outlaw bump stock devices saying, "I don't care if Congress does it or not, I'm writing it out myself.[19] Now, President Biden seeks to regulate braced pistols "without having to go through Congress."[20] *Compl.* ¶ 286. The Supreme Court struck down rules where agencies attempted to enact provisions expressly rejected by Congress. *West Virginia v. EPA,* No. 20-1530, at *5 (June 30, 2022); *Ala. Ass'n of Realtors v. United States Dep't of Health*, 557 F. Supp. 3d 1, 3 (D.D.C. 2021).

## H. **The Rule Attempts to Answer a Major Question Reserved to Congress**

The Rule seeks to make between 3 and 7 million (and possibly up to 40 million) firearm owners with guns outfitted with stabilizing braces into instant felons, notwithstanding the Agency's discretionary non-enforcement of many Rule provisions for 120 days. The Rule also affects the rights of every citizen who might wish to use a stabilizing arm brace, every manufacturer of braces, every manufacturer of pistols, and every firearm retailer who would like to sell braced pistols. Even with the Agency's obviously low-balled estimate of 1.4 million affected persons, the Rule's scale and scope are so widespread, its economic and political significance so great, and the burden on the right to keep and bear arms so heavy, that Congress could not have intended to vest Defendants with so much authority. *West Virginia v. EPA*, No. 20-1530, at *3 (June 30, 2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000). See,

---

[18] https://www.npr.org/2014/01/20/263766043/wielding-a-pen-and-a-phone-obama-goes-it-alone
[19] Public remarks of President Donald J. Trump, Feb. 26, 2018.
[20] President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298.

J.A. 98

e.g., *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U.S. __, __, 141 S.Ct. 2485 (2021); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *National Federation of Independent Business v. OSHA*, 595 U.S. __, __.

### I. Lenity and Vagueness Militate against the Rule's Interpretations.

Although the NFA is a tax statute herein construed in a civil setting, "the NFA has criminal applications that carry no additional requirement of willfulness." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992). Congress provided that while ignorance of the law is no excuse, failure to pay the NFA tax requires specific intent to violate federal criminal tax offenses. 26 U.S.C. § 7201, 7203; *Id.* at 518. "In light of the criminal aspect, the rule of lenity could be deemed to be in play. It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *City of Mesquite v. Aladdin's Castle. Inc.*, 455 U.S. 283, 289-90 (1982) (quoting *Groyned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *Hill v. Coggins*, 867 F.3d 499, 513 (4th Cir. 2017); *Williams v. Johnson*, 1:10cv823 (GBL/IDD), at *8 (E.D. Va. Sep. 12, 2011). "As we recently explained, a criminal statute is void-for-vagueness if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. This analysis should be conducted bearing in mind the context in which the statute is applied." *United States v. Beason*, No. 11-4676, 2013 WL 1694541, at *2 (4th Cir. Apr. 19, 2013). *United States v. Brewer*, 533 F. App'x 234, 9 (4th Cir. 2013).

What Defendants decry as a "loophole" actually means "lawful." A free citizen can do anything that is not specifically proscribed by law. *Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332, 343 (1900). The NFA and GCA are to be enforced according to their own terms.

*Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *U.S. v. Jennings*, 323 F.3d 263, 266 (4th Cir. 2003).

Agency argues throughout the Rule that its determination with respect to one brace it examines does not apply to other braces, no matter how similar they are in aspect. "In the NPRM, the Department also noted that ATF issued classification to some makers or manufacturers without having had the benefit of evaluating the 'brace' when attached to a firearm." Rule at 6496. Thus, Agency seeks to impose on law-abiding gun owners a hopelessly indecipherable set of subjective criteria that it alone can determine only after examining a particular weapon. "Given the wide variety of configurations of weapons and 'stabilizing braces,' the rule is 'necessary' or 'needful' to clarify the meaning of [the phrase] [designed or redesigned, made or remade, and intended to be fired from the shoulder." Rule at 6500.

A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be *held and fired by the use of a single hand*," and "any combination of parts from which" a handgun "can be assembled." [emphasis added] 18 U.S.C. § 921(a)(30). A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels *when held in one hand* that has both a chamber as an integral part of, or permanently aligned with, the bore and a short stock designed to be gripped by one hand at an angle to and extending below the line of the bore." [emphasis added] *See* 27 C.F.R. 478.11 and 479.11. A rifle is defined by the GCA as "a weapon *designed or redesigned, made or remade, and intended to be fired from the shoulder* and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." [emphasis added] 18 U.S.C. § 921(a)(7).

In prior determinations, Agency properly determined that if a brace on a pistol *can be* used as a brace with one hand, then the firearm is classified as a pistol. The Rule flips this approach on its head, now deciding that if a brace on a pistol *can be* used against the shoulder, then it *is* a rifle (and SBR). Because a braced pistol could arguably satisfy the definitions both of a pistol (designed to be used with one hand) and a rifle (designed to be fired from the shoulder), the Rule of Lenity demands that the Court rule favorably for the party allegedly violating the law.

In a case directly on point, the U.S. Supreme Court acknowledged that a collection of lawful parts that can be used for nothing except assembling them into a firearm produces a regulated firearm. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 511 (1992). The fact the Thompson Contender kit contained lawful configurations for a Title I pistol or rifle, and only the *possibility* of making a Title II SBR, the kit did not violate the NFA. *Id.* The Rule concedes that "The Supreme Court in *Thompson/Center* concluded that the 'mere possibility' that a pistol and accompanying kit might be 'use[d] to assemble a regulated firearm' did not establish that the 'combined packaging' of the kit and pistol brough the package within the scope of 'making' a short-barreled rifle. [*Thompson*] at 513." Rule at 6500, n. 78. Similarly, the mere possibility that a shooter can place a braced pistol against his shoulder does not constitute the making of an SBR.

The Rule falsely asserts that a brace on a "heavy" pistol has "no design function other than to facilitate the firing of the weapon from the shoulder." Rule at 6496. The most obvious available design function of a stabilizing arm brace is for use as a stabilizing arm brace; even the *possibility* of using it as a brace falls within the holding in *Thompson*. The Rule expressly rejected comments that if a particular user *can* or *does* use the brace on a pistol, that defeats a finding the firearm is an SBR. Rule at 6484. Plaintiff can easily fire his nine-pound rifle with one hand. Exh. 1, Fig. 13.

The Rule relies on manufacturer "marketing materials," making it impossible for users, like Plaintiff, to understand what marketing statements indicate to the Agency that a braced firearm is intended to be fired from the shoulder. The Rule relies on "likely use of the weapon in the general community," which Plaintiff could not possibly discern by himself. Rule at 6479—6480, 6495. The Rule relies on attached scopes with "eye relief that require the weapon to be fired from the shoulder," Rule at 6480, yet the Rule does not define how limited eye relief must be for Plaintiff to be violating the statutes. The Rule relies on the weight and length of the firearm, yet the Agency provides no guidance on how much or little a firearm must weigh to comply with the statutes. Agency relies on vague classification criteria such as the braced pistol being "similarly designed" to rifles. Worst of all, the Rule relies on these vague factors *in combination*, and neither Plaintiff nor the firearm community could possibly divine how the Agency would weigh each factor and their interactions with one another on their weapons.

**J.   Agency's Interpretations Are Not Deserving of Deference.**

This Court should not defer to the Agency's interpretations of statutes because the NFA and GCA are neither vague nor ambiguous about the definitions of a "pistol" and a "rifle." Even if those terms are not clear, the Agency's interpretations are not permissible. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

The NFA and GCA clearly define pistols as weapons designed for use with one hand. The patents and designs of all stabilizing braces demonstrate they were designed for weapons to be fired with one hand, and ***Defendants' determinations from 2012 to 2020 said so***. Using a brace, Plaintiff can easily hold and fire a nine-pound gun with one hand, whereas the front-heavy weapon would tilt forward without the brace. Exh. 1, Fig. 13.

USCA4 Appeal: 23-1604   Doc: 17   Filed: 10/30/2023   Pg: 106 of 138
Case 1:23-cv-00195-RDA-JFA   Document 17   Filed 03/17/23   Page 48 of 54 PageID# 644

J.A. 103

It is irrelevant that a braced pistol *could* be fired with two hands. It is common practice among self defense experts, competitive shooters, police, and military to train handgun shooters to use two hands, yet Defendants do not consider two-handed use of handguns to be making an Any Other Weapon ("AOW"), even when they have design features improving the grip of the non-firing hand. 26 U.S.C. § 5845(e). *See* Exh. 1, Figure 38. Any handgun could, rather ridiculously and dangerously, be fired from the shoulder. This does not alter the fact the handgun was designed to be fired with one hand. Also, the definitions of "rifle" or "any other weapon" do not include "designed to be fired with two hands." That is, a person's use of something other than what it was designed for does not alter its classification under the law.

The NFA and GCA clearly define a rifle as being "designed to be fired from the shoulder." There is no silence or ambiguity in this definition. Braced pistols are explicitly designed and intended to be fired with one hand, not against the shoulder.

Even if the Court finds that the NFA and GCA are ambiguous or silent, the Agency's interpretations are not permissible constructions of the statute. Pistols with braces were designed exactly for the purpose of one-handed firing, and Agency's earlier classifications held exactly that. Even now, Agency admits that *some* braced pistols might not be SBRs depending on the factors the Agency lists in the rule. Clearly, those pistols were designed for one-handed use.

Despite Defendants' misdirection that "many heavy pistols have the receiver of a rifle," Rule at 6518, these receivers are transferred as *pistols* based on the Agency's classification. Adding a brace does not change the design from one-handed use, and braces actually *facilitate* one-handed use. The Rule rejects that braces are "purported to assist the shooter [to] stabilize the weapon while shooting with one hand," Rule at 6494, but relies on "objective design features and characteristics that facilitate shoulder fire." Rule at 6479. Defendants simply choose their own

purported use of a firearm over other people's purported use. Defendants expressly say that owners of braced firearms may "remove any offending characteristics to remove the firearm from the purview of the NFA." So, they admit the unadorned AR pistols are pistols. If AR pistols are pistols, and braces facilitate one-handed firing, that is the end of the matter.

Because of all the procedural errors in this rulemaking, the Court should give Agency no deference to its interpretations. "Chevron deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

### K.  The Rule Imposes *Ex Post Facto* Criminal Liability.

Plaintiff is subject to *ex post facto* criminal liability because, for the first time in regulation, Defendants interpret 18 U.S.C. § 922(r) as applying not just to importers, but to end-users as well. The Rule explicitly states that the law is violated upon *assembly* of the firearm, and replacing foreign-made parts with American-made parts would not cure the violation. Rule at 6564.

The GCA restricts importation of firearms that the Agency unilaterally declares are "not for sporting purposes." 18 U.S.C. § 921. But the decision in *Bruen* has held that the Second Amendment presumptively protects all bearable arms, even those not in existence at the time the Second Amendment was ratified, and the government must demonstrate that restrictions on such weapons are part of the historical understanding of the Second Amendment. Because Plaintiff made SBRs from foreign-made pistols, and because the Rule interprets 922(r) to apply to Plaintiff, and because Defendants do not consider SBRs for "sporting purposes," and because Defendants claim the law violation cannot be cured, Plaintiff is subject to criminal liability for weapons he uses daily for home defense. *Compl*. ¶¶ 65, 251. Indeed, SBRs are used for sporting purposes in United States Practical Shooting Association (USPSA) competitions. "For all long guns (R, SG,

and PCC), Short Barreled Rifles (SBR's) are permitted provided the competitor is in full compliance with all state and federal laws and regulations concerning ownership and transport of the SBR and the PCC otherwise complies with Divisional requirements."[21] Exh. 1, Figures 39, 40.

## II.    THE RULE CAUSES PLAINTIFF IRREPARABLE HARM

As pleaded in Plaintiff's *Verified Complaint*, the Rule causes Plaintiff harm that is imminent and ongoing, concrete and particularized, and that setting aside the Rule will afford Plaintiff complete relief. First, the Rule, the NFA, and the GCA infringe upon Plaintiff's rights under the Second Amendment. "The ... deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

On January 31, 2023, Plaintiff became an instant felon by possessing at least five firearms equipped with stabilizing arm braces and numerous foreign-made firearms that he converted to SBRs. Although the Agency exercises its prosecutorial discretion to not enforce the NFA and GCA with respect to braces for 120 days following the Rule, Plaintiff is *immediately* subject to all of the ordinary and usual restrictions on a person possessing a lawful SBR, such as not being able to sell those firearms as Title I weapons, not being able to transport them to other states without Defendants' permission on ATF Form 20, and not being able to transport them to states that allow Title I firearms but not Title II firearms. No later grant of declaratory or injunctive relief will remedy these harms during the pendency of this case.

Since 2020, Plaintiff has been suspended from his job without pay in a blatant act of whistleblower retaliation. To continue to meet his financial obligations each month, Plaintiff has

_____

[21] USPSA Rifle, Shotgun and Multigun Rules, March 2023, p. 99.

had to sell firearms, and he intends to sell more in the near future. But the Rule expressly prevents Plaintiff from selling braced pistols without paying a $200 NFA tax and transferring the firearm to a buyer through ATF Form 4, which currently takes more than nine months to process. The tax, the long processing time, and the registration of Plaintiff's braced pistols as SBRs destroy the value of his guns and defeats the purpose of selling them.

Under the Rule, Plaintiff must engrave his braced pistols with his name and location. 27 C.F.R. 479.102(a)(1). Once Plaintiff has engraved his firearms, no future award of damages can remedy the defacement of his lawful property, particularly the serialized receivers, that are a store of value in trade.

Even now, Plaintiff is under imminent risk of search, seizure, and prosecution because of his pleadings in this case regarding firearms that were completely lawful before January 31, 2023.

## III.    BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF

If this Court enjoins enforcement of the Rule, there will be no deluge of shootings with braced pistols. In the years between 2012 and 2020, there were fewer than 200 known incidents of crimes *possibly* committed with braced pistols out of *millions* of braces owned by the public and *billions* of lawful uses. Indeed, Defendants do not report any surge in crimes with braced pistols during the period before the Rule became effective. Plaintiff has demonstrated earlier that the Rule will have virtually no benefits for public safety, and enjoining the Rule will cause no harm. The Rule's 120-day non-enforcement indicates further that Defendants do not really believe the Rule is so necessary as to have immediate effect.

Yet every day, the Rule makes Plaintiff and other law-abiding citizens across the nation into felons, putting them at risk of incarceration up to 10 years in prison, fines up to $250,000, loss

of non-compliant firearms, and permanent loss of their Second Amendment rights for each violation. Plaintiff has demonstrated the balance of equities and public interest weigh in his favor.

## IV.    BONDS, SECURITY, OR SURETIES

Because Defendants will suffer no financial harm if this Court enjoins their enforcement of this Rule, this Court should either set no requirement for bond or a nominal amount. Plaintiff has not received a paycheck from his federal employer for more than 2.5 years, Plaintiff has substantial debt, and his monthly net income is negative, so he cannot afford to pay bond.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for a nationwide temporary restraining order, a preliminary and a permanent injunction. The Court should hold the rule unlawful and set it aside under 5 U.S.C. § 706.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

1.  Declare that the Rule, RIN 1140-AA55, is held unlawful and set aside.

2.  Declare that regulation of braced pistols, short-barreled rifles, and short-barreled shotguns under the Rule, NFA, GCA, and Defendants' determinations violates the Second Amendment to the United States Constitution.

3.  Declare that Defendants' Rule and determinations create *ex post facto* liability on Plaintiff.

4.  Declare that 18 U.S.C. § 922(a)(4) violates the Second and Tenth Amendments.

5.  Declare that the National Firearms Registration and Transfer Record violates the Fourth and Fifth Amendments of the United States Constitution.

6. Declare that 18 U.S.C. §922(r) does not apply to end-users purchasing foreign-made pistols who then convert those pistols into braced pistols or SBRs.

7. Declare that 18 U.S.C. § 922(r) violates the Second Amendment.

8. Temporarily restrain, and preliminarily and permanently enjoin Defendants from enforcing any provisions of law, rule, or regulation this Court deems violative of law or the U.S. Constitution, in a nationwide injunction.

9. If this Court does not grant the requested injunctive relief, Plaintiff requests this Court suspend the effective date of the Rule until 120 days after the conclusion of this case.

10. Plaintiff requests immunity from prosecution, search, or seizure based on any pleaded facts in this case.

11. Order Defendants to provide a tax-exempt transfer of all firearms Plaintiff registers as an individual pursuant to the Rule to his Trust.

12. Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

13. Order any other that the court deems just and appropriate.

I hereby certify and verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746. No attorney has prepared or assisted in the preparation of this motion.

EXECUTED ON March 10, 2023.

-s- _Robert M. Miller_

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 10, 2023, a copy of the foregoing

**APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A**

**PRELIMINARY AND PERMANENT INJUNCTION** was sent to the Court by certified

Priority U.S. Mail.

I caused a copy of this filing to be served by certified Priority U.S. Mail and CM/ECF to:

U.S. Attorney for the Eastern District of Virginia
ATTN: Civil Process Clerk
Justin W. Williams U.S Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314

Steven Dettelbach, Director
Bureau of Alcohol, Tobacco, Firearms,
and Explosives
99 New York Ave, NE
Washington, DC  20226

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530-0001

Robert M. Miller
*Plaintiff, Pro Se*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT M. MILLER,                          )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     )    Civil Action No. 1:23-cv-195 (RDA/JFA)
                                           )
MERRICK GARLAND, *et al.*,                 )
                                           )
            Defendants.                    )

**MEMORANDUM OPINION AND ORDER**

This matter comes before this Court on Plaintiff's Motion for a Nationwide Temporary Restraining Order ("TRO") (Dkt. 16) and a Preliminary Injunction (Dkt. 17). This matter has been fully briefed and argued and is now ripe for disposition. Considering the Motion, the supporting memoranda (Dkt. Nos. 16; 17), the Defendants' Response (Dkt. 22), Plaintiff's Reply (Dkt. 26), as well as the arguments raised at the hearing held before this Court on April 12, 2023, this Court DENIES Plaintiff's Application for a Nationwide TRO and a Preliminary Injunction (Dkt. Nos. 16;17) for the reasons that follow.

I. BACKGROUND

A. Statutory and Regulatory Background

Congress enacted the National Firearms Act of 1934 ("NFA") in an attempt to regulate firearms in response to the emergence of organized crime. *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002). The NFA focuses on the regulation of weapons such as machine guns, sawed-off shotguns and silencers. *Id.* (internal citations omitted). There are eight specific categories under the NFA that are subject to registration and use requirements. 26 U.S.C. §§ 5801-02, 5811-12, 5821-22, 5841, 5845(a). At issue in this case is the registration requirements for short-

barreled rifles. A short-barreled rifle is a rifle that has "a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such a weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. §§ 5845(a)(3), (4). The NFA defines a rifle as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c). The Act requires short-barreled rifles to be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. Short-barreled rifles are also subject to certain taxes for ownership as well as transfer. *Id.* §§ 5811, 5812, 5821, 5822.

In 1968, Congress enacted the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921-931, which expanded federal firearms regulation to address the "widespread traffic in firearms and . . . their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 825-26 (1974). The GCA built upon the NFA and defined additional terms that were not defined in the NFA, such as "handgun." 18 U.S.C. §§ 921-22. The GCA's definition of rifle, however, remained the same as set forth in the NFA. *Id.* § 921(a)(7).

Congress vested the authority to enforce and administer both statutory schemes in the Attorney General of the United States, who then delegated that authority to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). 28 C.F.R. § 0.130. Since then, consistent with its delegated authority, ATF has promulgated rules classifying whether various weapons and devices qualify as firearms under the NFA. 27 C.F.R. §§ 478, 479; *e.g.*, U.S. ATF, Open

2

Letter on the Redesign of "Stabilizing Braces" (Jan. 6, 2015) (explaining that use of a stabilizing brace as "as a shoulder stock" modifies a pistol or handgun into "a NFA firearm").

In the last decade, there has been a proliferation of weapons equipped with various brace devices. Dkt. 22 at 4. Particularly, in 2012, the ATF received requests to classify a type of brace known as a stabilizing brace, which was originally designed "to assist people with disabilities or limited strength or mobility" in firing heavy pistols single-handedly. *Id.* at 5. However, as new types of stabilizing braces entered the market, the designs began to "include characteristics common to shoulder stocks." *Id.* at 6. ATF soon learned that these braces were being marketed by manufacturers as a means of creating short-barreled rifles that were purportedly "ATF compliant," even though the device had never been submitted for classification. *Id.* Ultimately, ATF became aware that manufacturers were using stabilizing braces as a means to skirt the requirements of the NFA. *Id.*

In response, ATF initiated a proposed rulemaking ("NPRM") in June 2021, which proposed amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the definition of the term "rifle." Dkt. 22 at 8. ATF received over 230,000 public comments and published its final rule on January 31, 2023. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) (the "Final Rule"). As a result, the Final Rule amended the statutory definition of rifle to include "any weapon that is equipped with an accessory, component, or other rearward attachment," such as a stabilizing brace, "that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6,497 (interpreting the definition of "rifle," under both the NFA and GCA). ATF lists six other factors relevant to the determination:

1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

88 Fed. Reg. 6,480. The NPRM also included a proposed table that created a weighted point system; but the Final Rule did not implement the point system. *Id.* at 6,479-80. The Final Rule took immediate effect, but gave individuals already possessing firearms subject to the rule until May 31, 2023 to come into compliance with the NFA. *Id.* at 6,570. Ultimately, the Final Rule makes it such that certain pistols equipped with stabilizing braces are now subject to heightened regulation under the NFA and the GCA.

## B. Factual and Procedural Background

Plaintiff Robert Miller, a gun owner and firearms seller, is a citizen of Virginia who has sued Defendant Attorney General Merrick Garland, ATF, and the director of ATF, Steven Dettelbach. Plaintiff filed this lawsuit on February 13, 2023 alleging that the regulation is unconstitutional and otherwise violates the Administrative Procedure Act (APA). Dkt. 1. On

4

March 17, 2023, Plaintiff filed an Application for a Nationwide Temporary Restraining Order, Dkt. 16, and an Application for a Preliminary and Permanent Injunction, Dkt. 17.  On April 3, 2023, Defendants filed their Opposition, Dkt. 22, and on April 10, 2023, Plaintiff filed his Reply. Dkt. 26.  On April 12, this Court held oral argument.  On May 2, 2023, Plaintiff filed a Notice of Supplemental Authority, Dkt. 28, and on May 4, 2023, Defendants filed their Response to the Notice, Dkt. 29.

## II.  STANDARD OF REVIEW

"A preliminary injunction [or TRO][1] is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief' and may never be awarded 'as of right.'"  *Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. LP*., 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter*, 555 U.S. at 22, 24 (2008)).  And "granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way."  *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  Courts do not lightly award this extraordinary relief, and preliminary injunctions are therefore "to be granted only sparingly."  *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 593 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

In order to be eligible for such relief, a plaintiff "must establish that: (1) [he] is likely to succeed on the merits; (2) [he] is likely to suffer irreparable harm without the preliminary injunction [or TRO]; (3) the balance of the equities tips in [his] favor; and (4) the injunction [or TRO] is in the public interest."  *Winter*, 555 U.S. at 20.  "The failure to show any one of the

---

[1] A grant of temporary injunctive relief requires the movant to establish the same four factors that govern preliminary injunctions.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 20 (2008).

relevant factors mandates denial of the preliminary injunction [or TRO]." *Parson v. Alcorn*, 157 F.Supp.3d 479, 491 (E.D. Va. 2016) (citation omitted).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

Plaintiff attacks the Final Rule on several grounds: (1) that the Final Rule exceeds ATF's authority; (2) that the Final Rule violates various Administrative Procedure Act ("APA") procedural requirements, (3) that the Final Rule implicates Major Questions Doctrine; (4) that the Final Rule imposes *ex post facto* criminal liability; (5) that the Final Rule violates the Fifth Amendment as it is void for vagueness; and (6) that the NFA and Final Rule infringe upon Plaintiff's Second Amendment rights. The Court will first address whether any of Plaintiff's claims are likely to succeed on the merits, beginning with the alleged APA violations before turning to the constitutional questions.

#### 1. Plaintiff's Administrative Law Challenges

#### a. ATF's Statutory Jurisdiction or Authority

This Court finds that Plaintiff is not likely to succeed on the merits of his APA claim. Plaintiff contends that the Final Rule violated the APA because ATF exceeded its statutory authority in promulgating the Final Rule because the rule's interpretation essentially "rewrites" the definition of "rifle" in the NFA and CGA. Dkt. 1 ⁋ 24. Defendants argue in response that the ATF has the clear authority to "interpret provisions within the NFA and GCA, including terms used within the statutory definition of 'rifle,'" because Congress delegated authority to "enforce and administer the statute to the Attorney General who then delegated said authority to the ATF." Dkt. 22 at 13. Plaintiff responds that the Final Rule conflicts with the statutory definition of "rifle" because pistols equipped with a stabilizing brace are designed to be fired

with one-hand and the "mere possibility that a shooter can place a braced pistol against his shoulder does not constitute the making of a[] [short-barreled rifle]." Dkt. Nos. 16 at 38-40; 26 at 7.

As an initial matter, the APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When agencies are given the authority to administer and enforce a statute, they often must interpret relevant provisions to ensure efficient and accurate implementation. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). It is not for the reviewing court to substitute its view for that of the administrative agency. However, an agency is constrained by the language of the statute it must administer and may not rewrite or redefine terms in a way that contradicts the original statute. *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (*citing Massachusetts v. EPA,* 549 U.S. 497 (2007).

As courts have consistently recognized, ATF has the authority to interpret the NFA and GCA where there is ambiguity,[2] meaning that it is not likely that Plaintiff will succeed on this claim. *Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 2711630, at *4 (N.D. Tex. Mar. 30, 2023)[3] (citing *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109, 129 (D.D.C. 2019)) (upholding ATF's interpretation that a bump stock is a machinegun as defined under the NFA). Further, as discussed above, the statutory definition of "rifle" in the

---

[2] Plaintiff argues that Defendants are not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) because of the procedural defects in the Final Rule. Dkt. 16 at 39. However, neither the agency nor the government relies on *Chevron* deference, so the Court declines to address whether deference may be applicable to this regulation. Dkt. 22 at 15 n.8; *see HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n,* 141 S. Ct. 2172 (2021) ("[T]he government is not invoking Chevron. We therefore decline to consider whether any deference might be due its regulation.").

[3] The Court is aware that the Fifth Circuit issued an order in *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023).

GCA and NFA uses terms such as "designed" "redesigned," "remade," and "intended[,]" and Congress did not shed any additional light on the definition of rifle. 26 U.S.C. § 5845(c). As the court held in *Mock*, in order to apply the statutory definition, it is "necessarily require[d]" to "evaluate objective weapon characteristics, and perhaps conduct to decide whether a particular firearm is subject to the NFA." *Mock*, 2023 WL 2711630 at *8. Thus, a rule that clarifies when an accessory, such as a stabilizing brace, remakes or redesigns a firearm to make it into a short-barreled rifle does not exceed ATF's statutory authority. The Final Rule does not "rewrite" the definition of rifle as Plaintiff contends, but rather provides guidance for enforcers to determine when a particular weapon with a stabilizing brace falls under the purview of the NFA. This Court is not convinced that the agency's interpretation contradicts the original meaning of "rifle" such that a preliminary injunction is necessary. Therefore, Plaintiff has not met his burden on this APA claim.

### b. ATF's Regulatory Analysis

#### i. Compliance with EO 12,866 and OMB Circular A-4

Plaintiff raises a series of arguments challenging ATF's regulatory analysis. First, Plaintiff argues that ATF failed to prove the Final Rule was necessary or appropriate as required by the APA. Dkt. 16 at 10. In support, Plaintiff cites Executive Order 12,866 ("EO 12,866") and OMB Circular A-4, which states that every rule must identify a "significant" or "compelling" problem that requires federal regulation, to bolster his claim that the agency did not engage in "good" regulatory analysis. *Id.* Plaintiff argues that Defendants relied on the two recent mass shootings in Colorado and Ohio, where pistol braces were used, to establish a need for rulemaking, which is insufficient to promulgate a rule regulating millions of pistols. *Id.* at 11. Defendants argue Plaintiff's claim must fail because the "APA provides no private right of action

8

to challenge the Rule's compliance with EO 12,866" and circulars such as OMB Circular A-4 are merely guidance. Dkt. 22 at 22-23. Additionally, Defendants argue that even still, the Final Rule "identified a significant problem of federal concern," the proliferation of stabilizing braces, and conducted the proper analysis in compliance with EO 12,866 and Circular A-4. *Id.* at 23.

Indeed, while Defendants' regulatory analysis may have room for improvement, the law does not require perfection. The Court agrees with the Defendants that since "[c]ompliance with [OMB] Circular A-4 is not required by any statute or regulation," including the APA, compliance with the circular is not subject to judicial review. *Louisiana v. Biden*, No. 22-30087, 2022 WL 866282, at *1 (5th Cir. Mar. 16, 2022); *see U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.*, 844 F.2d 1087, 1095 (4th Cir. 1988) (OMB circular "confers no grievable, arbitrable, or justiciable rights on third parties"). Similarly, EO 12,866 provides no private right of action, meaning that non-compliance with the order is also not subject to judicial review. *E.g.*, *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 (11th Cir. 2021) (holding that EO 12,866 does "not permit judicial review of inconsistent agency action"). Even still, as this Court discussed above, the definition of "rifle" necessarily requires an explanation to determine what firearms constitute rifles, thus the need to clarify the classification of weapons equipped with stabilizing braces is sufficient to support the ATF's rulemaking.

### ii. Cost-Benefit Analysis

Plaintiff also argues that ATF's analysis was deficient because the agency failed to quantify or monetize the Final Rule's benefits and underestimated its costs. Dkt. 16 at 2. Plaintiff contends that Defendants should have presented more data or statistics and attempted to estimate the value of a statistical life to quantify the benefits of the rule accurately. *Id.* at 14-15. In response, Defendants first argue that where Congress has determined short-barreled rifles pose

a particular danger to the public and ATF has been delegated the authority of enforcing the NFA, the requirement of empirical data to enforce the statute would render the statute itself a "nullity." Dkt. 22 at 24 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009)). Defendants next argue the Final Rule appropriately weighs the benefits to public safety because the Final Rule acts in line with Congress's decisions "by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.'" 88 Fed. Reg. at 6,481. Defendants contend that since public safety is difficult to quantify, "it is sufficient for the agency to 'exercise [its] professional judgment' to determine the importance of 'non-quantified benefits . . . in the context of the overall analysis.'" Dkt. 22 at 18 (citing OMB, Circular A-4 at 2).

Plaintiff next argues that ATF's analysis is deficient because the agency failed to rely on the Congressional Research Service's ("CRS") report. Dkt. 16 at 16. Defendants argue in response that the agency was aware of the CRS report's estimate but explained why it chose not to use CRS's estimate from an "unsourced, second-hand" and "not detailed" report over its own in the Final Regulatory Impact Analysis. Dkt. 22 at 24.

Finally, Plaintiff argues the analysis was deficient because the proposed rule cited negative externalities, but the Final Rule did not. Dkt. 16 at 15. Defendants contend that final rules are not required to "rely on the same justifications as the proposed rule." Dkt. 22 at 25. In response, Plaintiff argues that by removing negative externalities from the analysis, Defendants "gut[ted]" their analysis of the net benefits of the Final Rule. Dkt. 26 at 14-15.

Plaintiff's arguments that attention should be paid to cost, and that ATF should have tried to quantify the monetary benefits to public safety before using qualitative methods are well-taken, but any errors by ATF were at worst, harmless. The Court recognizes that benefits to public safety are difficult to quantify, and the "the law does not require agencies to measure the

10

immeasurable." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013); *see also Fox Television Stations, Inc.*, 556 U.S. at 519 (declining to "insist" agencies "obtain[] the unobtainable"); *Inv. Co. Inst.*, 720 F.3d at 379 ("Where Congress has required 'rigorous, quantitative economic analysis,' it has made that requirement clear in the agency's statute." Further, ATF's analysis of cost seems reasonable at this stage of the proceedings. The Agency issued a Final Regulatory Impact Analysis that included a 40-page discussion of costs. ATF, *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023), at 28-67 https://perma.cc/96PV-KRB9 ("RIA"). ATF calculated the anticipated cost of the Final Rule by doubling its initial estimate of pistols outfitted with stabilizing braces, which was based partly on evidence from brace manufacturers, to account for any incorrectly low numbers.[4] RIA at 18-22. ATF also explained it declined to rely on the CRS estimate because "[u]sing the upper end of the range would mean there [were] at least as many 'brace' devices or firearms with an attached 'brace' device as there are pistols that were manufactured in the U.S. between 2013 to 2020 (i.e., 32.4 million pistols)," and applying the lower end of the range "would mean nearly a third of pistols manufactured between 2013 to 2020 [were] equipped with a 'stabilizing brace,' even though braces are only used on a subset of pistols, and not all pistols are types for which a person would attach a brace." RIA at 19-20.

The Court is not swayed by Plaintiff's claim that the Final Rule is deficient because it relied on different justifications than the NPRM. As the court in *Mock* found, interpretive rules such as the one at issue are not subject to APA's requirements such as the logical outgrowth

---

[4] ATF initially estimated there were 3 million braces in circulation, but calculated anticipated costs based on 7 million braces. RIA at 18.

test,[5] which seems to be the crux of Plaintiff's claim. *Mock,* 2023 WL 2711630 at *5. Thus, interpretive rules are not required to use the same justifications for proposed rules and final rules. *Id*. Even assuming the rule is legislative, the Final Rule likely survives this procedural challenge because the negative externality justification was removed in response to public comment, 88 Fed. Reg. at 6,559, and the Final Rule provided an otherwise adequate though not perfect cost-benefit analysis. The Court finds ATF's cost benefit analysis to be reasonable and Plaintiff is unlikely to succeed on the merits of this claim.

### iii. Consideration of Regulatory Alternatives

Plaintiff also avers that ATF's analysis was deficient because the agency failed to consider regulatory alternatives. Plaintiff specifically argues Defendants should have considered the "no change" alternative, as the agency has not explained why the regulation would be better than the status quo and that Defendants should not have rejected comments regarding adding a "grandfather clause." Dkt. 16 at 18. Defendants contend that they considered the "no change" alternative within the NPRM, but decided not to adopt it because it would not address the agency's underlying concerns. Dkt. 22 at 26.

As other courts have noted, this Court cannot fault an agency for its decision not to adopt an alternative that the agency deems not viable or does not address the problem it has set out to solve. *TikTok Inc. v Trump*, 507 F. Supp. 3d 92, 112 (D.D.C. 2020); *see Am. Inst. of Certified Pub. Accts. v. IRS*, 746 F. App'x 1, 13 (D.C. Cir. 2018) ("We cannot fault the [agency] for failing to consider an alternative that was not addressed to the problem with which it was

---

[5] A final regulation satisfies the logical outgrowth test if the changes in the proposed version "are in character with the original scheme," and "the final rule is a 'logical outgrowth' of the notice and comments already given." *Mayor & City Council of Baltimore v. Azar*, 439 F. Supp. 3d 591, 610 (D. Md. 2020), *aff'd sub nom. Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020).

concerned.").  ATF states that its goal is to alleviate any confusion regarding the proper classification of "brace"-equipped weapons and to decrease the widespread circumvention of NFA controls that had been achieved through the proliferation of unregistered short-barreled rifles equipped with "brace" devices.  88 Fed. Reg. at 6,556.  As the "no change" approach likely would not "resolve [those] concerns," Defendants did not err when they failed to consider that approach.  *TikTok Inc.*, 507 F. Supp. 3d at 112; *Am. Inst. of Certified Pub. Accts.*, 746 F. App'x at 13.  Plaintiff's argument that ATF should have considered a grandfather clause, or a clause that would excuse current possessors from compliance requirements going forward, similarly fails.  ATF considered the grandfather clause option, and reasonably responded that "a prospective, indefinite exercise of its enforcement discretion (as embodied in a grandfathering provision for current possessors)" would allow possessors to continue to circumvent NFA regulations.  88 Fed. Reg. at 6,568.  While Plaintiff may disagree with the agency's determination, ATF "need only enable [a reviewing court] to see what major issues of policy were ventilated and why the agency reacted to them as it did."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (cleaned up).  Since the record reveals that ATF explained and evaluated the merits of the grandfather clause, finding it would not further the goal of the Final Rule, ATF did not need to consider that alternative.  *TikTok Inc.*, 507 F. Supp. 3d at 112.

Finally, Plaintiff's contention that ATF should have let Congress or state governments amend the NFA and the GCA fails, as the NFA and GCA are already written to regulate short-barreled rifles, and the ATF has already been tasked with the responsibility of enforcing the statute.  26 U.S.C. § 5845(a)(3); 18 U.S.C. § 921(a)(8).

### c. The Rule's Effective Date

Plaintiff argues the Final Rule's effective date is unlawful because the Congressional

Review Act ("CRA") requires that a "major rule" such as the Final Rule not take effect for 60 days after it is submitted to Congress or published in the Federal Register. Dkt. 16 at 19-21. Plaintiff opines that because the Final Rule is legislative, it cannot take effect until 30 days after publication. *Id.* Defendants respond that the Final Rule does not run afoul of the CRA and Plaintiff misapprehends the CRA requirements because though the Final Rule is effective immediately, it provided that the agency would "wait to initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register." Dkt. 22 at 42 (citing 88 Fed. Reg. at 6,481 (citing 5 U.S.C. § 801(a)(3))). Also, Defendants claim that since the rule is interpretive, it is exempt from the APA's 30-day requirement. Dkt. 22 at 42.

The Court agrees with Defendants that the Final Rule's effective date is lawful. Though the CRA states a "major rule cannot 'take effect' until the later of" 60 days after presentment to Congress or it is published on the Federal Register[,]" courts have held that provision "does not change the date on which the regulation becomes effective." *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1375 (Fed. Cir. 2002), *amended in part on reh'g*, 65 F. App'x 717 (Fed. Cir. 2003); *accord Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004). The CRA simply creates a "60-day waiting period" for enforcement of a major rule. *Liesegang*, 312 F.3d at 1375. Since ATF implemented a 60-day period for the enforcement of the Final Rule, though it was immediately effective, it does not run afoul of CRA requirements.

Additionally, final rules that are "interpretive" are not subject to the same requirements as legislative rules. For example, interpretive rules may take immediate effect. 5 U.S.C. § 553(d). An interpretive rule is a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). Further, interpretive rules "do not have the force and effect of law." *Id.*

14

(citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). As the Court holds above, the Final Rule is merely interpretative as it provides the public with guidance as to ATF's interpretation of definitions in the NFA and the GCA. The Court also finds Plaintiff's argument that the Final Rule is legislative to be unpersuasive as the Final Rule does not impose any new legal obligations and merely attempts to clarify when a weapon is a short-barreled rifle. 88 Fed. Reg. at 6,478; 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). Thus, the Final Rule's immediate effective date is not unlawful.

### d. Arbitrary and Capricious

Plaintiff next argues that the Final Rule is arbitrary and capricious for various reasons. First, Plaintiff argues the Final Rule is arbitrary and capricious because it relies on "factors Congress did not intend for [ATF] to consider" and that the NFA and GCA also don't rely on those factors. Dkt. 16 at 23. Plaintiff also contends the Final Rule is arbitrary and capricious because the individual factors are not objective, and their application is not explained adequately. *Id.* at 22. For example, Plaintiff points to the fact that the agency did not list specific measurements for the required surface area of the firearm and that the agency did not set "upper or lower limits on the weight of the firearm," and thus those factors are not tethered to any specific requirements. *Id.* Plaintiff also takes issue with the agency's inclusion of firearm marketing materials to classify firearms and uses his own guns as examples of why the Final Rule is arbitrary. *Id.* at 24-25. Plaintiff references his own Q Honey Badger pistol, stating that the firearm's objective features, such as its rear surface area, its length, and weight make it close to being considered a short-barreled rifle under the Final Rule, even though he could operate his firearm "using only one hand and the stabilizing brace." *Id.* at 24-26. Defendants respond by

noting that the NFA requires the regulation of certain firearms designed to be fired from the shoulder, and the criteria used in the Final Rule are used to serve that statutory inquiry. Dkt. 22 at 30. Defendants further point to assessing certain factors such as surface area to be fired from the shoulder is a fact specific inquiry which is why there are no specific measurements listed. *Id.* at 29. Lastly, Defendants retort that marketing materials are in line with what courts generally consider when evaluating the intended use of an item and that Plaintiff's reference to his own devices "misapprehends the relevant inquiry" which turns on whether the device is intended to be fired from the shoulder not whether it could be operated in other ways. *Id.* at 45.

"The APA's arbitrary-and-capricious standard requires that an agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In evaluating an arbitrary-and-capricious challenge, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Ren v. United States Citizenship & Immigr. Servs.*, 60 F.4th 89, 93 (4th Cir. 2023) (citing *Prometheus Radio Project*, 141 S. Ct. at 1158). Agencies often implement multi-factor balancing tests. *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties[.]") While numeric thresholds may be helpful or increase precision, courts have upheld agencies' use of multifactor tests even where there are none. *Texas v. EPA*, 983 F.3d at 839-40 (5th Cir. 2020). All that is required is that the agency "define and explain the criteria applied." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009). Despite Plaintiff's contention, the Final Rule does just that. For example, the Final Rule explains that for a firearm "marketed as a pistol that is a variant of a firearm," ATF will compare the weight and length to those "of variants designed, made, and intended to be fired from the

16

shoulder." 88 Fed. Reg. at 6,518. Further, consistent with the definition under the NFA and GCA, the inquiry is whether a firearm is designed or intended to be fired from the shoulder, not whether it can be fired with one arm. *Id.* at 6,501. While Plaintiff and other litigants have argued that the definition of a rifle should be limited to devices that are designed to be exclusively fired from the shoulder, many courts have rejected this interpretation of the statute. *United States v. Rose*, 695 F.2d 1356, 1357-58 (10th Cir. 1982); *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) (explaining the fact that a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition"), *overruled on other grounds by Haynes v. U.S.*, 390 U.S. 85 (1968). In using the six individual factors[6] listed in the Final Rule, though not explicitly relied on by the NFA or GCA or dispositive, this Court finds the ATF has acted within the "zone of reasonableness." *Prometheus Radio Project*, 141 S. Ct. at 1158. Accordingly, Plaintiff has not met his burden that the regulation is arbitrary and capricious.

### 2. Major Questions Doctrine

Plaintiff next argues that the Final Rule's impact on society is so great that Congress could not have intended for ATF to have that much authority and relies on the Major Questions Doctrine to invalidate the rule. Dkt. 16 at 35-36. Defendants respond that the doctrine does not apply because interpreting the NFA and GCA with regard to firearms is exactly the type of action the agency was tasked with. Dkt. 22 at 32. The Major Questions Doctrine applies to

---

[6] Plaintiff also briefly takes issue with the fact that the factors in the Final Rule represent a change of position on the part of ATF. Dkt. 16 at 24. However, as required by the APA, ATF explained that the rule constituted a change of position and why it was preferable to the status quo. *Fox Television Stations, Inc.,* 556 U.S. at 515-16. Further the Supreme Court has held "an agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 42 (1983).

extraordinary cases where there are "novel" interpretations of "ancillary statutes." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022). Before applying "major questions" principles, the Supreme Court has considered the following: (1) whether the challenged action is outside the agency's traditional field of expertise, (2) whether it intrudes on matters typically governed by state law, and (3) whether Congress has already expressly considered and rejected the measure. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000). None of those factors are present here. The Final Rule simply attempts to clarify any confusion regarding "stabilizing braces" and ATF firearm classifications, which does not qualify as an expansion of the agency's regulatory authority such that a preliminary injunction is warranted. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014).

### 2. Plaintiff's Constitutional Challenges

### a. *Ex-Post Facto* Liability

Plaintiff asserts that the Final Rule subjected him to "*ex post facto* criminal liability." Dkt. 16 at 41. Defendants argue this is not so. Dkt. 22 at 47. In support, Defendants argue that the Final Rule itself does not criminalize any conduct because it is interpretive, and that all liability stems from the NFA. *Id.* Defendants also cite to the specific language of the regulation, which states: "[ATF] has determined that any criminal liability for failure to take the necessary action to comply with Federal law for weapons that have already been made will result only for conduct occurring after the time period to register ends." Dkt. 22 at 33 (citing 88 Fed. Reg. at 6,554).

"To fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime."

*Lynce v. Mathis*, 519 U.S. 433, 441 (1997).  Courts have frequently held that continued or future possession of a firearm does not run afoul with the *ex post facto* prohibition.  *United States v. Mitchell*, 209 F.3d 319, 323 (4th Cir. 2000); *Benedetto v. Sessions*, No. CV CCB-17-0058, 2017 WL 4310089, at *4 (D. Md. Sept. 27, 2017).  Even if the Court considered the Final Rule to be legislative, it regulates continued possession of short-barreled rifles, which similar to *Mitchell* does not offend the *ex post facto* clause.  *Mitchell*, 209 F.3d at 323.  Therefore, Plaintiff is not likely to be successful on the merits of his *ex post facto* claim.

### b. Fifth Amendment and Rule of Lenity

Plaintiff argues that the Final Rule violates the Fifth Amendment because it is unconstitutionally vague and that the rule of lenity requires the Court "rule favorably for the party allegedly violating the law."  Dkt. 16 at 36-39.  Plaintiff criticizes the criteria ATF uses to determine whether a weapon is a "rifle," because, in his view, the Final Rule relies on various subjective factors such as manufacturer marketing materials and the likely use of the weapon in the general community.  *Id.*  Plaintiff asserts that this reliance on subjective factors, makes it difficult for him and other regulated parties to discern how the factors operate in conjunction with one another; and thus the rule is void for vagueness.  *Id.* at 39.  Defendants respond that the rule is not unconstitutionally vague because the criteria are primarily objective and that the agency is not required to provide the "granular" specificity that Plaintiff demands.  Dkt. 22 at 35.
 A law is unconstitutionally vague if it does not "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *United States v. Brewer*, 533 F. App'x 234, 238 (4th Cir. 2013).  "To sustain such a challenge, the complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard,

19

but rather in the sense that no standard of conduct is specified at all.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982) (internal citations omitted). Therefore, courts have frequently struck down statutes that "tied criminal culpability to … wholly subjective judgments." *United States v. Williams*, 553 U.S. 285, 306 (2008). While Plaintiff's argument that ATF could have used clearer and more precise language has some merit, the law does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The six factors considered by ATF provide a cognizable standard by which a person can conform their conduct that aligns with the statutory definition regarding whether a weapon is "designed, redesigned, made or remade and intended to be fire from the shoulder," which is sufficient to survive a void for vagueness challenge. *See Mock*, 2023 WL 2711630, at *7 (holding Plaintiffs did not meet their burden to show ATF's pistol brace rule was void for vagueness because it was comprehensible enough to put a person on notice that their weapon may be subject to federal laws). Thus, Plaintiff has failed to meet his burden on his void for vagueness claim.

Based on the Court's assessment that the final rule is interpretive, and not legislative, Plaintiff's argument regarding the rule of lenity is similarly unavailing. *See Mock,* 2023 WL 2711630, at *6 (holding Plaintiffs did not satisfy their burden to show likelihood of success on the merits with regard to lenity where the ATF's pistol brace rule merely interprets the NFA and GCA). Therefore, similar to the Plaintiffs in *Mock*, Plaintiff has not shown he is substantially likely to succeed on either his void for vagueness or rule of lenity claims.

c. Second Amendment

i. The Final Rule

20

Plaintiff brings a facial challenge to the constitutionality of the Final Rule and the NFA in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiff argues that the Final Rule violated the Second Amendment because it "regulate[s] bearable arms that have been in common use for lawful purposes long before the ratification of that amendment, and Defendants can show no historical analogues of regulating these guns prior to the NFA and GCA." Dkt. 16 at 3. Plaintiff also argues that for the Second Amendment to have meaning, it must extend to firearm accessories such as the stabilizing braces. Dkt. 26 at 16-17. Defendants argue in response that the Final Rule does not implicate the Second Amendment because a stabilizing brace is not a bearable arm, the Final Rule does not ban any firearms, and short-barreled rifles are dangerous and unusual weapons not subject to protection. Dkt. 22 at 48-49.

A rule implicates the Second Amendment when the instrument at issue "constitute[s] [a] bearable arm." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). The instrument "need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *Bruen*, 142 S. Ct. at 2132. Courts have held that "arm" typically covers "[w]eapons of offence or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller* 554 U.S. at 581. If a stabilizing brace is not encompassed by "Arms," it thus falls outside the protection of the Second Amendment. Where a rule does implicate a bearable arm, and thus the Second Amendment, the government must show that the rule "is consistent with the Nation's historical tradition of firearm regulation," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2002), by showing there is a "well-established and

representative historical analogue." *Id.* at 2133.

Plaintiff has not met his burden of showing that the Final Rule implicates the Second Amendment.  First, laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment.  *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding a silencer is not a weapon on its own but rather a firearm accessory and thus is not a bearable arm protected by the Second Amendment); *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023).  In the context of silencers, courts have routinely held that a silencer is not a firearm because a silencer cannot cause harm on its own, it is "not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4-5 (D. Md. Sept. 20, 2019) (collecting cases).  Like a silencer, a stabilizing brace cannot cause harm on its own, is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a brace.[7]

Assuming *arguendo* that the Final Rule does implicate the Second Amendment, Plaintiff's argument fails because as the court noted in *Mock*, "the Final Rule does not ban stabilizing braces, nor firearms equipped with them" but rather "requires individuals and entities to comply with the NFA's statutory requirements (e.g., by registering the weapons with ATF or permanently detaching the brace from the pistol)."  *Mock*, 2023 WL 2711630 at *14.  The Second Amendment does not prohibit the imposition of reasonable licensing regimes commonly associated with firearm ownership. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Bruen*, 142 S. Ct. at 2138 n.9

---

[7] Plaintiff appears to concede that braces do not serve a purpose independent of their attachment to a firearm.  Dkt. 26 at 14 ("By this statement, Defendants admit their Rule renders braces useless for any conceivable purpose and destroying their value—a cost Defendants did not include in their analysis.").

22

(2022) ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality [of reasonable licensing regimes][.]").  Requirements such as those at issue here, fingerprinting and background checks, do not offend the right to bear arms.  *Bezet*, 714 F. App'x at 340; *accord Lane v. Holder*, 703 F.3d 668, 672-73 (4th Cir. 2012) (finding plaintiffs did not suffer injury from "additional costs and logistical hurdles" in purchasing firearms, and explaining that laws imposing "minor inconveniences" are distinct from those effecting "an absolute deprivation" of the right to bear arms); *see, e.g., Saleem,* 2023 WL 2334417 at *11 (W.D.N.C. Mar. 2, 2023) (explaining that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible").  Plaintiff does not cite any language in the Final Rule that purports to ban any of his pistols that are outfitted with stabilizing braces.  Ultimately, under the Final Rule, Plaintiff may still possess and sell his firearms that are equipped with stabilizing braces upon registration with, and approval by, ATF.

## ii. Regulation of Short-Barreled Rifles Generally

Finally, Plaintiff argues that the NFA and Final Rule are unlawful because short-barreled shotguns and short-barreled rifles are commonly owned and not unusually dangerous, and thus protected by the Second Amendment.  Dkt. 16 at 30-31.  Plaintiff further argues that there is no historical analogue for the regulation of short-barreled rifles.  *Id.* at 29.  Defendants argue that the Second Amendment does not protect the possession of short-barreled rifles or shotguns because they are dangerous and unusual weapons which fall outside the protection of the Second Amendment.  Dkt. 22 at 37-40.  Defendants also argue that even if short-barreled rifles were covered by the Second Amendment, there is historical evidence of regulating firearms through taxation, registration, and licensing that can be traced to colonial times.  *Id.* at 41.

Many cases pre-*Bruen* have held that short-barreled shotguns are not subject to the

23

Second Amendment. *Heller*, 554 U.S. at 625 (holding that the Second Amendment does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"); *see also United States v. Chester*, 628 F.3d 673, 678-79 (4th Cir. 2010) ("[A] citizen's right to carry or keep sawed- off shotguns, for instance, would not come within the ambit of the Second Amendment."). Courts have also extended this analysis to short-barreled rifles envisioning no constitutional distinction between short-barreled rifles and short barreled shotguns. *United States v. Gilbert*, 286 Fed. App'x. 383, 386 (9th Cir. 2008); *United States v. Cox*, 235 F. Supp. 3d 1221, 1227 (D. Kan. 2017); *United States v. Gonzales*, No. 2:10-cr-00967, 2011 WL 5288727, at *6 (D. Utah Nov. 2, 2011). Since *Bruen*, lower courts have held that short-barreled rifles are not protected under the Second Amendment because like short-barreled shotguns, they are dangerous and unusual weapons. *See United States v. Royce,* No. 1:22-CR-130, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023) (holding that short-barreled rifles and shotguns are "'dangerous and unusual' weapons that are easily concealable and thus not protected by the Second Amendment"); *United States v. Rush*, No. 22-cr-40008-JPG, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (similar).

This Court finds the analysis in the above-cited cases persuasive and, based on the limited historical analysis provided at this stage of litigation, this Court cannot conclude that the NFA and Final Rule are substantially likely to violate Plaintiff's Second Amendment rights. Therefore, the Court finds Plaintiff is not likely to succeed on the merits of his Second Amendment claim based on the current record before the Court.

As failure to demonstrate likelihood of success on the merits as to at least one claim bars a TRO or preliminary injunction, the Court declines to analyze the other preliminary injunction factors at this stage. *Alcorn*, 157 F. Supp. 3d at 491.

IV.  Conclusion

In short, Plaintiff has not shown he is entitled to preliminary relief.  While there may have been some missteps by ATF in effectuation of the interpretive rule, any of those errors were harmless.  Thus, though Plaintiff makes sound arguments regarding the potential procedural violations of the APA, none of those arguments necessitate the extraordinary remedy of a Temporary Restraining Order or Preliminary Injunction.  Accordingly, it is ORDERED that Plaintiff's Application for a Nationwide TRO and Injunction (Dkt. Nos. 16 and 17) is DENIED.

The Clerk is directed to send a copy of this Order to counsel of record and to Plaintiff who is very effectively proceeding *pro se*.

Alexandria, Virginia
May 26, 2023

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge

25

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



FILED
MAILROOM

JUN 1 ☒ 2023

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Plaintiff(s)

ROBERT M. MILLER

CIVIL ACTION NO. ___1:23-cv-195___

v.

CRIMINAL NO. _____

Defendant(s)

MERRICK B. GARLAND,
Attorney General;
STEVEN DETTELBACH,
Director, BATFE

NOTICE OF APPEAL

Notice is hereby given that

___ROBERT M. MILLER_____ above named, hereby appeals to

the United States Court of Appeals for the Fourth Circuit from the Order entered in this action on

the _26th_ day of _May_____ 20 23 .

FILED
MAILROOM

JUN 1 ☒ 2023

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

_____
Attorney or Pro Se Appellant

Robert M. Miller
_____

4094 Majestic Ln, #278, Fairfax, VA 22033
_____
Address

Dated: ___May 31, 2023_____