No. 23-1604

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

ROBERT M. MILLER

*Plaintiff-Appellant,*

v.

MERRICK B. GARLAND, et al.

*Defendants-Appellees.*

---

**On Appeal from the United States District Court
for the Eastern District of Virginia**

---

**APPELLANT'S INFORMAL REPLY BRIEF**

---

Robert M. Miller, Ph.D.
*Pro se*
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444

Civ. A. No. 1:23-CV-00195-RDA-JFA

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

ARGUMENT ......................................................................................... 1

   I.   Plaintiff Has Proven His Entitlement for a Preliminary and Permanent Nationwide Injunction ....................................................................... 1

      A. Plaintiff's APA Claims Are Obviously Cognizable ............................... 1

      B.  The Rule Fails to Properly Interpret the NFA ......................................... 3

      C.  Agency's Factors Are Subjective, Vague, Ambiguous, Irrational ......... 4

      D.  The Rule's Effective Date Was Obviously Unlawful ............................ 8

     1.  The Rule Is a Legislative Rule. ................................................................. 8

     2.  The Rule's Immediate Effective Date Violates the APA and CRA .......... 10

      E.  The Agency Failed to Meet its Analytical Burden ................................ 13

      F.  Rule of Lenity ........................................................................................ 17

      G. The NFA, GCA, and Rule Violate the Second Amendment ................. 19

     1.  Agency Cannot Simply Declare SBRs to be Dangerous and Unusual ..... 19

     2.  SBRs and Braced Pistols Are Neither Dangerous Nor Unusual. ............. 20

     3.  NFA Regulations and Taxes Are Unconstitutional .................................. 22

      H. The District Court Erred Relying on Inapposite Authorities ............... 26

CONCLUSION ..................................................................................... 27

CERTIFICATE OF COMPLIANCE

CORPORATE DISCLOSURE STATEMENT

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Allentown Mack Sales & Service, Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359 (1998) ..................................................................................22

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993) ..................................................................................14, 15

*Andrews v. U.S.,* No. 04-7269, at *1 (4th Cir. Jan. 25, 2006) ................................17

*Bates v. Little Rock*, 361 U.S. 516 (1960) ...............................................19

*Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) ...........................................29

*Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133 (D.C. Cir. 2005) .23

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam) .15

*Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012)24

*Douglas v. Branch Banking & Trust Co.*, Civil Action No. 3:12cv854 (E.D. Va. Apr. 17, 2013)..................................................................................19

*Encino Motorcars*, 136 S.Ct. 1134........................................................15

*F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ..................................................................................24

*Frazier v. First Advantage Background Servs. Corp.*, Civil Action No. 3:17cv30 (E.D. Va. Sep. 24, 2018) ..................................................................20

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir. 2019) ...................................................................................5, 14

Gun Control Act of 1968, Pub. L. 90-618..............................................9, 14, 26, 27

*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007) ......................19

*Hope Natural Gas Company v. The West Virginia Turnpike Commission*, 143 W. Va. 913, 105 S.E.2d 630......................................................................................29

*Loan Syndications & Trading Ass'n v. Sec. & Exch. Comm'n*, 882 F.3d 220 (D.C. Cir. 2018) .....................................................................................................9

*Michigan v. Envtl. Prot. Agency*, 576 U.S. 743 (2015)....................................22, 23

*Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332 (1900)............................7

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) ...............................................................................11, 22

*Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761, 762 (9th Cir. 1937) ..........................................................................................................29

*National Maritime Union of America v. Herzog*, 78 F. Supp. 146 (D.D.C. 1948) 28, 29

*Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209 (D.C. Cir. 2004).......23

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...........................................................22

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .........................................................22

*Southeastern Community College v. Davis*, 442 U.S. 397 (1979) ...........................8

*Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir. 1996) ....................17

*Strickland v. United States*, 32 F.4th 311, 368 (4th Cir. 2022) ...............................24

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507
    (2015) ...................................................................................................................8

*U.S. v. Comstock*, 551 F.3d 274 (4th Cir. 2009) ......................................................33

*U.S. v. Comstock*, 560 U.S. 126 (2010)....................................................................33

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................................36

*United States v. F.C.C.*, 652 F.2d 72 (D.C. Cir. 1980) ...........................................24

*United States v. Lopez*, 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)

    ...........................................................................................................................33

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 511 (1992)....................27

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) ...........................................8

*Utility Air Regulatory Group*, 573 U.S., at ——, 134 S.Ct., at 2446 ......................8

*VanDerStok v. Garland*, Civil Action 4:22-cv-00691-O, at *12 (N.D. Tex. Sep. 2,
    2022)..................................................................................................................37

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ...............................................................19

### STATUTES

18 U.S.C. § 921 ....................................................................................................26, 27

18 U.S.C. § 926 ..........................................................................................................14

26 U.S.C. § 7801 ........................................................................................................14

26 U.S.C. § 7805 ................................................................................15

28 U.S.C. § 599A ...............................................................................15

5 U.S.C. § 706 ...................................................................................20

Administrative Procedure Act ...................................2, 3, 16, 17, 18, 21

Congressional Review Act ...........................................3, 16, 17, 18, 21

Gun Control Act ...................................................................................3

National Firearms Act .......................................................3, 6, 7, 9, 14, 32

Regulatory Flexibility Act...................................................................21

Small Business Regulatory Enforcement Fairness Act...........................21

## OTHER AUTHORITIES

Executive Order 12866.........................................................................31

Executive Order 13563.........................................................................31

Office of Management and Budget Circular A-4............................31, 32

## REGULATIONS

27 C.F.R. 478.11 ................................................................................22

27 C.F.R. 479.11 ................................................................................22

## ARGUMENT

## APPELLANT'S INFORMAL REPLY BRIEF

**I. Plaintiff Has Proven His Entitlement for a Preliminary and Permanent Nationwide Injunction.**

As described in Appellant Robert M. Miller's *Application for a Temporary Restraining Order, a Preliminary and a Permanent Injunction* ("*Application*"), his *Appellant's Informal Opening Brief* ("*Br. Appellant*") and this Reply brief, Miller easily satisfied the conditions for obtaining ***both*** preliminary ***and*** permanent injunctive relief. The following reply brief rebuts arguments Appellees made in their *Brief of Appellees* ("*Br. Appellees*").

**A. Plaintiff's APA Claims Are Obviously Cognizable**

Agency falsely argues "The Rule does not change the scope of the statutory provisions at issue." *Br. Appellees* at 14. Until the Agency promulgated the Rule, the general public ***and*** the Agency were on the same page that braces did not convert pistols to SBRs. This was the common understanding for more than eight years. Only after the election of a president hostile to gun rights did Agency do an about-face without any new information to justify a different decision.

The D.C. Circuit held that a prior Agency rule determining that bump stock devices convert a Title I rifle to a Title II machinegun was a legislative rule because it "unequivocally bespeaks an effort by the Bureau to adjust the legal rights and

1

obligations of bump-stock owners – i.e., to act with the force and effect of law." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019). Agency now makes the wholly untenable argument that "the Rule is not a final agency action challengeable under the APA, because ATF's decision to articulate for the public its understanding of the statute does not determine any legal rights or impose any legal obligations." *Br. Appellees* at 14. Both the bump-stock rule and the brace rule have identical character – purporting to interpret the NFA and GCA, the rules re-classified firearms formerly classified by the Agency as Title I firearms to be NFA-regulated Title II firearms.

The Rule's determination of Miller's legal rights and its imposition of legal obligations is as obvious. On January 30, 2021, Miller owned several Title I pistols equipped with stabilizing arm braces that he could take to other states or sell. The following day, the Agency determined Miller was in unlawful possession of NFA-regulated SBRs. Agency required Miller under threat of criminal prosecution to register his firearms under the NFA, destroy them, surrender them, or remove the braces; these are ***obviously*** legal obligations. Immediately on that date, Miller could no longer transport his braced pistols across state lines nor could he immediately sell them because they were now considered SBRs subject to transport and sale restrictions; these are obviously a determination of legal rights.

B.    **The Rule Fails to Properly Interpret the NFA**

Nothing in the NFA or GCA definitions of a rifle or pistol rely on any of the factors Agency considers in determining whether a braced pistol is an SBR. Those definitions define a rifle as designed or redesigned to be fired from the shoulder. But for eight years, Agency concluded that pistol braces ***did not*** do so. The Agency's fanciful claim is that it began to notice people using braces against their shoulders, it saw marketing materials saying it was legal to put braces against the shoulder, and that brace designs were increasingly resembling of stocks. Agency's argument is in bad faith because the public was responding ***to its own determinations*** that braces did not convert pistols into SBRs.

Agency repeatedly describes braced pistols as "circumventing the NFA." Sadly, courts in other jurisdictions share the same attitude that the industry and the public are somehow evading the will of Congress. Yet in the United States, a free man has the right to do ***anything*** not proscribed by law. *Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332, 343 (1900). If a legislature fails to circumscribe all behavior it wishes to prevent, or if technological developments make a statute's provisions obsolete, it is not for courts or agencies to rewrite the statutes to effectuate perceived Congressional intent; that is a job for Congress. "It is a bedrock rule that an agency can never 'rewrite clear statutory terms to suit its own sense of how the statute should operate.' *Utility Air Regulatory Group*, 573 U.S., at ——, 134 S.Ct.,

at 2446." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2543 (2015). An agency "has no authority to rewrite the statutory scheme by means of regulations." *Southeastern Community College v. Davis*, 442 U.S. 397, 410 (1979); *University of Texas v. Camenisch*, 451 U.S. 390, 399 (1981).

**C.**     **Agency's Factors Are Subjective, Vague, Ambiguous, Irrational**

No matter how many times Defendants claim their factors are "objective," objective reality shows otherwise. The district court clearly erred by concluding that the Rule's factors "provide[d] a cognizable standard by which a person can conform their conduct." The Agency's claim that the Rule's factors are "more than enough to give a 'person of ordinary intelligence fair notice of what is prohibited" is obviously false. *Br. Appellees* at 31.

The Rule's seven factors are wholly indecipherable because none of them provide any measurement threshold beyond which a firearm owner or the Agency could consider the factor more likely than not indicates the intent to use the braced pistol against the shoulder. Worst of all, Agency will consider all these factors *in combination* when making specific classifications of *a single firearm* that no private citizen could possibly discern.

None of the Agency's factors play any role in the definitions of a rifle or pistol in the NFA or GCA. Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

Agency's reliance on marketing materials is obviously arbitrary, wholly subjective to the Agency's judgment, and unavailable to any individual determining whether his braced pistol is an SBR. Worst of all, manufacturers and retailers began informing customers that they could put a braced pistol against their shoulders without violating the NFA ***because of*** the Agency's earlier classifications. Agency is nefariously using the reaction of the public to its own decisions as a reason to reach an opposite decision. Bad faith in rulemaking does not get worse than this. Congress never intended the Agency to use marketing materials to make firearm classifications.

So too is "likelihood of use by the community" unconstitutionally vague. The community has used braced pistols against their shoulders ***because of*** the Agency's prior classifications. An agency cannot in good faith claim some behavior is unlawful because lots of people take its word that the behavior is lawful. No individual person can possibly be aware of how a "community" uses these guns. He can only discern what his eyes can tell him from direct observation, which is mere anecdotal evidence. Agency never researched, does not know, and flatly rejected

every argument that people use braced pistols for one-handed firing support exactly as they were designed. Intent cannot be presumed.

Among the Agency's most preposterous, irrational factors is scope eye relief. That is, the Agency examines whether a user with the brace attached to his forearm could use a magnified optic attached to the gun. Nothing in the definitions of a rifle or pistol involve attached scopes. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). As plaintiff demonstrated with his own firearm, he is able to use a scope on a braced pistol with a published eye relief of 3.5 inches of eye relief and his eye more than 20 inches behind the ocular lens. Agency did no testing or evaluation to support this completely made-up factor; this is arbitrary, not reasoned decision-making.

Under this factor, a braced pistol classified as an SBR could conceivably revert to a Title I pistol merely by taking the scope off the gun, or vice versa. This makes no sense. Agency provided no measures for a magnified optic to be unusable while on a gun attached to the forearm; it alone can determine whether it indicates an SBR, and it has no published guidance on how it will decide; this is arbitrary and subjective by definition.

Agency argues that "the single firearm plaintiff discusses in his brief (at 23-24) is his "Q Honey Badger pistol with a brace." *Br. Appellees* at 32. It goes on to say that "The Rule uses that braced firearm repeatedly as a representative example

6

of a firearm likely to be classified as a short-barreled rifle…Plaintiff is not confused about whether the NFA, as interpreted by the Rule, applies to his particular firearm, and his vagueness challenge fails." *Id.* Agency apparently did not read Miller's detailed brief on this firearm. Despite the Agency explicitly designating the Q Honey Badger as an SBR, it does not meet ***any*** of the Agency's seven factors except, perhaps, rear surface area, underscoring the arbitrariness of these factors. Miller can use his 9.1 lbs Honey Badger with one hand despite having a weight consistent with the Agency's vague reference to rifle weights. The length of pull on Miller's Honey Badger is just shy of 13.5 inches. Miller can use his Nikon P-300 scope with a published eye relief of 3.5 inches with his eye more than 20 inches from the ocular lens. Agency has identified no "marketing materials" by Q, LLC indicating likely use against the shoulder. Agency has presented no indication in the Rule that the Honey Badger is likely to be fired from the shoulder. Miller could not possibly determine, on his own, that the Q Honey Badger is an SBR based on even an interpretation of the factors heavily favoring the Agency's classification. The Agency's determination that a Q Honey Badger is an SBR runs counter to the facts applied to its own determinative factors. *State Farm* at 42.

Next, Agency puts the noose around its own neck saying that "To the extent plaintiff remains uncertain about how ATF will classify any particular other braced firearm, he may 'request a classification determination from ATF for additional

clarity." *Br. Appellee* at 32. Good luck to the Agency making 3 to 7 million separate individual determinations about whether particular braced pistols are SBRs. Agency **admits** here that the Agency **and only the Agency** can make a definitive classification by examining the entire firearm and brace. This is vague, ambiguous, arbitrary, and subjective. This isn't an "administrative process" as the Agency describes it, but a sham process that no one will use, and cost the Agency never included in their analysis of Rule costs on the public or the government.

**D.    The Rule's Effective Date Was Obviously Unlawful**

1.   The Rule Is a Legislative Rule.

Concerning Miller's reference to a Fifth Circuit decision holding that the Rule is a legislative rule, Agency makes a counterargument that is as puzzling as it is mendacious. "As an initial matter, the five factors identified in *Mock* are four too many. The key feature that distinguishes interpretive from legislative rules is that '[l]egislative rules result from an agency's exercise of delegated legislative power' and thus 'have the force and effect of law,' while interpretive rules 'are issued by an agency to advise the public of the agency's construction' of a statute. *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019) (per curiam). *Br. Appellees* at 21.

Agency apparently failed to read the *Guedes* decision it was citing because the Fifth Circuit relied directly on *Guedes* holding that the Agency's prior bump-

8

stock rule was a legislative rule for all the same reasons argued by Miller and held by the Fifth Circuit.

Agency deliberately takes a single general passage out of context in *Guedes* and ignores the direct reference in *Guedes* saying, "Legislative rules result from an agency's exercise of 'delegated legislative power' from Congress. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)." *Guedes* at 17-18. Agency **expressly** invoked its delegated legislative power in the Rule:

> The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended,[10] and Congress has included provisions in these statutes that authorize the Attorney General to promulgate regulations as are necessary to enforce the provisions of the GCA and NFA. See 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).[11] Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. See 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)– (2); T.D. Order No. 221(2)(a), (d), Establishment, Organization, and Functions, 37 FR 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations to implement the GCA and NFA. See 27 CFR parts 478, 479.

88 FR 6481.

The Fifth Circuit relied on several other factors included in the *Guedes* decision:

> To determine whether a rule is legislative or interpretive, we ask whether the agency "intended" to speak with the force of law. *Encino Motorcars*, 136 S.Ct. at 2122 ; *Am. Mining Cong.*, 995 F.2d at 1109. Central to the analysis is the "language actually used by the agency."

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). We also consider "whether the agency has published the rule in the Code of Federal Regulations" and "whether the agency has explicitly invoked its general legislative authority." *Am. Mining Cong.*, 995 F.2d at 1112.

Consistent with *Guedes*, the Rule is legislative because the Agency amended the Code of Federal Regulations, 27 C.F.R. §§ 478.11, 479.11. See 88 FR 6480.

The *Guedes* court held that "the Bump-Stock Rule is a legislative rule" because it "unequivocally bespeaks an effort by the Bureau to adjust the legal rights and obligations of bump-stock owners – i.e, to act with the force of law." *Guedes* at 18. The Rule in the instant case clearly adjusted Miller's legal rights and obligations, forcing him under threat of criminal liability to register his braced pistols as SBR, remove the braces, destroy his braced pistols, or surrender them to the Agency. The Rule prohibited Miller from carrying his braced pistols across state lines without the Agency's permission, and it prohibited him from selling his braced pistols as Title I firearms.

Thus, Agency's **own cited authority** confirms, conforms to, and was relied upon by the Fifth Circuit decision, which the Agency claims "incorrectly held that the stabilizing-brace rule is legislative, not interpretive."

2. The Rule's Immediate Effective Date Violates the APA and CRA

It cannot be disputed that the Rule became effective immediately upon its publication date in the *Federal Register*. Agency's claim that the Rule became

10

effective on its *compliance* date cannot be squared with the statutory text of the APA and CRA, Congressional intent for those statutes, or the Rule's own requirements.

The APA requires that "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date," with three exceptions not present in the Rule. 5 U.S.C. § 533(d). The statutory text plainly says "effective date." Because the statutory text is clear, that is the end of the mater. *Andrews v. U.S.,* No. 04-7269, at *1 (4th Cir. Jan. 25, 2006); *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir. 1996).

The Congressional Review Act ("CRA"), codified in 5 U.S.C. § 801 et seq., mandates that before a rule ***can take effect***, the Agency must submit to each House of the Congress and to the Comptroller General containing a copy of the rule, a concise general statement relating to the rule including whether it is a major rule; and the proposed ***effective date*** of the rule. [emphasis added] 5 U.S.C. § 801(a)(1).

The Rule explicitly says "DATES: *Effective date:* This rule is effective January 31, 2023. *Compliance Date*: Any weapons with 'stabilizing braces' or similar attachments that constitute rifles under the NFA must be registered no later than May 31, 2023." 88 FR 6478.

Congress in the APA and CRA could not have meant anything other than the effective dates agencies publish in their rules in the *Federal Register*. Agencies

could not mean anything other than what Congress intended when they publish an "Effective Date" in their rules. Agency's arguments are frivolous.

For the first time on appeal, Agency claims that even if the Rule violated the APA and CRA with an unlawful effective date, the error is harmless "because Plaintiff does not contend that ATF attempted to enforce the Rule against him during the period before he asserts it could validly take effect." *Br. Appellees* at 15.

Miller most certainly did make that argument. *Application* at 42—43; *Br. Appellant* at 42, 46. Immediately upon the Rule's publication date, it became unlawful for Miller to transport his braced firearms to other states without first obtaining approval from the Agency by filing an ATF Form 5320.20, *Application to Transport Interstate or to Temporarily Export Certain NFA Firearms*. On that same date, it was unlawful for Miller to sell his braced pistols as Title I firearms. <u>*Id.*</u>. Miller would have had to pay a $200 transfer tax, and the prospective buyer would have to submit his fingerprints and photographs and wait up to nine months to receive the purchased braced pistol. Such restrictions caused Miller immediate and irreparable harm and a cause of action for vindication of his rights in federal court. *Bates v. Little Rock*, 361 U.S. 516, 524 (1960). ("[T]he very fact that some executive actions have the sweeping potential to affect the liberty of so many is a reason to consider proper means to impose restraint and to provide some redress from injury.") *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1863 (2017). "[T]he threat of substantial government

encroachment upon important and traditional aspects of individual freedom is neither speculative nor remote." *Bates*, *supra*.

Aside from the direct injury of the $200 tax, these additional impediments to sale severely damage the market value of Miller's braced pistols. "It is well-settled that economic damages constitute a cognizable injury-in-fact." *Douglas v. Branch Banking & Trust Co.*, Civil Action No. 3:12cv854, at *9 (E.D. Va. Apr. 17, 2013), citing *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 642 (2007). "An intangible injury may constitute injury in fact." *Frazier v. First Advantage Background Servs. Corp.*, Civil Action No. 3:17cv30, at *12 (E.D. Va. Sep. 24, 2018).

## E.     <u>The Agency Failed to Meet its Analytical Burden</u>

Agency's argument and the lower court's holding that it satisfied the regulatory analysis requirements of the APA, CRA, and the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act ("SBREFA") cannot be squared with facts and well-established law.

To put it as clearly and bluntly as possible, Agency conducted ***no analysis whatsoever*** of the Rule's benefits; it merely waved its hands in an illustrious proclamation that it would enhance public safety. No federal agency is allowed to get away with this in their rulemaking.

Agency did not monetize nor quantify rule benefits, nor did it attempt to do so, nor did it explain why monetizing and quantifying rule benefits was not possible. Agency did not even explain a chain of causation from specific rule provisions to the vague, conclusory, purported benefits for public safety it claimed. ***How*** will the Rule save any lives or prevent any damages? This must be ***explained*** in the rule, not merely asserted.

The Supreme Court struck down an agency rule when the agency refused to consider rule costs. *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 750 (2015). Agencies must engage in reasoned decision-making. *Allentown Mack Sales & Service, Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998), citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 52 (1983). The Rule cannot possibly be "logical and rational" if the Agency cannot show it has any benefits. The mere 19 deaths and 169 other undescribed, potentially criminal uses of braces do not support regulating the *millions* of law-abiding gun owners who use braces for lawful purposes *billions* of times. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194 (1947).

Agency erroneously argued, and the district court erroneously accepted, that Executive Order 12,866 is not binding on the Agency's analysis of costs and

benefits. The Supreme Court spoke directly to this issue: "[B]y virtue of a longstanding Executive Order applying to significant rules issued under the Clean Air Act (as well as other statutes), the Agency must ***systematically assess*** the regulation's costs and benefits. See Exec. Order No. 12866, 58 Fed.Reg. 51735, 51738, 51741 (1993)" [emphasis added] *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 767 (2015).

It has been well-settled for decades that agencies are required to consider the policy effects of their rules, including the benefits, costs, and the expected impact of the rule on competitiveness, innovation, prices, costs, international trade, and other factors laid out in statute, regulation, and executive orders. That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). Courts invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers," and "[o]ne of those constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537, 129 S.Ct.

1800, 173 L.Ed.2d 738 (2009); *Strickland v. United States*, 32 F.4th 311, 368 (4th Cir. 2022).

Whether or not an agency is required to conduct a cost-benefit analysis, if it chooses to do so, it must take a "hard look" at the salient problems and genuinely engage in reasoned decision-making. *United States v. F.C.C.*, 652 F.2d 72, 96 (D.C. Cir. 1980). Agency's complete abdication of its obligation to discuss Rule benefits not only isn't a hard look, it's not any look at all. It ignored a major aspect of the problem.

As Plaintiff demonstrated, the Rule has no benefits. Criminal uses of braced pistols are so rare compared to the number of braced pistols in common use and compared to total crimes that they are not statistically different from zero.

As Plaintiff demonstrated, even if the Rule would have prevented all nineteen deaths from 2012 to 2020 *involving* braced pistols, the saving of 2.1 lives per year at a Value of a Statistical Life of $10 million totaling $21 million would come **nowhere close** to exceeding annualized Rule costs of $266.9 million. 88 FR 6481.

Nor can the Agency attribute to its Rule the prospective saving of those lives because braces on pistols marginally account for no more than a minuscule fraction of the $21 million in losses; i.e., in the presence of the Brace Rule, murderers would still be able to use unlawful braced pistols, unlawful SBRs, rifles, shotguns, and handguns to commit mass murder. The marginal impact of a brace's concealability

16

and shouldering are only a minuscule proportion of the total effect of the firearm's other deadly factors. Agency presented zero evidence these murders involved concealing the braced pistols or placing them against the shoulder, and the Agency lied in its Rule claiming "the shooters in both instances reportedly [used] the 'brace' as a shoulder stock when neither of two news articles it cited mentioned anything about shouldering the braces. 88 FR 6495 and n. 67. Lying about facts is not reasoned decision-making.

## F.    Rule of Lenity

Again, the Agency's response to Miller's arguments vis-à-vis the Rule of Lenity misses the mark, by misrepresenting Miller's arguments and making generalized, hand-waving statements.

Miller's argument was crystal clear. A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be ***held and fired by the use of a single hand***," and "any combination of parts from which" a handgun "can be assembled." [emphasis added] 18 U.S.C. § 921(a)(30). A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels ***when held in one hand*** that has both a chamber as an integral part of, or permanently aligned with, the bore and a short stock designed to be gripped by one hand at an angle to and extending below the line of the bore." [emphasis added] *See* 27 C.F.R. 478.11 and 479.11. Since the advent of

17

stabilizing braces, Agency classifications expressly said braces assisted users in firing the pistols with a single hand. It maintained this interpretation for more than eight years. Now, after a change in presidential administrations, it asserts the opposite: that braces do not assist users in firing with one hand. The adjudicative fact that people (including Miller) can and do use braces as originally designed for one hand proves the factual proposition.

A rifle is defined by the GCA as "a weapon ***designed or redesigned, made or remade, and intended to be fired from the shoulder*** and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." [emphasis added] 18 U.S.C. § 921(a)(7). Agency contends that braces facilitate firing a pistol from the shoulder.

Taking both propositions as true, *arguendo*, that a braced pistol is designed both to be fired with one hand and from the shoulder, the Rule of Lenity demands that courts interpret the statute such that owners of braced pistols do not suffer criminal liability merely because they ***can*** fire it from the shoulder.

The Agency's mere cry that the Supreme Court's decision in *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 511 (1992) does not advance Miller's claim fails to understand that court's decision. Given a firearm that could be *either* a pistol, rifle, or SBR, the Court applied the Rule of Lenity to conclude the Contender Kit was not an NFA regulated SBR simply because an SBR could be made. This is

exactly analogous to the instant case. The mere fact that a user of a braced pistol *could* use it against his shoulder does not make it an SBR because of the availability of using the brace as a stabilizing brace in one hand. Mere possession of a braced pistol does not support any inference of intent to shoulder the firearm.

## G.    The NFA, GCA, and Rule Violate the Second Amendment

### 1.  Agency Cannot Simply Declare SBRs to be Dangerous and Unusual

Agency argues that the Second Amendment is not implicated because short-barreled rifles are among a class of weapons that Congress has considered "dangerous and unusual." *Br. Appellees* at 41. The district court erred by completely ignoring adjudicative facts demonstrating braced pistols and SBRs are bearable arms in common use for lawful purposes, they are not dangerous and unusual, and there exists no historical analogues to the Founding of regulating them.

Neither Congress nor an agency can declare adjudicative facts that determine the outcome of a case. Courts must make an independent determination of dispositive facts based on evidence presented to it. *National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 184 (D.D.C. 1948) "Congress has no power, by mere legislative fiat, to create a fact or to change a fact." *Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761, 762 (9th Cir. 1937). "Congress cannot establish its own power by a mere affirmation of fact." *National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 185 (D.D.C. 1948). "It is well settled

that a factual reality can not be changed or overcome by mere legislative fiat and that a legislative declaration which is clearly contrary to the actual facts will not be recognized or sanctioned in a judicial proceeding." *Hope Natural Gas Company v. The West Virginia Turnpike Commission*, 143 W. Va. 913, 105 S.E.2d 630.

2. SBRs and Braced Pistols Are Neither Dangerous Nor Unusual.

The U.S. Supreme Court clearly explained that the "dangerous and unusual" test is a *conjunctive* test; a weapon subject to constitutional restrictions must be ***both*** dangerous ***and*** unusual. *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016). The High Court also made it clear that "dangerous" weapons do not include "weapons [that] belong to a class of arms commonly used for lawful purposes." *Id*. "*Heller* defined the 'Arms' *covered by* the Second Amendment to include 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.*

Agency's Rule ***admits*** that there are at least three million braced pistols owned by private citizens for lawful purposes, and as many as seven million. Agency records show at least 600,000 registered short barreled rifles. These numbers of firearms far exceed the threshold of commonality of "[h]undreds of thousands of Tasers and stun guns" that have been sold to private citizens. *Caetano* at 420. As with tasers and stun guns, braced pistols and SBRs are "widely owned and accepted as a legitimate means of self-defense across the country." *Id*. Importantly, SBRs are

20

legal to own in all but five states and the District of Columbia. Moreover, the number of SBRs necessary to satisfy the commonality test cannot be restrained by presumptively unlawful laws restricting their possession, such as the NFA; this would provide a circular justification of "These guns are not in common use for lawful purposes, but they are not in common use because they have been unlawfully restricted."

Without any rebuttal from the Agency, Miller proved using a basic equation from physics, that SBRs have projectiles with *far* less energy than otherwise identical longer-barreled rifles. *Application* at 30. The longer a barrel, the higher the velocity of the projectile. Since kinetic energy equals one-half the mass of a bullet times its squared velocity, an increase in velocity increases kinetic energy at an exponential rate. Kinetic energy is the measure of the danger of any firearm's projectile.

Miller also proved that SBRs and braced pistols are *less* concealable than otherwise identical pistols without a stock or brace because they are smaller. Handguns, which are obviously more concealable than SBRs, are expressly protected by the Second Amendment. *See Bruen*.

With a lengthy set of historical examples, Miller proved that rifles, muskets, and shotguns with short barrels were in common use for lawful purposes even before the ratification of the Second Amendment. *Complaint* ¶¶ 67—78; *Application* at 29.

Appellee's opposition in the district court and its appellate brief failed to raise a single historical analogue of regulating short barreled weapons from the time of the Founding, or regulating *concealable* weapons as opposed to *concealed* weapons.

Even if Agency identified historical *state* level regulation of short barreled firearms, states have police powers that the federal government does not possess. *See Lopez and Comstock, supra*.

3. NFA Regulations and Taxes Are Unconstitutional

For the first time on appeal, Agency seeks to rescue its failed attempt to rebut Miller's arguments in the district court against the regulation and taxation of SBRs, forfeiting the argument. Agency employs a bevy of irrelevant historical regulations having nothing to do with NFA regulated firearms.

Agency claims that "The NFA, enacted nearly a century ago, is also 'consistent with this Nation's historical tradition of firearm regulation.' *Bruen*, 142 S. Ct. at 2126." *Br. Appellees* at 46. While citing the proper standard, Agency failed to provide even a single analogous historical regulation of short barreled rifles. Agency's purported historical analogues come from the mid-19th century, all of which *precede* ratification of the Fourteenth Amendment and certainly did not exist at the time the Second Amendment was ratified.

First, Agency claims that "The colonies routinely imposed requirements that – like the NFA – authorized the government to keep a record of firearm ownership

in the community." *Br. Appellees* at 46. This argument, were it to be accepted, pertains only to the *registration* requirement of the NFA, not its onerous taxes and restrictions. Agency also misses the mark claiming *the federal government* may impose registration requirements because *colonies* did so. States and colonies have police powers that the federal government does not possess. "Unlike the states, the federal government has no general police or *parens patriae* power. *United States v. Lopez*, 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *U.S. v. Comstock*, 551 F.3d 274, 278 (4th Cir. 2009)(reversed on other grounds, relevant holding sustained in *U.S. v. Comstock*, 560 U.S. 126, 148 (2010).)

Next, Agency raises irrelevant historical inspection requirements: "a number of colonies and early States imposed inspection or testing requirements that – like the NFA's scheme – were aimed at ensuring safe firearm possession." *Br. Appellees* at 47. The NFA contains no inspection or testing requirements, and the reference to these laws is impertinent. To the extent Agency is referring to its evaluation of firearms and parts to produce classification letters, these are not done to ensure safety of the operation of guns, which is not within the Agency's authority. Agency blathers about inspecting barrels and requiring licenses for gunpowder, which have nothing to do with the issues of the instant case. Agency hobbles these irrelevant laws together to argue for a ***general*** history of regulation, but the decision in *Bruen* requires ***specific*** historical analogues, though not exact twins.

23

Agency can muster a history of only **four** states imposing "direct taxes on firearm ownership" in the mid-19th century. *Br. Appellees* at 47. All these taxes are small *sales* taxes to raise revenue, not the onerous, prohibitive taxes of the NFA designed to bar all but the wealthiest people from ownership of regulated goods. As the Supreme Court observed, "[fe]w laws in the history of our Nation have come close to [that] severe restriction." *Bruen*, at 2128; *Heller* at 629.

A Mississippi statute imposed a "tax of two dollars on each duelling or pocket pistol, except such as are kept for sale by merchants or artizans, or kept for use by military companies." Add.92.[1] Depending on which pistol a consumer purchased, this tax ranges from about 6 percent to 20 percent of the price of a firearm, similar to ordinary sales taxes, which states still impose to this day and which no one contends is unlawful. This is a far cry from the NFA's 100 percent tax on machineguns and 40,000 percent tax on silencers, which were designed to price these goods out of the market, circumventing the constitutional right guaranteed by the Second Amendment.

---

[1] Agency employed no pinpoint citations nor quotes or descriptions of the laws it cited in its addendum, forcing Plaintiff to search for what taxes it alluded to, to rebut its general reference to state laws. This is typical of the Agency's "drive-by" litigation tactic of casual reference to inapposite law and statute. As shown here, a falsehood expressed in one sentence takes paragraphs to rebut.

A mid-19th century North Carolina law imposed a $1.25 tax "On every pistol, ***except such as are used exclusively for mustering***…" A Georgia law imposed a one dollar tax (about 6.5 percent) on "every gun or pistol, musket or rifle ***over the number of three*** kept or owned on any plantation in the counties aforesaid." [emphasis added] *Add*.100—101. An Alabama law imposed a two dollar tax (about 13 percent) on "all pistols or revolvers in the possession of private persons, not regular dealers holding them for sale." Add.105.

Agency falsely asserts that "Taken together, these laws reflect a historical tradition of regulation 'relevantly similar' to the requirements under the NFA … Like these laws, the NFA taxes and regulates (but does not prohibit) firearm ownership to ameliorate the danger that weapons pose and gather information on firearms." *Br. Appellees* at 47. Every tax law cited by Agency was part of the state's *general tax authority* for raising revenue. These laws also imposed taxes on slaves, sale of bonds, real property, toll roads, studhorses and jackasses, interest and dividends; pleasure vehicles; gold, silver and jewelry; clocks, playing cards, harps and pianos; alcoholic beverages, and occupational tools. None of these taxes had anything to do with reducing "dangers" to the public from firearm ownership. This is part of an incessant pattern of sanctionable false and frivolous arguments by the Agency to support unconstitutional laws and regulations.

**H.**     **<u>The District Court Erred Relying on Inapposite Authorities</u>**

Among the Agency's more ridiculous and frivolous arguments accepted blindly by the district court was its contention that the Rule does not implicate Second Amendment rights because braces are accessories, and "laws that regulate the use of firearm accessories or attachment do not generally implicate the Second Amendment." *Br. Appellees* at 12. Agency and the lower court relied on a court decision finding that the Second Amendment does not protect ownership of silencers because they are accessories. *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). *Id.*

The issue in this case is ***not*** whether a pistol brace is an accessory and whether the Second Amendment protects firearm accessories. The issue at bar is whether ***attaching*** a pistol brace to a pistol changes its classification to an SBR. Both the pistol to which a brace is to be attached and the resulting braced pistol ***are*** firearms, the regulation of which are subject to Second Amendment scrutiny. "The NPRM explained that, although ATF generally does not classify unregulated components or accessories alone under the GCA and NFA, there are times when the addition of a component or an accessory to a firearm can affect the firearm's classification." 88 FR 6495.

The *Cox* case is even more irrelevant because the Agency has long stated, and courts have held, that the Agency has no authority to regulate firearm parts and

26

accessories. "ATF has no general authority to regulate weapon parts." *VanDerStok*

*v. Garland*, Civil Action 4:22-cv-00691-O, at *12 (N.D. Tex. Sep. 2, 2022).

## <u>CONCLUSION</u>

For the reasons set forth in Miller's *Complaint*, *Application*, and his appellate

briefs, this Court should hold the Agency's Rule unlawful and set it aside pursuant

to 5 U.S.C. § 706.

Executed November 20, 2023.          Respectfully submitted,

/S/

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P. 32(g), Appellant certifies that this petition complies with all the requirements set forth in Fed.R.App.P. and Circuit Rules.

Appellant certifies this motion complies with the type-volume limitations in Circuit Rule 27(d) because it consists of 6,487, not including words exempted under Fed.R.App.P. 32(f).

This motion complies with Fed.R.App.P. 27(d)(1)(E) and 32(a)(5)—(6) because it uses proportionally-spaced, 14-point, Times New Roman font, double spaced on 8 ½ by 11-inch paper with one-inch margins on all four sides.

Executed November 20, 2023                    Respectfully submitted,

/S/ _____

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to D.C. Circuit Rule 35(c), Appellant, *pro se*, is a private individual with no parent corporations, affiliates, or publicly held corporations with interest in this case.

Executed November 20, 2023.          Respectfully submitted,

/s/ _____

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## **CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on November 20, 2023, a copy of the

foregoing **APPELLANT'S INFORMAL OPENING BRIEF** was filed by

CM/ECF.

I caused a copy of this filing to be served by CM/ECF to:

Sean R. Janda
U.S. DOJ
950 Pennsylvania Ave NW
Room 7260
Washington, DC 20530
(202) 514-3388
Sean.r.Janda@usdoj.gov

Robert M. Miller, *pro se*